# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

ANTHONY D. BRESSI,
DAMONICO L. HENDERSON, and
TERRY HARRIS,

Defendants.

No. 4:19-CR-00207

(Chief Judge Brann)

## MEMORANDUM OPINION

### FEBRUARY 28, 2023

After a multi-year investigation into a large-scale, cross-border drug distribution scheme, the Government sought and secured an indictment against three alleged co-conspirators: Anthony Bressi, Damonico Henderson, and Terry Harris. Both the investigation and the evidence it uncovered were extensive. Physical surveillance. Video surveillance. Bank records. Cell phone records. Cooperating witnesses. Searches. Seizures. Through these efforts and with this evidence, the Government obtained Bressi's confession and cooperation—he disclosed the details of the scheme, identified his two co-defendants, and participated in controlled buys to both.

His admission and assistance notwithstanding, Bressi has pleaded not guilty. As have Henderson and Harris. And the three men, in contesting the cases against them, have filed a litany of pretrial motions—eleven in total. But what the

Defendants have in quantity, they lack in quality. As detailed below, these motions to suppress and to sever are without merit. They are therefore denied.

## I.   BACKGROUND

### A.   Factual Background

#### 1.   Start of the Investigation

In the summer of 2016, the Federal Bureau of Investigation began investigating the financial dealings of Anthony Bressi,[1] an ex-convict who served extended prison sentences for manufacturing explosives and methamphetamine.[2] Following his release from prison in 2014, Bressi formed a limited liability company named SHIVA Science & Technology Group LLC ("SHIVA") and then opened business checking and savings accounts for SHIVA, as well as a personal checking account in his name, with M&T Bank.[3] Over the next two years, Bressi made a series of cash deposits into these accounts that appeared to be "structured"—that is, made in amounts below the $10,000 minimum bank reporting requirement— ███████████████████████████████████ ██████████████████████ tipping off the FBI to possible money laundering.[4]

The FBI then contacted Bressi's probation officer (at the time, Bressi was under supervision following his release from federal prison) about the possibility

---

[1]   *See* GX 11.1 (Jan. 24, 2018, Case Opening File).
[2]   *See* GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 4–5.
[3]   *Id.* ¶¶ 14, 17.
[4]   *See* GX 11.1 (Jan. 24, 2018, Case Opening File) at 1–4.

of information sharing.[5] The United States Probation Office for the Middle District of Pennsylvania notified this Court and requested authorization "to share information and intelligence with any law enforcement agency involved in [the] investigation" into Bressi's "abnormal [banking] activity."[6] The Court granted this request on October 14, 2016.[7]

Around this time, Bressi closed the accounts with M&T Bank and opened new business and personal bank accounts with First Keystone Community Bank.[8] Consistent with this Court's October 2016 Order, Bressi's probation officers then provided the FBI with copies of Bressi's and SHIVA's bank statements with First Keystone.[9] ███████████████████████████████████████████ ████████████████████████████ multiple "suspicious cash transactions" between February and November 2017 totaling approximately $740,000.[10] ████████ ████████████████████████ Bressi entered the bank's branch in Danville, Pennsylvania (where Bressi lived) with a "black duffel bag which contained the cash deposit."[11] First Keystone's employees found this particularly suspect given

---

5  *See* Doc. 211-1 (Oct. 14, 2016, Court Authorization for Information Sharing Between Probation and the FBI).
6  *Id*.
7  *Id*.
8  GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 17–18.
9  *Id*. ¶ 46.
10  GX 11.1 (Jan. 24, 2018, Case Opening File) at 3.
11  *Id*.

that "SHIVA, as portrayed by Bressi and its website, does not appear to be a business that would deal in cash."[12]

### 2. Initial Investigative Steps

The FBI officially opened its investigation into Bressi in January 2018.[13] In the eighteen months that followed, the Government built its case against Bressi and his co-defendants, Henderson and Harris, through a series of investigative actions.

<u>Banking Records</u>: ███████████████████ the Government obtained grand jury subpoenas for Bressi's and SHIVA's bank records.[14] These records indicate that between August 2018 and June 2019, Bressi made cash deposits totaling nearly $1.8 million into SHIVA's First Keystone business checking account.[15] During this period, there were no incoming wire transfers or business checks deposited into SHIVA's account.[16] Instead, the account was funded exclusively by cash deposits.[17] Bank personnel informed the FBI that Bressi personally made all the cash deposits at First Keystone's Danville branch.[18] According to the bank officials, Bressi stated that he "liked to deal in cash" and

---

[12] *Id.*
[13] *Id.* at 1.
[14] *See* Doc. 208 (Bressi Omnibus Mot. – Gov't Opp.) at 4.
[15] GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶ 19.
[16] *Id.* ¶ 22.
[17] *Id.*
[18] *Id.* ¶ 20.

"does not like checks"; and when pressed by bank personnel, he offered only "vague answers about his business."[19]

SHIVA's Internet Profile and Purchase Activity: According to SHIVA's website, the company was involved in "Tech Developments" and "Consulting & Custom Solutions."[20] SHIVA claimed to be "in the process of developing some world-changing technologies in fields as diverse as energy, medicine, beverages, communications, entertainment, aerospace, transportation, chemistry, robotics, artificial intelligence, and defense."[21] SHIVA's Facebook page highlighted certain products it was purportedly designing and manufacturing, including "Dazzle Coating"—which it described as "a coating to protect aircraft, drones, rockets, and other vehicles from laser directed energy weapons"—and a "Beverage Synthesizer"—a device designed to "chemically reproduce any known beverage."[22] SHIVA described itself as "Sci-Fi Realized" because "many of [its] products do just that—turn science fiction into science fact."[23]

In truth, SHIVA was long on fiction and short on fact. The FBI's review of the purchase activity within SHIVA's business checking account did not reveal any purchases relevant to Dazzle Coating, the Beverage Synthesizer, or any other

---

[19] *Id.*
[20] *Id.* ¶ 23.
[21] *Id.*
[22] *Id.* ¶¶ 24, 45.
[23] *Id.* ¶ 23.

products SHIVA publicized online.[24] Instead, the FBI discovered purchases

through Amazon, PayPal, and other online platforms of laboratory equipment such

as Tyvek suits, respirators, separating tables, and glassware for bulking

chemicals.[25] These records—supplemented by Federal Express delivery records

obtained via administrative subpoena—establish that SHIVA also purchased

several chemicals "that are known pre-cursors that can be used for illegal drug

production including but not limited to methamphetamine and fentanyl."[26]

Although some of these chemicals have legitimate uses, the FBI uncovered an

invoice for 5.1 kilograms of the chemical compound "3-Methyl-1-

phenethylpiperidin-4-one," which, according to a forensic chemist with the U.S.

Drug Enforcement Administration ("DEA"), is a "precursor for 3-methylfentanyl"

with no legitimate, licit use.[27]

Following these discoveries, the FBI elected to conduct a "trash pull" from a

dumpster on SHIVA's commercial property, which was located along Route 15 in

Lewisburg, Pennsylvania.[28] At approximately 5:00 p.m. on November 29, 2018,

Pennsylvania State Police Troopers Ryan Kelley and Russell Burcher, who were

coordinating with the FBI investigative team, drove to the SHIVA property,

opened the dumpster outside the building, seized two trash bags from inside, and

---

[24]  *Id.* ¶ 27.
[25]  *Id.*
[26]  *Id.*
[27]  *Id.* ¶¶ 27–31.
[28]  *Id.* ¶ 32.

then drove off.[29] The dumpster was located in the parking lot a short distance off

Route 15; there was no gate or fencing around either the parking lot or the

dumpster, and the dumpster was not secured by a lock, chain, or any other

mechanism.[30]

Inside the SHIVA trash bags, the FBI uncovered, among other items, two

empty glass bottles of the chemical "Aniline" and a white laboratory coat stained

with residue of Aniline and 4-Anilinopiperidine.[31] An FBI chemist informed the

investigatory team that these are "precursors used in the synthesis of fentanyl and

fentanyl [analogues]," though they "are known to have other uses outside of

fentanyl synthesis."[32] The DEA chemist confirmed that 4-Anilinopiperidine is

"used in a synthesis method of fentanyl" and "advised that the identification of

Aniline and 4-Anilinopiperidine on the lab coat is pretty convincing evidence of

fentanyl synthesis."[33]

Interviews with Confidential Witnesses: In addition to monitoring SHIVA's

internet profile and purchasing activity, the FBI interviewed multiple confidential

---

[29]   Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Burcher Testimony) at 65:9–70:10.

[30]   *Id*. at 68:4–6 ("Once I got to the dumpster, the lid was unsecured. There was no lock. There
       was no chain. There was nothing securing the lid of the dumpster."), 69:3–16 ("Q. And if we
       could go back to Exhibit 2.0. Again, there's no—there's no fence around the building or
       parking lot in this picture, correct? A. Correct. Q. And there's no—there's no gate or—or
       specific entryway into the parking lot that's visible in this picture, correct? A. Correct. . . . Q.
       In this picture, there's no fence around the dumpster itself, is there? A. There is not."); *see also*
       GX 2.0 (Photo of SHIVA Dumpster); GX 2.1 (Photo of SHIVA Dumpster).

[31]   GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 32–33.

[32]   *Id*. ¶ 33.

[33]   *Id*.

witnesses with knowledge about Bressi and SHIVA.[34] The FBI has identified the first confidential witness ("CW-1") as "a person who claimed to have been in a relationship with [Bressi] but [who] broke off the relationship after discovering that [he] was on federal probation and . . . involved in drug trafficking."[35] CW-1 told the FBI about her relationship with Bressi, recounting multiple instances in which Bressi spent thousands of dollars in cash on luxury items for CW-1—including $5,000 for a pair of diamond earrings and $18,000 for a Land Rover.[36] CW-1 also stated that Bressi "regularly" traveled to Cleveland, Ohio to "see a black man named 'Monty,'" and that every time Bressi met up with Monty, "he returned with a big black bag full of cash."[37]

The second confidential witness ("CW-2") worked at SHIVA.[38] Although Bressi purportedly hired CW-2 to "manage SHIVA's clients and do marketing," CW-2 informed the FBI that he/she "never met a client."[39] According to the FBI, CW-2 "was not aware of any type of service being provided by SHIVA" and "never saw any product from SHIVA go out the door for sale."[40]

<u>Meetings Between Bressi, Henderson, and Harris</u>: The FBI and its partners at the State Police also reviewed the Defendants' historical cell phone location

---

[34]  *See id.* ¶¶ 53–56.
[35]  *Id.* ¶ 53.
[36]  *Id.* ¶ 55(c), (f).
[37]  *Id.* ¶ 55(d).
[38]  *Id.* ¶ 56.
[39]  *Id.* ¶ 56(d).
[40]  *Id.* ¶56(e).

information and surveilled the Defendants and the SHIVA commercial property.[41] Through these efforts, the FBI observed several meetings between Bressi and his co-defendants, Henderson and Harris.[42]

For example, using prospective location and pen register data for Bressi's and Harris's cell phones, the FBI learned that Bressi and Harris arranged a meeting at the Springfield Mall outside Philadelphia, Pennsylvania on September 12, 2018.[43] That day, local police officers were dispatched to perform physical surveillance at the mall; they identified Bressi and a black male, who they believed to be Harris, exit a store together and walk toward their respective vehicles.[44] They saw Bressi grab an unidentified object from the trunk and place the object in the other man's car.[45] The two men shook hands and then went their separate ways.[46]

The FBI then contacted the State Police and asked them to conduct a lawful traffic stop of Bressi.[47] State Police Trooper Luke Straniere, who was positioned on Interstate-80, spotted Bressi's vehicle and followed it for about a mile.[48] During this time, Trooper Straniere "paced" Bressi's vehicle, matching Bressi's speed and

---

[41]  *Id.* ¶¶ 57–95.

[42]  *Id.*

[43]  *Id.* ¶ 59.

[44]  *Id.* ¶ 60.

[45]  *Id.*

[46]  *Id.*

[47]  *Id.* ¶ 61.

[48]  Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 80:8–17 ("I was able to use my speedometer to clock the vehicle at a speed of 80 miles an hour in a posted 70 mile an hour zone. . . . [T]he duration of the clock was approximately one mile doing 80—80 miles an hour. My speedometer read 80 miles an hour, and the distance between my vehicle and the Mercedes neither increased nor decreased.").

9

monitoring his speedometer to determine how fast Bressi was driving; he registered Bressi's vehicle traveling 80 miles per hour in a 70-miles-per-hour zone.[49] Trooper Straniere then conducted the traffic stop, which lasted approximately 24 minutes.[50] During the stop, Bressi "displayed a nervous demeanor"[51]—his hands were shaking, voice quivering, and the vein in his neck visibly pulsating.[52] Bressi also lied to Trooper Straniere about his travel: Bressi said that he was coming from a business meeting in Hazelton (though Trooper Straniere knew he was returning from the Philadelphia area) and claimed he left his home at 2 p.m. (though Trooper Straniere knew that to be impossible given that Bressi was traveling between his home in Danville and the Springfield Mall outside Philadelphia).[53]

Bressi then consented to a pat-down and vehicle search.[54] During the pat-down, Trooper Straniere discovered a wad of cash totaling $2,000.[55] And in the

---

49   *Id.*
50   *See* GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording).
51   GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶ 62.
52   Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 86:4–24.
53   GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶ 62; *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 86:4–24.
54   GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording); *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 88:16–22 ("Q. Okay. And in this case, you asked Mr. Bressi if you could pat him down; correct? A. That's correct. Q. And did he say yes? A. He did. Both—both verbally and prior to even answering, he put his hands up and turned with his back to me to allow the patdown."), 92:7–14 ("Q. Okay. Did you then conduct a search of his vehicle? A. I did. Q. And when you asked him if you could search the vehicle, do you remember what his response was? A. By all means. Q. Okay. And did you take that to mean he was consenting to the search of his vehicle? A. Yes.").
55   *Id.*

car, Trooper Straniere found an additional $10,000 in cash inside a plastic grocery-style bag.[56] Trooper Straniere then seized the money and took it to the State Police Barracks in Milton for inspection.[57]

Additionally, FBI agents observed two separate meetings in 2018 between Bressi and Henderson (i.e., "Monty") at a Perkins restaurant in Clarion, Pennsylvania.[58] At the second meeting, which occurred on November 30, 2018, agents saw Henderson retrieve a bag from his car and then give the bag to Bressi.[59] Afterwards, Bressi returned home and then deposited $33,000 into his bank account.[60] For his part, Henderson was stopped by the Pennsylvania State Police on his return to Ohio; he told the Troopers that he had been visiting family in New York—a statement they knew to be false.[61]

---

[56]   Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 93:7–13 ("Q. And apart from that approximate[ly] $10,000 that you retrieved from the vehicle, do you recall if you found anything else of note in the vehicle that day? A. No, ma'am, [not] that I can remember. Q. But it was approximately $10,000 in cash wrapped in a grocery-style bag; is that correct? A. Correct.").

[57]   *Id*. at 95:2–10.

[58]   GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 86–91; *see also* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization ¶¶ 57–62.

[59]   GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶ 88; *see also* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization – SEALED) ¶ 59.

[60]   GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶ 89; *see also* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization) ¶ 60.

[61]   GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶ 90; *see also* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization) ¶ 61.

### 3.    June 2019 Search and Interviews

Based on these investigative efforts, the Government sought and obtained a search warrant for the SHIVA property and Bressi's home in Danville.[62] In support of the search warrant application, FBI Special Agent Timothy K. O'Malley, the lead investigator on the case, prepared a lengthy probable cause affidavit detailing the information described above.[63] United States Magistrate Judge William I. Arbuckle authorized the warrants,[64] which the FBI investigators and their partners at the State Police executed that same day.

As shown in video footage of the search, three law enforcement vehicles converged on the SHIVA property as Bressi and his fiancée were preparing to leave for lunch.[65] Agents and officers pulled in front of Bressi's car, exited their vehicles, and confronted the couple, guns drawn.[66] The officers then holstered their firearms and separated the couple.[67] Trooper Kelley guided Bressi to a picnic table on the other side of the SHIVA building, and the two sat down for an interview.[68]

---

[62]  *See* GX 6.0 (June 8, 2019, Search & Seizure Warrant – SHIVA); GX 6.1 (June 8, 2019, Search & Seizure Warrant – Bressi's Home).

[63]  *See* GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit).

[64]  GX 6.0 (June 8, 2019, Search & Seizure Warrant – SHIVA); GX 6.1 (June 8, 2019, Search & Seizure Warrant – Bressi's Home).

[65]  GX 1.2 (June 18, 2019, SHIVA Search Video); GX 1.3 (June 18, 2019, SHIVA Search Video).

[66]  *See* GX 1.2 (June 18, 2019, SHIVA Search Video).

[67]  *Id.*

[68]  *Id.*

Although there is some disagreement about who initiated the interview,[69] by all accounts the interview was friendly and conversational.[70] At no point during the interview was Bressi handcuffed or placed in any other restraint.[71]

According to Special Agent O'Malley's notes, before the interview began, Trooper Kelley "inquired as to whether or not Bressi had been advised of his *Miranda* rights."[72] Bressi stated that he had not; Trooper Kelley responded by "advis[ing] him that he was not under arrest and was under no obligations to speak with" them, and that "no promises would be extended," "no threats would be made," and Bressi "could refuse to answer any questions he liked and he was not obligated to speak to anyone."[73] Bressi said that "he was aware of his rights as he was familiar with these types of situations."[74]

Bressi began the interview by providing a detailed account of SHIVA's purportedly lawful business activities, but after Trooper Kelley outlined "the scope and depth of the investigation" against him, Bressi admitted that he was

---

[69]   During the November 2022 evidentiary hearing, Trooper Kelley testified that "Bressi indicated that he wishe[d] to speak with [him]." Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 137:15–17. But Bressi asserts that Special Agent O'Malley "advised Mr. Bressi . . . that he and [Trooper Kelley] wanted to talk to Mr. Bressi about Shiva." Doc. 151 at 3.

[70]   Doc. 258 (Nov. 15, 2022, Hearing Tr. – Special Agent O'Malley Testimony) at 173:19–22 (describing Bressi's demeanor as "calm and conversational"); Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) at 129:18–19 (describing Bressi as "talkative, very talkative").

[71]   *See* GX 1.2 (June 18, 2019, SHIVA Search Video); GX 1.3 (June 18, 2019, SHIVA Search Video).

[72]   Doc. 216-1, Ex. A (Special Agent O'Malley FBI FD-302 Report – June 9, 2019, SHIVA Interview) at 1 (cleaned up).

[73]   *Id.*

[74]   *Id.*

manufacturing fentanyl and fentanyl analogues.[75] Bressi then informed the investigators that he was currently in the process of making 600 kilograms of carfentanil, a fentanyl analogue, and that in the past, he delivered "finished product in 50 kilogram quantities," which he sold for $25,000 per kilogram.[76]

The investigators later relocated Bressi to the Milton PSP Barracks.[77] Special Agent O'Malley "read [Bressi] his *Miranda* rights," and then restarted the interview.[78] Bressi gave a lengthy videotaped statement in which he detailed his drug manufacturing activities and explained that the batch of carfentanil currently in production was destined for delivery to Harris in Philadelphia and to Henderson, who resided in the greater Cleveland area.[79]

### 4.    Controlled Deliveries

Armed with this information as well as Bressi's continued cooperation, the FBI arranged to proceed with the deliveries to Henderson and Harris—albeit under its supervision and with a different, licit substance substituted for the carfentanil.

First, on June 15, 2019, Bressi met Henderson near the Pennsylvania-Ohio border in Hermitage, Pennsylvania.[80] Law enforcement officers saw Bressi give

---

[75]   Doc. 216-1, Ex. A (Special Agent O'Malley FBI FD-302 Report – June 9, 2019, SHIVA Interview) at 2–8.

[76]   *Id*. at 8–9.

[77]   *See* Doc. 216-2, Ex. B (Special Agent O'Malley FBI FD-302 Report – June 9, 2019, Milton Barracks Interview).

[78]   *Id*. at 1 (cleaned up).

[79]   *Id*. at 2–9.

[80]   Doc. 197 (Mot. to Suppress Physical Evid. – Gov't Opp.) at 3.

Henderson buckets containing the substituted substance, and then followed Henderson from Hermitage to his home in Elyria, Ohio.[81] Once there, the law enforcement officers arrested Henderson and executed a search warrant on Henderson's home, which Magistrate Judge Jonathan D. Greenberg for the United States District Court for the Northern District of Ohio authorized the prior day.[82]

When applying for the search warrant of Henderson's home, the Government submitted a probable cause affidavit prepared by FBI Special Agent Casey T. Carty.[83] The affidavit identifies the location they wished to search (Henderson's home) and the items they were searching for ("evidence, contraband, fruits, and instrumentalities" of illicit narcotics manufacturing and distribution).[84] Further, the affidavit details, among other things, the relationship between Henderson, Harris, and Bressi;[85] Bressi's suspicious banking activity;[86] Bressi's meetings with Harris and Henderson;[87] and the search of SHIVA and Bressi's subsequent confessions.[88]

Second, on June 18, 2019, Harris drove from Philadelphia to Bressi's home in Danville, Pennsylvania to pick up ten buckets of what he believed to be

---

[81] *Id.*

[82] *Id.*; *see also* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization – SEALED)**.**

[83] Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization – SEALED).

[84] *Id.* at 1–2.

[85] *Id.* ¶¶ 7–14.

[86] *Id.* ¶¶ 15–25.

[87] *Id.* ¶¶ 33–67.

[88] *Id.* ¶¶ 68–84.

carfentanil.[89] For this interaction, Bressi was wearing a recording device provided by the FBI, who had agents on site, surveilling the home and recording the exterior of Bressi's house throughout Harris's time at the residence.[90] The video recording shows Bressi and Harris placing ten buckets of the substituted substance into Harris's truck,[91] and the audio recording contains drug-related discussions between Bressi and Harris that arguably indicate Harris was aware of the product he was receiving.[92]

---

[89] Doc. 258 (Nov. 15, 2022, Hearing Tr. – Special Agent O'Malley Testimony) at 163:9–14 ("Q. Harris—was Harris ever seen on those pole cams? A. Yes. Q. When? A. On June 18th, 2019, Mr. Harris traveled from Philadelphia to Mr. Bressi's residence. So he appears on the 63 Cricket Lane camera on June 18th, 2019."), 199:6–9 ("Q. Okay. And there were—there were 10 buckets of Carfentanil that were put in whoever's truck on June 18th, correct? A. Yes."); *see also* Doc. 259 (Nov. 16, 2022, Hearing Tr. – Special Agent O'Malley Testimony) at 21:10–22:20 ("Q. You indicated at the time of the June—June 18th transactions or whatever that occurred at Cricket lane, Mr. Bressi, at that point in time, had already been arrested, correct? A. Yes. . . . Q. So you got Bressi out of one of the local county prisons and you tell him what's going to occur, correct? A. Correct. This was—we don't tell him what was going to occur. I think important here is this was arranged before the search warrant, that this meeting was going to take place at Mr. Bressi's residence on that date. And the details were sured up by a phone call that day, as well. So this—this meeting was a preplanned meeting between Mr. Harris and Mr. Bressi. Q. So you're saying that this meeting was scheduled between Bressi and Harris prior to the June 8th search at SHIVA? A. Yes.").

[90] *See* GX 7.0 (June 18, 2019, Cricket Lane Audio); GX. 7.1 (June 18, 2019, Cricket Lane Video Pt. 1); GX 7.2 (June 18, 2019, Cricket Lane Video Pt. 2).

[91] *See* GX 7.1 (June 18, 2019, Cricket Lane Video Pt. 1); *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Special Agent O'Malley Testimony) at 206:6–13 ("Q. And up to this point, had you—had you and other members of the FBI put lactose into 5 gallon buckets? A. Yes, we did. Q. And what is it that Bressi's carrying and the other gentleman, whoever he may be, is carrying? A. It would be the white five gallon buckets that were filled with lactose that were placed from the garage in to the cab.").

[92] *See* GX 7.0 (June 18, 2019, Cricket Lane Audio).

**B.      Procedural History**

Bressi, Henderson, and Harris were arrested on separate criminal complaints between June 10 and June 18, 2019.[93] Later that month, on June 27, 2019, a federal grand jury in the Middle District of Pennsylvania returned a four-count indictment against the Defendants, charging them collectively with conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances (Count I), and individually with possession with the intent to distribute controlled substances (Bressi – Count II; Henderson – Count III; Harris – Count IV).[94] The Defendants pleaded not guilty.[95]

Relevant here, following his arrest, Henderson has been held at the Lycoming County Prison.[96] During incarceration, Henderson made numerous calls to family and friends.[97] As stated in the Lycoming County Prison Inmate Handbook and reiterated via electronic notice at the beginning of all calls, Henderson's calls were recorded and subject to monitoring.[98]

---

[93] *See* Dkt. No. 19-MJ-00044, Doc. 3 (June 10, 2019, Bressi Compl.); Dkt. No. 19-MJ-00047, Doc. 1 (June 14, 2019, Henderson Compl.); Dkt. No. 19-MJ-00048, Doc. 1 (June 17, 2019, Harris Compl.).

[94] Doc. 16 (Indictment).

[95] Doc. 22 (Harris Not Guilty Plea); Doc. 28 (Bressi Not Guilty Plea); Doc. 38 (Henderson Not Guilty Plea).

[96] Doc. 167 (Mot. to Suppress Prison Calls – Henderson Br.) at 2.

[97] *Id.*

[98] *See* GX 4.0 (Lycoming County Prison Inmate Handbook) at 23 (noting that "[a]ll calls are recorded, may be listened to and divulged"); GX 4.2 (Lycoming County Prison Telephone Call Warning).

Apart from their respective motions for pretrial release, the Defendants have filed eleven different pretrial motions: eight motions to suppress, two motions to sever, and a motion to compel discovery.[99] The parties fully briefed these motions and then requested an evidentiary hearing, which this Court granted and scheduled for November 15 and 16, 2022.[100] Following the evidentiary hearing,[101] the Court permitted the parties to submit supplemental briefing.[102] Having received the parties' supplemental briefs,[103] the Court finds that these motions are now ripe for disposition.

## II.   ANALYSIS

Before the Court now are the Defendants' eleven pretrial motions, which generally fall into two categories: (a) motions to suppress, and (b) severance and discovery motions. The suppression motions include four motions from Bressi and two apiece from Henderson and Harris:

---

[99]   Doc. 150 (Bressi Mot. to Preclude Statements); Doc. 158 (Harris Mot. to Sever); Doc. 160 (Harris Mot. to Preclude Co-Conspirator Statements); Doc. 162 (Harris Mot. to Preclude Tape Recordings and Transcripts); Doc. 166 (Henderson Mot. to Suppress Prison Calls); Doc. 168 (Henderson Mot. to Suppress Physical Evid.); Doc. 170 (Henderson Mot. to Compel); Doc. 172 (Henderson Mot. to Sever); Doc. 186 (Bressi Mot. to Preclude Traffic Stop Evid.); Doc. 188 (Bressi Mot. to Suppress Trash Pull Evid.); Doc. 190 (Bressi Omnibus Mot.).

[100]   *See* Doc. 235 (Scheduling Order – Nov. 15, 2022, Suppression Hearing).

[101]   *See* Doc. 258 (Nov. 15, 2022, Hearing Tr.); Doc. 259 (Nov. 16, 2022, Hearing Tr.).

[102]   *See* Doc. 261 (Dec. 14, 2022, Supplemental Briefing Order).

[103]   *See* Doc. 264 (Harris Post-Hearing Supplemental Br.); Doc. 267 (Bressi Post-Hearing Supplemental Br.). Following the hearing, Henderson elected not to file a supplemental brief.

| Defendant | Motion | Docket Number |
|-----------|--------|---------------|
| **Bressi** | Omnibus Motion to Suppress | Doc. 190 |
| | Motion to Suppress Evidence from the Traffic Stop on September 12, 2018 | Doc. 186 |
| | Motion to Suppress Evidence from the "Trash Pull" on November 29, 2018 | Doc. 188 |
| | Motion to Suppress the Statements on June 8, 2019 | Doc. 150 |
| **Henderson** | Motion to Suppress Prison Calls | Doc. 166 |
| | Motion to Suppress Physical Evidence | Doc. 168 |
| **Harris** | Motion to Suppress Co-Conspirator Statements | Doc. 160 |
| | Motion to Suppress Tape Recordings and Transcripts | Doc. 162 |

Additionally, Henderson and Harris filed motions to sever their trials from Bressi's, and Henderson filed a motion to compel discovery.[104] The Court starts with the Defendants' motions to suppress and then turns to the remaining three motions concerning severance and discovery.

### A.    Motions to Suppress

#### 1.    Bressi's Motions to Suppress

Bressi has filed four separate motions to suppress. The first, which the parties characterize as an "omnibus" motion, challenges the legality of the Government's investigation as well as the searches and seizures performed

---

[104] *See* Doc. 158 (Harris Mot. to Sever); Doc. 170 (Henderson Mot. to Compel); Doc. 172 (Henderson Mot. to Sever).

pursuant to grand jury subpoena.[105] The second concerns a traffic stop that

occurred on September 12, 2018.[106] The third pertains to evidence FBI

investigators seized on November 29, 2018, from the dumpster on the property of

Bressi's business, SHIVA.[107] The final motion seeks to suppress statements made

during a custodial interview held on June 8, 2019, outside the SHIVA building, as

well as the statements he made later that day in an interview at the Pennsylvania

State Police barracks in Milton.[108] For the reasons provided below, these motions

are denied.

### a.      Bressi's Omnibus Motion (Doc. 190)

Bressi's omnibus motion asserts three separate bases for suppression: the

allegedly unlawful (i) genesis of the investigation, (ii) seizure of his bank records,

and (iii) probable cause affidavits underlying the search warrants executed on June

8, 2019. None of these arguments has merit.

### i.      Legality of the Investigation

First, Bressi challenges the legality of the Government's investigation,

arguing that the FBI initiated the investigation only after receiving information

improperly disclosed by the Probation Office.[109] According to Bressi, the probation

officer responsible for his supervision violated Probation's procedures on sharing

---

[105]  Doc. 190 (Bressi Omnibus Mot.).
[106]  Doc. 186 (Bressi Mot. to Suppress Traffic Stop Evid.).
[107]  Doc. 188 (Bressi Mot. to Suppress Trash Pull Evid.).
[108]  Doc. 150 (Bressi Mot. to Suppress Statements).
[109]  Doc. 191 (Omnibus Mot. – Bressi Br.) at 4–6.

information with law enforcement by providing the FBI with details about Bressi's banking activity, employment, and business transactions.[110] Although Bressi does not state this explicitly, it seems he believes this information sharing renders inadmissible all evidence subsequently obtained. But as the Government argues, he is wrong on the both the facts and the law.

Probation officers are employees of the judicial branch hired to, among other things, monitor the conduct and condition of probationers and individuals on supervised release.[111] Probation officers must report this information to the sentencing court.[112] As a general rule, "[p]robation officers in the federal system are not police investigators."[113] That said, courts recognize that "the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined."[114] So long as law enforcement is not using "the probation system for investigatory purposes" to "evade the Fourth Amendment warrant requirement," it is "wholly permissible for law enforcement officers and probation officers to work together and share information to achieve their objectives."[115] Moreover, as "probation and supervised release files are under

---

[110] *Id.* at 6.

[111] 18 U.S.C. §§ 3602, 3603(2).

[112] *Id.*

[113] *United States v. Lacerda*, 958 F.3d 196, 219 (3d Cir. 2020).

[114] *United States v. Reyes*, 283 F.3d 446, 463–64 (2d Cir. 2002).

[115] *United States v. Penson*, 141 F. App'x 406, 410 (6th Cir. 2005) (internal quotation marks and citation omitted); *see also United States v. Harper*, 928 F.2d 894, 897 (9th Cir. 1991) ("[P]olice may not use a parole officer as a 'stalking horse' to evade the fourth amendment's warrant requirement. However, police and parole officers are entitled to work together to achieve their objectives; concerted action does not in and of itself make a search constitutionally infirm.")

the court's jurisdiction," the Court is authorized to grant Probation permission to share information with law enforcement.[116]

Here, Bressi misconstrues the genesis of the FBI's investigation into his alleged criminal conduct. The investigation into Bressi did not originate with the information provided by Probation; rather, the FBI began monitoring Bressi after it received reports of Bressi's suspicious banking activity.[117] According to the FBI's Case Opening File, on July 16, 2016, M&T Bank filed a SAR noting eleven cash deposits between February and April of that year totaling $82,000 that appeared to be "structured" to avoid bank reporting requirements.[118] Bressi purportedly informed M&T Bank personnel that "he receives cash by courier because the companies he works for do not want a paper trail."[119] The Case Opening File highlights a second SAR filed in early October 2016, which discloses cash deposits that Bressi made between October 5, 2015, and October 10, 2016, totaling $71,000

---

(internal citations omitted), *overruled on other grounds by Unites States v. King*, 687 F.3d 1189 (9th Cir. 2012). In *United States v. Williams*, the Third Circuit held that the Supreme Court's ruling in in *United States v. Knights*, 534 U.S. 112 (2001), "precludes the viability of 'stalking horse' claims"—that is, claims that a probation officer's search was premised on an impermissible, purely investigatory purpose. 417 F.3d 373, 377–78 (3d Cir. 2005). Instead, "ordinary Fourth Amendment analysis dictates the propriety of a search." *Id*. This Court views the Third Circuit's holding in *Williams*, clarifying the framework for assessing the constitutionality of probationary searches, as consistent with the ruling in *Penson* that law enforcement cannot use Probation to bypass Fourth Amendment restrictions. 141 F. App'x at 410.

[116] *See* Guide to Judiciary Policy, Vol. 8 (Probation and Pretrial Services, Part E (Post-Conviction Supervision)) Ch. 5, § 510.10.

[117] Doc. 208 (Omnibus Mot. – Gov't Opp.) at 5.

[118] GX 11.1 (Jan. 24, 2018, Case Opening File) at 2.

[119] *Id*.

that were similarly structured.[120] Bressi provided "vague" and "evasive" answers when questioned by bank staff about these transactions.[121] He closed the account on October 11, 2016.[122]

It was only after that disclosure that the FBI approached Probation about sharing information on Bressi.[123] Probation promptly notified this Court and requested authorization "to share information and intelligence with any law enforcement agency involved in [the] investigation" into Bressi's "abnormal [banking] activity."[124] The Court granted that request on October 14, 2016.[125] Accordingly, as the Government contends, all subsequent communication and information sharing between Probation and the FBI were therefore "judicially authorized."[126]

Moreover, even absent judicial authorization, nothing in the record indicates that the FBI impermissibly used Bressi's probation officer to "evade the Fourth Amendment warrant requirement."[127] On this, the Court finds instructive the United States Court of Appeals for the Eighth Circuit's ruling in *United States v. Shurn*.[128] In that case, law enforcement began investigating the defendant, a

---

[120] *Id*. at 3.

[121] *Id*.

[122] *Id*.

[123] *See* Doc. 211-1 (Oct. 14, 2016, Court Authorization for Information Sharing Between Probation and the FBI).

[124] *Id*.

[125] *Id*.

[126] Doc. 208 (Omnibus Mot. – Gov't Opp.) at 7.

[127] *Penson*, 141 F. App'x at 410.

[128] 183 F. App'x 598, 600–02 (8th Cir. 2006).

parolee, after receiving an anonymous phone call about the defendant's suspected narcotics dealing.[129] The lead detective spoke with the defendant's parole officer repeatedly throughout his investigation; the parole officer verified addresses associated with the defendant (which police subsequently surveilled), told the detective about the defendant's suspected abuse of his fiancée, and then disclosed the defendant's temporary participation in a drug rehabilitation program.[130] The defendant sought to dismiss the indictment based on these *ex parte* communications, arguing that his probation officer became "an advocate for the prosecution," thereby "intertwining the judicial and executive branches" in violation of his constitutional rights to be tried by an impartial tribunal.[131]

The Eighth Circuit rejected this argument, explaining that "[i]n our judicial system, police officers and probation officers must often work together and share information."[132] Because the contacts between the parole officer and detective "did not dominate the police investigation"—neither the parole officer nor the detective "relied exclusively on information from each other in their individual investigations"—the Eighth Circuit concluded that "[t]here was no violation of due process or other unconstitutional commingling of governmental powers."[133]

---

[129] *Id.* at 600.
[130] *Id.*
[131] *Id.* at 601.
[132] *Id.*
[133] *Id.* at 601–02.

Just as in *Shurn*, the law enforcement agents investigating Bressi communicated with Bressi's probation officers throughout the investigation—the probation officers detailed their observations of Bressi's home and workplace, and provided the FBI with copies of bank statements from Bressi's personal checking and savings accounts and from SHIVA's business checking account[134]—but these contacts in no way "dominate[d]" the FBI's investigation.[135] As explained, the FBI investigation started with, and then built upon, reports of Bressi's suspicious banking activity provided by various retail bank branches in July and October 2016.[136] The suspect activity, which continued into 2019, was substantial and well-documented.[137] Indeed, between October 2015 and June 2019, Bressi made cash deposits into SHIVA's business checking accounts at M&T Bank and First Keystone totaling more than $1.8 million.[138] Further, the probable cause affidavit attached to the June 2019 Search Warrant Application details the extensive, multi-year investigation into Bressi's suspected criminal activity, which included interviews with bank personnel and certain confidential witnesses, an analysis of SHIVA's internet profile and purchase activity, a review of FedEx deliveries to SHIVA's corporate address, the seizure and subsequent testing of trash outside the

---

[134]  GX 11.1 (Jan. 24, 2018, Case Opening File) at 4; *see also* GX 6.0 (June 8, 2019, SHIVA Search Warrant) at 19–33.

[135]  *Shurn*, 183 F. App'x at 601.

[136]  GX 11.1 (Jan. 24, 2018, Case Opening File) at 2–3.

[137]  *Id* at 2–4; *see also* GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 16–22.

[138]  *Id.*

SHIVA building, the collection and analysis of current and historical precision location data for the Defendants' cell phones, as well as video and human surveillance of the Defendants and the SHIVA building.[139]

Because the FBI agents investigating Bressi did not "rel[y] exclusively" on information from Bressi's probation officer in its investigation, the Court concludes that "[t]here was no violation of due process or other unconstitutional comingling of government powers."[140] Bressi's motion to suppress predicated on the discussions between the investigating FBI agents and his probation officer is denied.

### ii.      Bressi's Bank Records

Bressi next asks the Court to suppress all evidence seized on or before June 8, 2019.[141] According to Bressi, the Government's seizure of his bank records, pursuant to grant jury subpoena, was unlawful, and because these records served as the basis for the remaining evidence seized on or before June 8, 2019, the evidence should be suppressed.[142] But, again, Bressi is simply incorrect.

First, Bressi argues that his bank records are protected by the Fourth Amendment, and therefore the Government should have secured a warrant to access them—rather than procuring the records via grand jury subpoena.[143] Bressi

---

[139]  GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 14–102.
[140]  *Shurn*, 183 F. App'x at 601–02.
[141]  Doc. 191 (Omnibus Mot. – Bressi Br.) at 7–11.
[142]  *Id*.
[143]  *Id*. at 9.

acknowledges that in *United States v. Miller*, the Supreme Court of the United States held that under the third party doctrine—which provides that "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party"—a bank customer has no constitutionally protected expectation of privacy over financial records held by the bank.[144] However, Bressi asserts that this ruling must be reexamined because "[i]n modern day banking, a person does not relinquish control of information, including personal identifying information, by supplying the information to a bank."[145] According to Bressi, this reexamination flows naturally from the Supreme Court's 2018 ruling in *Carpenter v. United States*.[146]

Bressi is wrong. In *Carpenter*, the Supreme Court considered whether the third party doctrine obviated an individual's privacy interest in, and thus Fourth Amendment protection of, his cell phone location records.[147] Noting the "unique nature of cell phone location records"—which it described as "detailed, encyclopedic, and effortlessly compiled"—the Supreme Court held that "an individual maintains a legitimate expectation of privacy in the records of his physical movements as captured through" cell phone data.[148] In reaching that conclusion, the Supreme Court explicitly distinguished cell phone location records

---

[144]  425 U.S. 435, 440–43 (1976).
[145]  Doc. 191 (Omnibus Mot. – Bressi Br.) at 9.
[146]  *Id*. at 8–9 (citing *Carpenter v. United States*, 138 S.Ct. 2206 (2018)).
[147]  138 S.Ct. at 2216–20.
[148]  *Id*. at 2216–17.

from bank records, explaining that although "the third-party doctrine applies to . . . bank records," cell-site records are "qualitatively different."[149]

As such, despite the changes in banking technology and record keeping since the Supreme Court decided *Miller* in 1976, the *Carpenter* ruling in no way undermines the continued validity and precedential force of *Miller*. Quite the opposite. Last year, in *United States v. Hall*, the Third Circuit rejected a claim identical to the one Bressi advances here—that he "had a Fourth Amendment-protected privacy interest in the contents of his bank records"— because it "is squarely foreclosed by *Miller* and the third-party doctrine," and "[t]he Supreme Court reaffirmed *Miller* as good law in *Carpenter*."[150] Consistent with *Hall*, Bressi's motion to suppress bank records obtained via subpoena, rather than with a search warrant, is denied.

Second, Bressi contends that regardless of whether bank records can be lawfully obtained via grand jury subpoena, the seizure was nonetheless improper because the Government did not have a legal basis to initially subpoena Bressi's records. Bressi describes the grand jury investigation as "officious meddling" in his affairs, a "fishing expedition," and an improper "attempt to undermine the

---

[149] *Id.*
[150] 28 F.4th 445, 458 (3d Cir. 2022).

legitimate business [he] was undertaking through SHIVA."[151] But hyperbole aside, Bressi provides no factual or legal basis for this accusation.

Given the grand jury's "functional independence" from the Judicial Branch, courts have been loath to intrude on the grand jury's function and procedures.[152] So long as the grand jury's investigation is for a "lawfully authorized purpose,"[153] courts afford the grand jury wide latitude in carrying out its "investigatory function."[154] And in setting the parameters for a "lawfully authorized purpose,"[155] courts again provide the grand jury broad discretion: unlike a court, "whose jurisdiction is predicated on a specific case or controversy, the grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'"[156]

Here, Bressi has presented no evidence demonstrating that the purpose and scope of the grand jury investigation was somehow improper. As discussed, the Government presented the matter to the grand jury for investigation after learning

---

[151] Doc. 191 (Omnibus Mot. – Bressi Br.) at 11 (citing *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 213 (1946); *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 299 (1991)).

[152] *United States v. Williams*, 504 U.S. 36, 48–50 (1992) ("Given the grand jury's operational separateness from its constituting court, it should come as no surprise that we have been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure.").

[153] *Oklahoma Press*, 327 U.S. at 209.

[154] *R. Enterprises*, 498 U.S. at 297 ("The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred.").

[155] *Oklahoma Press*, 327 U.S. at 209.

[156] *R. Enterprises*, 498 U.S. at 297 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642–43 (1950)).

of Bressi's suspicious banking activities. These activities alone were sufficient to establish "suspicion that the law [was] being violated."[157] Accordingly, Bressi's motion to suppress all evidence seized on or before June 8, 2019, based on the function of the grand jury is denied.

### iii.  Probable Cause Affidavits

Finally, Bressi challenges the constitutionality of the searches executed pursuant to court-authorized warrant, arguing that the probable cause affidavit supporting the search warrant applications either misrepresents or omits material information.[158] But that's simply untrue. Further, even if the Court accepted Bressi's contention and then incorporated the omitted information into, and excised the alleged misrepresentations from, the affidavit, it would be of no practical or legal consequence; the Court agrees with the Government that these revisions would not "change the ample probable cause found in the affidavit."[159]

It is well established that "[t]he Fourth Amendment prohibits the intentional or reckless inclusion of a material false statement (or omission of material information) in a search-warrant affidavit."[160] In *Franks v. Delaware*, the Supreme Court held that although there is "a presumption of validity with respect to the affidavit supporting [a] search warrant," a defendant may be entitled to an

---

[157] *Id.*

[158] Doc. 191 (Omnibus Mot. – Bressi Br.) at 13–16; *see also* Doc. 267 (Bressi Post-Hearing Supplemental Br.) at 2–4.

[159] Doc. 208 at 14–17 (citing *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).

[160] *United States v. Pavulak*, 700 F.3d 651, 665 (3d Cir. 2012).

evidentiary hearing on whether the affidavit, properly considered—that is, either without the material false information or with the material omitted information—establishes probable cause.[161] To rebut the presumption of validity and justify an evidentiary hearing, the defendant must (1) "make a substantial preliminary showing that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit," and (2) "demonstrate that the false statement or omitted facts are necessary to the finding of probable cause."[162]

First, the Court must determine whether Bressi has shown that Special Agent O'Malley—the FBI Agent who submitted the probable cause affidavit—knowingly or recklessly omitted or mispresented material facts from the affidavit. The Court addresses separately the information that Bressi argues the Government omitted or misrepresented.

For the alleged omissions, Bressi highlights several facts that purportedly demonstrate that SHIVA was a legitimate business enterprise.[163] Specifically, Bressi notes that the affidavits make no mention of Bressi's patent applications, the "hundreds of chemicals" SHIVA purchased that the affidavits do not describe as "potential drug precursors," and "the fact that SHIVA had spent considerable sums

---

[161] 438 U.S. at 171–72.
[162] *Pavulak*, 700 F.3d at 665 (internal quotation marks omitted).
[163] Doc. 191 (Omnibus Mot. – Bressi Br.) at 13–14.

of money on supplies and equipment that could not possibly be connected with the production or trafficking in controlled substances [or] money laundering."[164]

But to establish that an omission was "made with reckless disregard for the truth," a defendant must show that "any reasonable person would have known that this was the kind of thing the judge would wish to know."[165] This requires proof of a contradiction or inconsistency; absent any indication that the omitted information contradicts the Government's characterization of the defendant's illicit conduct or purpose, courts consider the information extraneous, irrelevant to the probable cause determination.[166]

Here, the omissions Bressi highlights do not contradict the factual assertions in the affidavit demonstrating that SHIVA was a criminal enterprise Bressi used to launder money generated by his drug trafficking activities. For example, Bressi's patent applications and SHIVA's spending on supplies and equipment unrelated to

---

[164] *Id.*; *see also* Doc. 267 (Bressi Post-Hearing Supplemental Br.) at 3 (highlighting four categories of allegedly exculpatory information omitted from the affidavit: (1) "Mr. Bressi's legitimate business ventures, including patent applications"; (2) "Mr. Bressi's receipts for purchase of equipment, chemicals, and items not associated with the manufacture of controlled substances"; (3) "information about legitimate ventures from the SHIVA website"; and (4) "travel destinations described as suspicious were legitimate destinations") (cleaned up).

[165] *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (citation and brackets omitted).

[166] *See United States v. Yusuf*, 461 F.3d 374, 383 n.8 (3d Cir. 2006) ("[T]o make [the *Franks* hearing] preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.") (citation omitted); *United States v. Desu*, 23 F.4th 224, 235 (3d Cir. 2022) ("That [the defendant's co-conspirator] had more money in her bank accounts than she allegedly skimmed from Heights Pharmacy does not contradict the claim that the cash-skimming scheme existed. A judge would not want to know about an irrelevant, additional sum of [the co-conspirator's] money in order to determine whether probable cause existed.").

drug production and trafficking do not negate or otherwise cast doubt on the affidavit's description of Bressi's (and SHIVA's) suspicious banking activities: after making structured cash deposits below the $10,000 mandatory reporting requirement to SHIVA's savings account with M&T Bank between October 2015 and June 2016 (totaling $153,000), Bressi made cash deposits totaling more than $1.7 million to his business checking account with First Keystone Community Bank between August 2016 and June 2019.[167] Similarly, whether SHIVA purchased "hundreds of chemicals" that are not identified as "fentanyl precursors"[168]—that is, chemicals used to manufacture fentanyl—has no bearing on Agent O'Malley's statement in the affidavit that Bressi did, in fact, purchase fentanyl precursors, including chemicals with no known legitimate, licit use.[169]

For the alleged misrepresentations, Bressi emphasizes three aspects of the affidavit: (1) the descriptions of the chemicals Bressi allegedly obtained; (2) meetings between SHIVA employees at Bressi's home; and (3) the citations to statements by two separate confidential witnesses.[170] As with the alleged omissions, however, none of these purported misrepresentations warrant suppression.

---

[167] GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 17, 19.

[168] Doc. 191 (Omnibus Mot. – Bressi Br.) at 14.

[169] *See, e.g.*, GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶¶ 30–32 (discussing Bressi's purchase of 5.141 kilograms of the chemical compound "3-Methyl-1-phenethylpiperidin-4-one," which a DEA forensic chemist described as a "precursor for 3-methylfentanyl"; the chemist stated that "he could not think of any licit use for this chemical").

[170] Doc. 191 (Omnibus Mot. – Bressi Br.) at 13–16.

As a preliminary matter, Bressi offers no support for his claim that the affidavit contains falsehoods regarding the chemicals Bressi purchased or the SHIVA employee meetings at Bressi's home. On the former, Bressi asserts that "[i]n the affidavits there is representation of common lab chemicals as indicative of illicit drug manufacturing, but the fact is the chemicals were legally possessed and had scientifically legitimate use in the experiments and research Mr. Bressi was conducting."[171] But as the Government notes, the affidavit does not deny or otherwise obscure that certain chemicals Bressi purchased had legitimate uses— indeed, the affidavits explicitly acknowledge that certain chemicals "are known to have other uses outside of fentanyl synthesis."[172] The affidavits simply detail which chemicals Bressi purchased that DEA and FBI forensic chemists identified as "precursors used in the synthesis of fentanyl and fentanyl related compounds"[173]—findings Bressi does not dispute.[174] Moreover, although Bressi contests the affidavits' description of meetings between SHIVA employees at his home, he does not cite any particular paragraph he considers objectionable,[175] and this Court, in its review of the affidavits, found none.

Bressi does, however, raise concerns about the confidential witness statements cited in the affidavit. According to Bressi, these confidential witnesses

---

[171] *Id*. at 14.
[172] GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit) ¶ 33.
[173] *Id*.
[174] *See* Doc. 191 (Omnibus Mot. – Bressi Br.) at 14.
[175] *See id*.

lacked credibility and reliability, as they were purportedly Bressi's "jilted girlfriends" who owed him "considerable sums of money which neither intended to repay."[176] Further, Bressi asserts that certain representations the confidential witnesses made—namely, details regarding Bressi's recurrent trips to Philadelphia and Cleveland to meet Harris and Henderson, respectively—were contradicted by evidence the FBI uncovered in its investigation.[177]

The Court finds these objections unpersuasive. To establish probable cause based, in part, on information provided by a confidential witness or informant, the government need only "show by the totality of the circumstances either that the informant has provided reliable information in the past or that the information has been corroborated through independent investigation."[178] As discussed, the affidavit details the FBI's multi-year investigation into Bressi's alleged illicit activities, including how they first learned of the confidential witnesses, what the confidential witnesses said, and the FBI's efforts to corroborate the confidential witnesses' statements.[179] For example, according to the affidavit, CW-1 told the FBI that Bressi "regularly" traveled to Cleveland to "see a black man named 'Monty,'" and that every time Bressi met up with Monty, "he returned with a big black bag full of cash."[180] The affidavit then discusses the FBI's efforts to identify

---

[176] *Id.* at 15.

[177] *Id.*

[178] *Yusuf*, 461 F.3d at 384 (emphasis added).

[179] *See* GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit).

[180] *Id.* ¶ 55(d).

"Monty" (i.e., Henderson) and monitor Bressi's movements using historical cell phone location data and visual surveillance, thus tracking his meetings with Henderson for the purpose of collecting suspected drug trafficking proceeds.[181]

Accordingly, this is not a case in which law enforcement established probable cause for a search based exclusively on the uncorroborated account of an unreliable confidential witness; the affidavit contains a substantial amount of corroboration and evidence of further criminality the FBI uncovered through its subsequent investigative efforts. The Court finds no fault in the Government's use of, or the issuing judge's partial reliance on, the confidential witness statements contained in the probable cause affidavit.

Second, even were the Court to find that these omissions and alleged misrepresentations concern facts "the judge would wish to know,"[182] a *Franks* hearing would nevertheless be unwarranted as Bressi failed to demonstrate that the inclusion of the omitted facts and excision of the disputed facts would alter the issuing judge's probable cause finding. Because the alleged omissions do not contradict the factual assertions in the affidavit demonstrating that SHIVA was a criminal enterprise, there is no reason to believe that including the omitted information would have altered the issuing judge's probable cause determination. And the confidential witness statements are not necessary to establish probable

---

[181] *Id*. ¶¶ 81–95.
[182] *Wilson*, 212 F.3d at 788.

cause.[183] Given the thorough documentation of Bressi's suspicious banking activities, acquisition of chemicals used to manufacture fentanyl, and suspicious meetings with Harris and Henderson, the issuing judge had ample information to justify a probable cause finding even absent the confidential witness statements.[184]

Accordingly, Bressi's constitutional challenges to the probable cause warrants is without merit. Bressi's omnibus motion to suppress is denied.

### b.      Traffic Stop on September 12, 2018 (Doc. 186)

Bressi next moves to suppress all evidence seized during, or as a result of, the traffic stop on September 12, 2018.[185] According to Bressi, this evidence should be suppressed because the State Police Trooper who conducted the stop, Trooper Straniere, (i) lacked reasonable suspicion that Bressi committed a traffic violation, (ii) unlawfully extended the stop beyond the time necessary to address the traffic violation, (iii) performed an unlawful pat-down, (iv) impermissibly seized the cash from Bressi's pocket, (v) conducted an unlawful search of Bressi's car, and (vi) failed to administer a *Miranda* warning before questioning Bressi about his travels and destination.[186] The Court addresses each argument in turn.

---

[183] As Bressi offers no support for his claim that the affidavit contains falsehoods regarding the chemicals Bressi purchased or the SHIVA employee meetings at Bressi's home, the Court does not consider either of these purported "misrepresentations" here.

[184] *See* GX 6.2 (June 8, 2019, SHIVA Search Warrant Affidavit).

[185] Doc. 186 (Bressi Mot. to Suppress Traffic Stop Evid.).

[186] Doc. 187 (Mot. to Suppress Traffic Stop – Bressi Br.).

### i.   Justification for the Stop

It is well established that a police officer's decision to stop an automobile qualifies as reasonable so long as the officer had probable cause to believe a traffic violation occurred.[187] Moreover, the officer's subjective intent and actual motivations for conducting the stop are irrelevant: "the Supreme Court [has] established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime."[188]

Here, Trooper Straniere conducted a traffic stop after observing a speeding violation. At the November 2022 evidentiary hearing, Trooper Straniere testified that he spotted Bressi's vehicle—which FBI agents alerted him to and asked him to stop—and then sped up behind it and followed it for about a mile.[189] During this time, Trooper Straniere "paced" Bressi's vehicle, matching Bressi's speed and monitoring his speedometer to determine how fast Bressi was driving, and registered Bressi's vehicle as traveling at 80 miles per hour.[190] The cars were

---

[187] *See Wren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

[188] *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Wren*, 517 U.S. at 810).

[189] Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 80:8–17 ("I was able to use my speedometer to clock the vehicle at a speed of 80 miles an hour in a posted 70 mile an hour zone. . . . [T]he duration of the clock was approximately one mile doing 80—80 miles an hour. My speedometer read 80 miles an hour, and the distance between my vehicle and the Mercedes neither increased nor decreased.").

[190] *Id.*

driving in a 70-miles-per-hour zone.[191] Although Bressi questioned Trooper

Straniere's ability to effectively pace his vehicle "so as to give an acceptable,

reliable indication of [his] speed,"[192] he offered no evidence rebutting or otherwise

contesting Trooper Straniere's account of events preceding the traffic stop. The

Court therefore accepts Trooper Straniere's testimony that, using the pacing

technique, he clocked Bressi at approximately 80 miles per hour in a 70-miles-per-

hour zone—a traffic violation that "legitimize[d]" the stop.[193]

### ii.      Length of the Traffic Stop

In *Rodriguez v. United States*, the Supreme Court of the United States held

that a traffic stop may last no longer than is necessary to effectuate the purpose of

the stop—that is, to address the traffic violation at issue.[194] However, the Supreme

Court affirmed that the Fourth Amendment "tolerate[s]" certain unrelated

investigative actions during the stop, such as an inquiry into separate suspected

criminal activity or a pat-down of the driver, so long as these actions do not

---

[191] *Id.*

[192] Doc. 187 (Mot. to Suppress Traffic Stop – Bressi Br.) at 12; *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 100:9–17 ("Q. Okay, Trooper. So how do you establish that distance didn't change? . . . A. You just answered it, sir. I visually detected that. Q. And how do you visually detect your speed? A. With my speedometer. Q. Yes. So you're sitting in the vehicle. Does it have a heads up display? Does it display your speed or you have to take your eye off my vehicle potentially and look down and look at the speedometer? A. I have to look at the speedometer. Yes. Q. Yeah. So you had to take your eyes off of my vehicle? A. That's correct, for a brief moment in time.").

[193] *Mosley*, 454 F.3d at 252.

[194] 575 U.S. 348, 354 (2015).

"lengthen the roadside detention."[195] And it is beyond dispute that "[a]fter a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation."[196]

The traffic stop at issue here lasted approximately 24 minutes.[197] The video recording of the stop reveals that Trooper Straniere completed the typical investigative steps required to determine whether to issue a traffic ticket (i.e., "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"[198]) as well as the pat-down and subsequent questioning in ten minutes; the remaining fourteen minutes were caused by Trooper Straniere's search of the vehicle.[199] At the November 2022 evidentiary hearing, Trooper Straniere testified that he has conducted thousands of traffic stops during his time with the State Police and that a standard traffic stop typically lasts between five and fifteen

---

[195] *Id.* (citing *Arizona v. Johnson*, 555 U.S. 323, 327–328, 333–34 (2009) (finding that police officer did not unlawfully extend the length of a traffic stop by asking the driver questions about his possible gang affiliation, asking the driver to exit his vehicle, and conducting a pat-down); *Illinois v. Caballes*, 543 U.S. 405, 407–08 (2005) (declaring constitutional a dog sniff conducted during a lawful traffic stop because, among other things, "the duration of the stop . . . was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop")).

[196] *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003).

[197] *See* GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording).

[198] *Rodriguez*, 575 U.S. at 349.

[199] GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording).

minutes.[200] Bressi does not contest that. As the video recording affirms, Trooper Straniere completed the typical investigative steps for a traffic stop concerning a speeding violation as well as the pat-down and questioning within the generally accepted timeframe.

The question, then, is whether Trooper Straniere was justified in expanding the scope of the inquiry—and the length of the stop—by searching Bressi's vehicle. On this, the Court finds instructive the Third Circuit's 2014 ruling in *United States v. Thompson*, which concerned a valid traffic stop that the trooper extended to include a K-9 search.[201] During an evidentiary hearing on the defendants' motion to suppress all evidence related to the traffic stop, the trooper testified that he became suspicious that the driver and passengers in the vehicle were engaged in illegal drug smuggling based on certain physical indicators as well as the driver's suspect statements about his travel plans.[202] Specifically, the trooper observed that the driver "was visibly nervous, with a shaky voice and a vein on his neck pulsating rapidly."[203] Further, the driver stated that he was heading out of state for a three-week trip, but he had only one suitcase.[204] Based on this testimony, the district court found that the trooper "had a 'reasonable

---

[200] Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 91:7–14.
[201] 772 F.3d 752 (3d Cir. 2014).
[202] *Id*. at 759.
[203] *Id*.
[204] *Id*. at 756.

suspicion' to believe that [the driver] was engaged in an illegal activity, and to extend [the] traffic stop to include a K-9 search." [205] The Third Circuit agreed.[206]

The circumstances surrounding the traffic stop here closely align with those in *Thompson*. Trooper Straniere testified that he observed several indicators supporting his suspicion that Bressi was engaging in criminal activity. [207] Specifically, Trooper Straniere noted that Bressi's hands were shaking, voice quivering, and the vein in his neck was visibly pulsating.[208] Bressi also provided false information about where he was traveling from (Bressi claimed he was coming from Hazelton, though Trooper Straniere knew he was returning from the Philadelphia area) and when he first left his house that day (Bressi claimed he left his home at 2:00 p.m., though Trooper Straniere knew that was impossible given when law enforcement saw him at the Springfield Mall outside Philadelphia).[209] Further, Bressi informed Straniere that he had $12,000 in cash with him ($2,000 recovered from his pockets during the pat-down; $10,000 in a plastic bag in the car) and claimed this was the fruits of a "business meeting."[210]

---

[205]  *Id*. at 760.
[206]  *Id*.
[207]  Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Straniere Testimony) at 86:4–24 (describing Bressi's shaking hands, quivering voice, and pulsating neck vein, and noting Bressi's false statements regarding when and where he traveled).
[208]  *Id*.
[209]  *Id*.
[210]  *See* GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording); *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Special Agent O'Malley Testimony) at 177:14–24 ("Q. The $10,000 in cash. What was your reaction to hearing Bressi say that he had that from a business meeting? A. I—I did not believe that. Q. Why? A. Because in today's day and age, business is not conducted that way, especially with the type of business that Mr. Bressi portrayed SHIVA to

42

The Court agrees with the Government that as in *Thompson*, these indicators constitute "a constellation of suspicious circumstances that emerged during the traffic stop, which required additional investigation to confirm or disprove his reasonable concern that Bressi was engaged in illegal activity."[211] Accordingly, the length of the stop—the initial investigatory actions related or incident to the speeding violation, and the subsequent search of the vehicle—does not present any Fourth Amendment concerns.

### iii.        Pat-Down Search

The Supreme Court has long held that during a traffic stop, the "driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'"[212] But regardless of whether an officer reasonably believes a driver is armed, "a search conducted pursuant to a valid consent is constitutionally permissible."[213] To be valid, consent must be freely and voluntarily given.[214] Consent is considered voluntarily unless the individual's "will was overborne,"[215] which courts determine based on a "totality of the circumstances inquiry" assessing, among other things, "the setting in which the consent was obtained, the parties' verbal and non-verbal

---

be, the kinds of products he portrays that it is producing. It's— Q. And you also knew that he was not in Hazelton? A. And I also knew that he was not in Hazelton, that he was in Philadelphia.").

[211] Doc. 206 (Mot. to Suppress Traffic Stop – Gov't Opp.) at 11–12 (cleaned up).

[212] *Johnson*, 555 U.S. at 331 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977)).

[213] *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

[214] *Id.*

[215] *Id.* at 226.

actions, and the age, intelligence, and educational background of the consenting individual."[216] The Government bears the burden "of proving that the consent was, in fact, freely and voluntarily given."[217]

Here, Bressi consented to the pat-down. As captured on the video recording of the traffic stop, before performing the pat-down, Trooper Straniere asked Bressi, "Can I pat you down, is that okay?"[218] Bressi raised his arms and then responded, "Sure."[219] This constitutes express verbal consent, validated by physical conduct manifesting consent.[220]

Bressi argues that this consent was not voluntary, as he was "experiencing a hypoglycemic reaction," which he describes as a "potential medical emergency."[221] The Court is not persuaded. As the Government asserts, "the video of the entire roadside interaction shows that Bressi was in good health for the brief stop and not suffering in any significant way, much less that his will was overborne."[222]

---

[216] *Givan*, 320 F.3d at 459.

[217] *Schneckloth*, 412 U.S. at 222 (internal quotation marks and citation omitted).

[218] GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording).

[219] *Id.*

[220] *See*, *e.g.*, *United States v. Wilson*, 413 F.3d 382, 388 (3d Cir. 2005) (finding that the defendant's conduct—"cooperat[ing] with [the officer] throughout the encounter, as he answered all of [the officer's] questions, offered to show [the officer] his CDs and initiated opening the trunk of his car in order to do so"—supported the district court's conclusion that the defendant's "consent to the search of his bag was voluntary").

[221] Doc. 187 (Mot. to Suppress Traffic Stop – Bressi Br.) at 15.

[222] Doc. 206 (Mot. to Suppress Traffic Stop – Gov't Opp.) at 13 (citing GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording)).

### iv.        Seizure of the Cash

As discussed, temporary seizures following an initial investigatory traffic stop are lawful so long as the officer has reasonable suspicion that criminal activity is afoot.[223] Lawful temporary seizures include K-9 searches to determine whether to search or seize objects based on a detectible scent of illicit narcotics.[224]

During the pat-down search, Trooper Straniere found in Bressi's pocket a wad of cash totaling $2,000.[225] He pulled the money out and set it on the hood of his police vehicle for the remainder of the traffic stop.[226] At the end of the stop, Trooper Straniere informed Bressi that he would be taking the money—as well as other money and items subsequently seized from Bressi's car—to the Milton Police Barracks for a K-9 detection search.[227] As has been established, Trooper Straniere developed reasonable suspicion that Bressi was engaged in illegal activity, justifying an extension of the traffic stop. This reasonable suspicion likewise supports his decision to temporarily seize, among other things, the $2,000 in cash found in Bressi's pocket for a K-9 search.[228]

---

[223] *See Givan*, 320 F.3d at 458; *see also United States v. Holland*, 2017 WL 2118283, at *2 (M.D. Pa. May 16, 2017) (Rambo, J.) (noting that "brief investigatory stops that result in temporary seizures . . . must be based on reasonable suspicion") (citing *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014)).

[224] *See, e.g.*, *Thompson*, 772 F.3d at 759–60 (affirming district court ruling that trooper "had a 'reasonable suspicion' to believe that [the driver] was engaged in illegal activity, and to extend [the] traffic stop to include a K-9 search").

[225] GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording).

[226] *Id.*

[227] *Id.*

[228] *See Thompson*, 772 F.3d at 759–60.

### v.     Vehicle Search

Next, Bressi challenges the legality of Trooper Straniere's search of Bressi's vehicle.[229] But as with the pat-down, Bressi consented to the vehicle search. The video recording of the traffic stop reveals that prior to the vehicle search, Trooper Straniere asked Bressi, "Can I search your vehicle?"[230] Bressi responded, "By all means."[231] Trooper Straniere then sought confirmation, stating, "You don't have to let me do that."[232] And Bressi replied, "Yes, I know," affirming both his understanding and his consent.[233] Because the vehicle search was supported by valid consent, it presents no Fourth Amendment concerns.[234]

### vi.     *Miranda* Warnings

Finally, Bressi argues that evidence from the search should be suppressed because Trooper Straniere did not *Mirandize* him before asking questions about his travels and destination.[235] The Court disagrees. In *Berkemer v. McCarty*, the Supreme Court held that although "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle," ordinary traffic stops do not "sufficiently impair [the] free exercise of [their] privilege against self-incrimination to require that [they] be warned of [their]

---

[229] Doc. 187 (Mot. to Suppress Traffic Stop – Bressi Br.) at 9–10.
[230] GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording).
[231] *Id.*
[232] *Id.*
[233] *Id.*
[234] *See Schneckloth*, 412 U.S. at 222.
[235] Doc. 187 (Mot. to Suppress Traffic Stop – Bressi Br.) at 10–12.

constitutional rights."[236] The Supreme Court has repeatedly affirmed this ruling,[237] and the Third Circuit, citing *Berkemer*, notes that "a roadside interrogation of a motorist pulled over during a traffic stop is not a formal arrest because a motorist is not completely at the mercy of the police, but instead expects a presumptively temporary and brief encounter in which he may be given a citation and in the end will most likely be allowed to continue on his way."[238] Accordingly, "*Miranda* instead comes into play during a traffic stop as of the moment the suspect is formally placed under arrest."[239]

Because the questioning at issue here—i.e., inquiries "about Mr. Bressi's travels and his destination" that Trooper Straniere made while inspecting Bressi's license, registration, and insurance[240]—constituted a roadside interrogation that was not preceded by a formal arrest, Bressi was not in *Miranda* custody.[241] Therefore, the absence of a *Miranda* warning has no bearing on the admissibility of the evidenced seized during the September 2018 traffic stop.

The motion is denied.

---

[236]  468 U.S. 420, 437 (1984).

[237]  *See, e.g.*, *Howes v. Fields*, 565 U.S. 499, 509–10 (2012) (affirming precedent that "a person detained as a result of a traffic stop is not in *Miranda* custody"); *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody.") (internal citations omitted).

[238]  *United States v. Ley*, 876 F.3d 103, 108–09 (3d Cir. 2017) (internal quotation marks, ellipses, brackets, and citations omitted).

[239]  *Id.*

[240]  Doc. 187 (Mot. to Suppress Traffic Stop – Bressi Br.) at 11.; *see also* GX 3.0 (Sept. 12, 2018, Traffic Stop Mobile Video Recording).

[241]  *See Ley*, 876 F.3d at 108–09.

### c.   "Trash Pull" on November 29, 2018 (Doc. 188)

In his third suppression motion, Bressi asks the Court to suppress all evidence seized on November 29, 2018, the day State Police Troopers Kelley and Burcher conducted a "trash pull" from a dumpster on the SHIVA property.[242] According to Bressi, although "trash left for collection outside the curtilage of the home may be searched without a warrant,"[243] he maintained a reasonable expectation of privacy over the contents of the SHIVA dumpster because the dumpster was on his commercial property and he "took considerable affirmative steps to exclude public accessibility to the dumpster."[244] The Government does not contest the circumstances surrounding the dumpster; it simply considers these circumstances insufficient to establish that Bressi "took steps to maintain his privacy interest in his trash after placing it in the dumpster."[245] The Court agrees with the Government.

In *California v. Greenwood*, the Supreme Court held that Fourth Amendment protections do not extend to "trash left for collection in an area accessible to the public."[246] Although courts have held that a defendant may maintain an expectation of privacy when he takes affirmative steps to exclude the public from the

---

[242] Doc. 189 (Mot. to Suppress Trash Pull – Bressi Br.) at 1–2; *see also* Doc. 207 (Mot. to Suppress Trash Pull – Gov't Opp.) at 1–2.

[243] Doc. 189 (Mot. to Suppress Trash Pull – Bressi Br.) at 4 (citing *California v. Greenwood*, 486 U.S. 35, 37 (1988)), 8.

[244] *Id*. at 8.

[245] Doc. 207 (Mot. to Suppress Trash Pull – Gov't Opp.) at 3.

[246] 486 U.S. at 41.

dumpster,[247] the weight of the albeit limited legal authority on this issue suggests that absent a secured locking mechanism on the dumpster or a preventative barrier restricting the property on which the dumpster sits, no reasonable expectation of privacy exists.[248] Posting "no trespassing signs,"[249] using third-party trash disposal companies,[250] and placing dumpsters near private commercial buildings do not constitute affirmative steps sufficient to establish a reasonable expectation of privacy.[251]

---

[247] *See, e.g., United States v. Varjabedian*, 2006 WL 1004847 (D. Mass. Apr. 14, 2006) (finding that defendant maintained an expectation of privacy over dumpster secured with "light chains").

[248] *See, e.g., United States v. Dunkel*, 900 F.2d 105, 106–07 (7th Cir. 1990) (affirming district court ruling denying motion to suppress evidence seized from a warrantless trash pull of a commercial dumpster in a parking lot "open to all comers," distinguishing case where "[n]o one other than [the defendant] and his employees had access to the fenced-in yard" at issue) (citing *United States v. Swart*, 679 F.2d 698 (7th Cir. 1982)), *vacated and remanded on other grounds by Dunkel v. United States*, 498 U.S. 1043 (1991); *United States v. Hall*, 47 F.3d 1091, 1095–97 (11th Cir. 1995) (holding that a commercial proprietor has no expectation of privacy over dumpster "located in a parking lot that the business shares with other businesses," when "no steps are taken to limit the public's access to the dumpster"); *United States v. Skruck*, 2014 WL 6883073 (N.D.W.Va. Dec. 4, 2014) (holding that defendant "did not control the dumpster in a manner that excluded the public," as the dumpster "was not blocked by fence or other obstacle" and was locked only intermittently, if ever).

[249] *See Dunkel*, 900 F.2d at 107 (citing *Oliver v. United States*, 466 U.S. 170, 179–80 (1984), for the holding that "'open fields' doctrine applied despite 'no trespassing' signs").

[250] *See Hall*, 47 F.3d at 1097 (finding that the Supreme Court in *Greenwood* attributed no weight to the use of a "private garbage collector," explaining that "the garbage's conveyance to the garbage collector is properly read as one more example of the fact that a third party was afforded access to the discarded garbage").

[251] *See Skruck*, 2014 WL 6883073 at *4 (no expectation of privacy over dumpster located "approximately twenty-five to thirty feet away from the side of the store" as it was "not blocked by a fence or other obstacle"); *see also Varjabedian*, 2006 WL 1004847 at *2 (noting that circuit courts generally find that "whether the trash was deposited within or without the curtilage is not a crucial determinant") (citing *United States v. Comeaux*, 955 F.2d 586, 589 (8th Cir. 1992); *United States v. Wilkinson*, 926 F.2d 22, 27 (1st Cir. 1991), *overruled on other grounds by Bailey v. United States*, 516 U.S. 137, 149 (1995); *United States v. Hedrick*, 922 F.2d 396, 400 (7th Cir. 1991)).

Here, Bressi identifies the following "affirmative steps" that he took to "exclude public access to the dumpster":

- posted signs around the SHIVA parking lot indicating the property was private;

- maintained "multiple, easily noticeable security cameras outside of the building that recorded the parking lot, with one of the cameras trained on the dumpster's location";

- placed the dumpster "close to the building and about 25–30 feet away from the public highway";

- used "opaque trash bags for all of SHIVA's trash, thereby concealing the contents of the trash bags";

- kept a lid on the dumpster that "cover[ed] the trash from view"; and

- "had a contract with Fishers Disposal for the weekly collection of his trash on Tuesdays."[252]

But consistent with the prevailing case law, these actions do not establish a reasonable expectation of privacy over the contents of the dumpster, as none actually restricts the public's access.[253] Photographs of the SHIVA property demonstrate that the dumpster is located in a parking lot just off the public roadway adjacent to the property.[254] There is nothing surrounding the dumpster or the parking lot obstructing the entry of third parties.[255] There are no locks or chains preventing a third party

---

[252] Doc. 189 (Mot. to Suppress Trash Pull – Bressi Br.) at 8–9 (cleaned up).

[253] *See, e.g.*, *Dunkel*, 900 F.2d at 107 ("no trespassing" signs); *Skruck*, 2014 WL 6883073 at *4 (close proximity to commercial building); *Hall*, 47 F.3d at 1097 (private trash disposal company).

[254] *See* GX 2.0 (Photo of SHIVA Dumpster); GX 2.1 (Photo of SHIVA Dumpster).

[255] *Id.*; *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Burcher Testimony) at 69:3–16 ("Q. And if we could go back to Exhibit 2.0. Again, there's no—there's no fence around the building or parking lot in this picture, correct? A. Correct. Q. And there's no—there's no gate

from opening the dumpster and accessing its contents.[256] Indeed, that is why Troopers Kelley and Burcher had no difficulty retrieving trash from the dumpster on the date in question; they simply drove up, opened the dumpster, removed two trash bags that were immediately accessible, and drove off.[257]

Accordingly, the Court finds that Bressi had no reasonable expectation of privacy over the contents of the dumpster on the SHIVA property. This motion to suppress is denied.

### d.   Bressi's Statements (Doc. 150)

In his final motion to suppress, Bressi argues that all statements he made during an interview held on June 8, 2019, outside the SHIVA building, as well as the statements he made later that day in an interview at the Milton barracks, should be suppressed because he was not properly *Mirandized* prior to the initial interview.[258] This motion raises three questions: (i) whether Bressi was in custody during the interview at SHIVA; (ii) whether Bressi was given appropriate *Miranda* warnings prior to that interview; and (iii) if the SHIVA interview was

---

or—or specific entryway into the parking lot that's visible in this picture, correct? A. Correct. . . . Q. In this picture, there's no fence around the dumpster itself, is there? A. There is not.").

[256] *See* GX 2.0 (Photo of SHIVA Dumpster); GX 2.1 (Photo of SHIVA Dumpster); *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Burcher Testimony) at 68:4–6 ("Once I got to the dumpster, the lid was unsecured. There was no lock. There was no chain. There was nothing securing the lid of the dumpster.").

[257] *See* GX 2.2 (Nov. 29, 2018, Video of Trash Pull); *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Burcher Testimony) at 68:4–12.

[258] *See* Doc. 151 (Mot. to Suppress June 2019 Statements – Bressi Br.).

constitutionally infirm, whether Bressi's statements at the Milton barracks should be suppressed.

### i.      Custody

To determine whether an individual was "in custody," courts must "ask, as an objective matter, whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave."[259] Because the Supreme Court recently clarified that the "freedom-of-movement" test identifies "only a necessary and not a sufficient condition for *Miranda* custody,"[260] courts "must ask the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."[261] For this, relevant considerations include (1) where the interrogation was conducted, (2) whether the suspect volunteered for the interview and the tone of the questioning, (3) whether the officers used constraints, (4) whether weapons were present or drawn, (5) whether officers told the suspect he was free to leave or refuse to answer questions, and (6) the duration of the interrogation.[262]

---

[259] *United States v. Ludwikowski*, 944 F.3d 123, 131 (3d Cir. 2019) (internal quotation marks omitted).

[260] *Howes*, 565 U.S. at 509 (internal quotation marks and citation omitted).

[261] *Ludwikowski*, 944 F.3d at 131 (internal quotation marks omitted).

[262] *See, e.g.*, *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) ("Relevant considerations [for a *Miranda* custody determination] include: (1) the interrogation's duration; (2) its location (e.g., at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.") (internal quotation marks and citations omitted); *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (listing five non-exhaustive factors relevant to *Miranda* custody inquiry: "(1) the language used to summon the individual;

In assessing whether the interview at the SHIVA property constitutes a custodial interrogation, the Court finds particularly instructive three opinions. The first, *United States v. Faux*, concerns an interview conducted outside the defendant's home while law enforcement executed a search warrant.[263] The defendant moved to suppress the statements she made during the interview, arguing that the questioning "amounted to a custodial interrogation" and thus "her statements must be suppressed because she was never given *Miranda* warnings."[264] The district court granted the motion.[265]

On appeal, the United States Court of Appeals for the Second Circuit highlighted several "aggravating factors" the district court identified to "distinguish [the] case from those where home interviews were held non-custodial":

(1) the number of officers (ten to fifteen) on the premises executing the search;

(2) the defendant was separated from her husband and "was never explicitly told whether the agents would accommodate a request . . . to see [him]";

(3) the defendant "was not permitted to move freely about her home during the two-hour interrogation," as agents "accompanied her to the bathroom and to her bedroom to fetch a sweater";

---

(2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual").

[263] 828 F.3d at 132–33.

[264] *Id.* at 134.

[265] *Id.*

(4) the officers "never told [the defendant] she was free to leave or that she had a choice whether to respond to questioning"; and

(5) the defendant and her husband had to cancel a vacation to remain at the house during the search.[266]

The Second Circuit found the district court's assessment of these "aggravating factors," and the conclusion drawn therefrom to suppress the statements, erroneous. In holding that the defendant "was not in custody," the Second Circuit acknowledged that "the two-hour interview was conducted while officers swarmed about [the defendant's] home," but emphasized the following facts:

> [S]he was told 20 minutes into the interview that she was not under arrest; she was never told that she was not free to leave; she did not seek to end the encounter, or to leave the house, or to join her husband; the tone of the questioning was largely conversational; there is no indication that the agents raised their voices, showed firearms, or made threats. Her movements were monitored but not restricted, certainly not to the degree of a person under formal arrest.[267]

Accordingly, the Second Circuit concluded that the defendant was "never 'completely at the mercy of' the agents in her home."[268]

The second opinion instructive here, *United States v. Hargrove*, likewise concerns a home interview conducted incident to a search pursuant to a valid search warrant.[269] The United States Court of Appeals for the Fourth Circuit

---

[266] *Id.* 136–38.
[267] *Id.* at 138–39.
[268] *Id.* at 139.
[269] 625 F.3d 170, 179 (4th Cir. 2010).

explained that "some of the officers were armed upon entry of [the defendant's] home, directed the occupant's actions during the initial safety sweep of the residence, and conducted a safety pat down of [the defendant]."[270] The Fourth Circuit noted that although "between ten and fifteen agents participated in the initial execution of the search warrant, only two agents were with [the defendant] during the interview."[271] The defendant was not handcuffed during the interview; the interviewing officers, although armed, never drew their firearms during the interview or threatened the defendant; before the interview, the officers told the defendant he was not under arrest and that he was free to leave; and the conversation was "amicable and non-threatening in tone."[272] Further, although an agent was "blocking" the defendant's exit from the kitchen, where he was being interviewed, the defendant "was permitted to move about his house so long as doing so did not interfere with the ongoing search."[273] Based on this evidence, the Fourth Circuit held that the interview "did not constitute a 'custodial interrogation' that invoked [the defendant's] right to be read *Miranda* warnings."[274]

The third opinion, *United States v. Bassignani*, involves an interview conducted in a conference room at the defendant's workplace.[275] In finding "that

---

[270] *Id.*
[271] *Id.*
[272] *Id.* at 179–80.
[273] *Id.* at 181.
[274] *Id.* at 182.
[275] 575 F.3d 879, 886 (9th Cir. 2009).

the interrogation was not custodial," the United States Court of Appeals for the Ninth Circuit emphasized three factors that "strongly suggest" that a reasonable person in the defendant's position would conclude that after questioning he or she would be free to leave: (1) the interview was "plainly consensual" as it "was conducted in an open, friendly tone," with the defendant "participat[ing] actively"; (2) the defendant "was interviewed at a conference room within his workplace— plainly a familiar environment"; and (3) although the officer "never explicitly said that [the defendant] was free to leave," he "did not pressure [the defendant] to confess or to stay in the conference room," and the defendant "was never physically restrained."[276]

As in *Faux*, *Hargrove*, and *Bassignani*, the totality of the circumstances surrounding the June 2019 interview outside the SHIVA building establish that Bressi was not "in custody" such that *Miranda* warnings were necessary. First, the interview occurred at a picnic bench outside Bressi's workplace in the middle of the day.[277] As in *Bassignani*, the location of the interview—"plainly a familiar environment"—"strongly suggest[s] that the interrogation was not custodial."[278]

---

[276] *Id.* at 884–86.

[277] *See* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 137:9–14 ("Q. All right. If we could skip ahead to 6 minutes and 10 seconds. And press pause. Do you recognize what's happening here at 6 minutes and 10 seconds? A. Yes. We were—Mr. Bressi and myself are traveling across the front, in front of SHIVA over to the picnic table to sit and talk."); *see also* GX 1.2 (June 18, 2019, SHIVA Search Video).

[278] 575 F.3d at 885, 887.

Second, although there is some disagreement about who initiated the interview,[279] the evidence establishes that the interview was friendly and conversational. When asked during the November 2022 evidentiary hearing to describe Bressi's demeanor during the interview, Special Agent O'Malley testified that "[i]t was calm and conversational."[280] As the respective circuit courts held in *Faux*, *Hargrove*, and *Bassignani*, the tone of the interview is important in determining whether it was sufficiently coercive to constitute a custodial interview. That the interview remained calm and conversational, open and friendly again suggests it was not custodial.[281]

Third, as Bressi himself acknowledges, he "was not handcuffed during the picnic table interview."[282] Indeed, the video recording of the interview reveals that the officers did not use any constraints on Bressi while the interview took place.[283]

---

[279] During the November 2022 evidentiary hearing, Trooper Kelley testified that "Bressi indicated that he wishe[d] to speak with [him]." Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 137:15–17. But Bressi asserts that Special Agent O'Malley "advised Mr. Bressi . . . that he and [Trooper Kelley] wanted to talk to Mr. Bressi about Shiva." Doc. 151 (Mot. to Suppress June 2019 Statements – Bressi Br.) at 3.

[280] Doc. 258 (Nov. 15, 2022, Hearing Tr. – Special Agent O'Malley Testimony) 173:19–22. Trooper Kelley agreed, stating that Bressi was "talkative, very talkative." Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 129:18–19.

[281] *See Faux*, 828 F.3d at 138–39 (emphasizing that "the tone of the questioning was largely conversational"); *Hargrove*, 625 F.3d at 179–80 (noting the conversation was "amicable and non-threatening in tone"); *Bassignani*, 575 F.3d at 884 (finding that the interview was "plainly consensual" as it "was conducted in an open, friendly tone," with the defendant "participat[ing] actively").

[282] Doc. 216 (Mot. to Suppress June 2019 Statements – Bressi Reply) at 3.

[283] *See* GX 1.3 (June 18, 2019, SHIVA Search Video).

The absence of handcuffs or other physical constraints placed on Bressi similarly undercuts his claim that the interview was a custodial interrogation.[284]

Fourth, none of the officers interviewing Bressi had their firearms drawn or displayed them in any way during the interview.[285] Now, as Bressi notes, the interview was precipitated by three law enforcement vehicles converging on the SHIVA property as Bressi and his fiancée were preparing to leave for lunch, blocking their exit; agents and officers exited the vehicles and confronted the couple, guns drawn.[286] But after the initial approach, the officers holstered their firearms.[287] In that sense, the situation is akin to that *Hargrove*, where "some officers did have their firearms drawn during the initial entry and security sweep, consistent with standard protocol," but "their firearms were not drawn during the interview and they did not threaten [the defendant]."[288] Consistent with the Fourth

---

[284] *See Faux*, 828 F.3d at 138 (noting that the defendant "was not handcuffed during the interrogation"); *Hargrove*, 625 F.3d at 179–80 (same).

[285] *See* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 129:20–130:9 ("Q. At some point, where are there—prior to walking over to the table, were there any guns drawn by you? A. By myself? Q. Yes. A. While walking over to the table, no. No firearms were displayed. Q. Did you—did you see any other officers displaying firearms? I'm sorry. Did you see any other officers with—brandishing firearms unholstered? Did they withdraw? A. During the initial approach or— Q. No. After the initial approach. A. No. No. Q. After you gave Bressi his *Miranda* warnings, did you see anyone with their firearms drawn? A. No.").

[286] Doc. 216 (Mot. to Suppress June 2019 Statements – Bressi Reply) at 2; *see also* GX 1.2 (June 18, 2019, SHIVA Search Video).

[287] *See* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 129:20–130:9; GX 1.2 (June 18, 2019, SHIVA Search Video).

[288] 625 F.3d at 174, 179.

Circuit in *Hargrove*, this Court finds these circumstances insufficient to create a custodial situation.[289]

Fifth, the officers interviewing Bressi repeatedly told him that he was not under arrest. In his moving brief, Bressi notes that before Trooper Kelley guided him to the picnic table for the interview, Special Agent O'Malley "advised Mr. Bressi that he 'was not under arrest at this time,'" and that after they were situated at the picnic table but prior to interview, Trooper Kelley "reiterated that Mr. Bressi was not under arrest and was not required to speak with the officers."[290] Trooper Kelley then "advised Mr. Bressi that no promises or offers were going to be made and he could refuse to answer any questions."[291]

Bressi attempts to minimize these instructions by noting that "[a]t no time during this span of several hours was Mr. Bressi advised that he was free to leave."[292] But the absence of that advisement does not nullify the instructions given and thus transform a non-custodial interview into a custodial interrogation. For example, in *Faux*, the Second Circuit dismissed the district court's concern that the officers "never told [the defendant] she was free to leave or that she had a choice whether to respond to questioning," stressing that "she was told 20 minutes into the

---

[289] *Id*. at 179.

[290] Doc. 151 (Mot. to Suppress June 2019 Statements – Bressi Br.) at 3 (cleaned up); *see also* Doc. 258 (Nov. 15, 2022, Hearing Tr. – Special Agent O'Malley Testimony) 170:8–9 (testifying that he "notified [Bressi] that he was not under arrest at this time").

[291] Doc. 151 (Mot. to Suppress June 2019 Statements – Bressi Br.) at 3.

[292] Doc. 216 (Mot. to Suppress June 2019 Statements – Bressi Reply) at 2.

interview that she was not under arrest" and "she was never told that she was *not* free to leave."[293] Similarly, in *Bassignani*, the Ninth Circuit noted that although the officer "never explicitly said that [the defendant] was free to leave," he "did emphasize in the first two minutes of the interview" that the defendant "was not under arrest"—a factor that "strongly suggest[ed] that the interrogation was not custodial."[294]

To be sure, the length of the interview (Trooper Kelley and Special Agent O'Malley questioned Bressi at the picnic table outside SHIVA over the course of several hours)[295] is at the "high end," which "weighs in favor of finding that [Bressi] was in custody."[296] But this factor does not subsume the five factors that came before it. Taken together, the location and tone of the interview, the absence of handcuffs and unholstered firearms, and the express instructions that Bressi was not under arrest or required to speak with the officers establish that a reasonable person in Bressi's position would have felt that he or she was at liberty to terminate the interview and leave.[297]

---

[293]  828 F.3d at 138–39.

[294]  575 F.3d at 886–87.

[295]  *See* Doc. 151 (Mot. to Suppress June 2019 Statements – Bressi Br.) at 3; *see also* GX 1.2 (June 18, 2019, SHIVA Search Video); GX 1.3 (June 18, 2019, SHIVA Search Video).

[296]  *Bassignani*, 575 F.3d at 886 (noting that Ninth Circuit precedents "suggest that a two-and-a-half hour interrogation is at the high end," which "weighs in favor of finding that [the defendant] was in custody").

[297]  *See Ludwikowski*, 944 F.3d at 131.

Accordingly, Bressi was not "in custody" during the interview outside SHIVA, and therefore officers were not required to issue him *Miranda* warnings at that time. This alone necessitates dismissal of Bressi's motion to suppress the statements he made on June 8, 2019.

### ii.  *Miranda* Warning at SHIVA

Moreover, even if Bressi was "in custody" during the June 2019 interview outside SHIVA, the statements would nevertheless be admissible because the evidence establishes that he did, in fact, receive the *Miranda* warnings.

According to the Government, "Trooper Kelley verbally gave the same standard warnings that he has given suspects hundreds of times in his career of over 20 years," including "the right to remain silent, the fact that statements made may be used against Bressi at trial, the right to an attorney and the fact that one would be appointed if Bressi could not afford one, and the fact that there were no promises or threats being made and that Bressi could terminate the interview at any time."[298] And at the November 2022 evidentiary hearing, Trooper Kelley affirmed that he *Mirandized* Bressi prior to the interview:

> Q. And what did the conversation [with Bressi], as you're walking from the car to the other side of the building, what did that conversation consist of?
>
> A. I inquired as to whether or not Mr. Bressi had been advised of his *Miranda* rights.

---

[298]  Doc. 196 (Mot. to Suppress June 2019 Statements – Gov't Opp.) at 17–18.

Q. And what did he say?

A. I believe he had not been advised. I don't know if somebody else had spoken to him. But I took that opportunity to advise him of his rights.

Q. And what did he say?

A. I advised him of his rights. And after—after the rights were—he was advised, he elected to speak with myself and Special Agent O'Malley.

Q. My question is, to the best of your knowledge, can you tell the Court what were the—the quote *Miranda* rights that you told him at that time?

A. They would be the same *Miranda* rights I've read individuals since becoming a Trooper. My name is Ryan Kelley with the Pennsylvania State Police assigned to the FBI. You have an absolute right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to have an attorney before—with you. You have the right to have an attorney present during questioning—before questioning. If you cannot afford to hire an attorney, the Government will appoint an attorney to represent you. If you decide to answer questions, you cannot be forced to continue at any time. I can't make you any promises, and I will not threaten you in any way. Do you understand your rights as I've advised you. And with that in mind, do you wish to answer questions.[299]

For his part, Bressi acknowledges that Trooper Kelly "reiterated that [he] was not under arrest and was not required to speak with the officers," and "advised [him] that no promises or offers were going to be made and he could refuse to answer any questions," but he claims that "[a]t no point during the lengthy

---

[299] Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 127:21–129:3.

custodial interview in the SHIVA parking lot was [he] ever advised of his *Miranda* rights."[300] However, at the evidentiary hearing, Bressi presented no evidence challenging or in any way undermining Trooper Kelley's testimony.

Instead, Bressi seems to rely exclusively on the documents attached to his briefing—namely, the FD-302 reports Special Agent O'Malley prepared regarding the two separate interviews on June 8, 2019.[301] According to Bressi, "[t]he Government's own records demonstrate that Mr. Bressi was not given *Miranda* warnings."[302] But that's incorrect.

Special Agent O'Malley's FD-302 report regarding the interview with Bressi outside SHIVA provides the following description of the warnings Trooper Kelley gave Bressi:

> [Trooper] Kelley inquired as to whether or not Bressi had been advised of his Miranda Rights prior to interview. Bressi related that he had not been advised of his rights, at which time [Trooper] Kelley advised him that he was not under arrest and was under no obligations to speak with he or [Special Agent O'Malley]. Bressi was further advised that no promises would be extended and no threats would be made. [Trooper] Kelley ended this exchange by advising Bressi that he could refuse to answer any questions he liked and he was not obligated to speak to

---

[300] Doc. 151 (Mot. to Suppress June 2019 Statements – Bressi Br.) at 3–4 (cleaned up).

[301] *See* Doc. 216 (Mot. to Suppress June 2019 Statements – Bressi Reply) at 4–5 (asserting that Special Agent O'Malley's FD-302 report on the custodial interview outside SHIVA "does not say that [Trooper] Kelley advised Mr. Bressi of his *Miranda* rights," citing Doc. 216-1, Ex. A (Special Agent O'Malley FBI FD-302 Report dated 6/9/19), but that the "FD-302 report of the interview with Mr. Bressi at the PSP Barracks . . . confirms that Mr. Bressi was given *Miranda* warnings," citing Doc. 216-2, Ex. B (Special Agent O'Malley's FBI FD-302 Report dated 6/11/19)).

[302] *Id.*

anyone. Bressi related that he was aware of his rights as he was familiar with these types of situations.[303]

Far from establishing that Bressi did not receive his *Miranda* warnings, these notes support Trooper Kelley's testimony that he gave the standard warnings that he's "read individuals since becoming a Trooper."[304] For one thing, Special Agent O'Malley's notes indicate that Trooper Kelley began the warning by first asking Bressi whether he "had been advised of his *Miranda* rights prior to the interview."[305] This preliminary inquiry can leave no doubt that Trooper Kelley was attempting to advise Bressi of his *Miranda* rights. Moreover, the notes demonstrate that Bressi himself understood that Trooper Kelley was giving him a *Miranda* warning.[306]

At most, Bressi can argue that the warnings, as recounted in Special Agent O'Malley's notes, do not perfectly conform to the instructions the Supreme Court enumerated in *Miranda*. But as the Supreme Court itself has explained, there is no "talismanic incantation" or rigidly formulaic version of *Miranda* warnings required.[307] Moreover, Bressi's prior criminal history and express acknowledgment

---

[303] Doc. 216-1, Ex. A (Special Agent O'Malley FBI FD-302 Report dated 6/9/19) at 1.

[304] Doc. 258 (Nov. 15, 2022, Hearing Tr. – Trooper Kelley Testimony) 127:21–129:3.

[305] Doc. 216-1, Ex. A (Special Agent O'Malley FBI FD-302 Report dated 6/9/19) at 1 (cleaned up).

[306] *Id*. ("Bressi related that he was aware of his rights as he was familiar with these types of situations.").

[307] *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curium).

that he understood both his rights and the warnings being issued obviates any constitutional concerns about the proper explication of the *Miranda* rights.[308]

### iii.   Statements at the Milton Barracks

Finally, Bressi asks the Court to suppress the statements he made later on June 8, 2019, during an interview at the Milton Barracks.[309] Bressi admits that prior to this interview, he received verbal and written *Miranda* warnings,[310] but he argues that these post-*Miranda* statements should be suppressed because the statements "were made as a result of a 'deliberate two-step strategy' that the Supreme Court has determined to be violative of a criminal defendant's *Miranda* rights."[311] But this argument is without merit. To establish that a law enforcement engaged in the "deliberate two-step strategy" to elide *Miranda*, a defendant must first demonstrate that law enforcement conducted a "prewarning interrogation" in which "the initial failure to warn was deliberate."[312] As discussed, there are no statements here secured through a pre-warning interrogation: Trooper Kelley

---

[308] *See United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (holding that the defendant waived his *Miranda* rights when, prior to law enforcement questioning, he stated that "he understood his rights and agreed to talk," as the defendant "was familiar with his rights, having been involved in the justice system on numerous previous occasions").

[309] Doc. 151 (Mot. to Suppress June 2019 Statements – Bressi Br.) at 8–10.

[310] *See id*. at 4 ("Upon arrival at the barracks, Mr. Bressi was escorted to an interview room and was advised of his *Miranda* rights by Agent O'Malley at approximately 7:50 p.m."), *accord* Doc. 196 (Mot. to Suppress 2019 Statements – Gov't Opp.) at 5–6 ("Bressi gave an additional statement at PSP Milton. This statement was preceded by verbal and written *Miranda* warnings.").

[311] Doc. 216 (Mot. to Suppress June 2019 Statements – Bressi Reply) at 6 (citing *Missouri v. Seibert*, 542 U.S. 600, 615 (2004) (Kennedy, J., concurring)).

[312] *United States v. Shaird*, 463 F. App'x 121, 123 (3d Cir. 2012).

properly *Mirandized* Bressi prior to the interview outside SHIVA earlier in the day.

Accordingly, the post-*Miranda* statements are admissible. Bressi's motion is

denied.

### 2. Henderson's Motions to Suppress

For his part, Damonico Henderson has filed two suppression motions. The

first concerns post-arrest statements he made on prison calls during his detention at

the Lycoming County Prison.[313] The second seeks to suppress physical evidence

law enforcement seized from his residence in Elyria, Ohio.[314] As with Bressi's

motions, neither of Henderson's motions has merit.

### a. Prison Calls (Doc. 166)

In his first motion, Henderson asks the Court to suppress any recordings of

the telephone conversations he had on the Lycoming County Prison telephones

during his detention for this case.[315] According to Henderson, "[t]here is simply no

Fourth Amendment exception that exempts prison or jailhouse communication;

yet, the wholesale seizure and disclosure of [his] prison calls did just that and

violated his Fourth Amendment [rights]."[316] Although Henderson acknowledges

that he "was placed on notice by the prison that his calls may be monitored and

recorded," he believes "[t]he fact that one government actor . . . monitors

---

[313]  Doc. 166 (Henderson Mot. to Suppress Prison Calls).
[314]  Doc. 168 (Henderson Mot. to Suppress Physical Evid.).
[315]  Doc. 166 (Henderson Mot. to Suppress Prison Calls).
[316]  Doc. 167 (Mot. to Suppress Prison Calls – Henderson Br.) at 3–4.

potentially sensitive information for institutional security purposes, does not mean that law enforcement can access the same information for criminal investigative purposes without a search warrant."[317]

But, indeed, it does. To suppress evidence on privacy grounds, a defendant must establish that the Government violated a legitimate expectation of privacy, and that this expectation was both subjectively held and objectively reasonable.[318] As the Third Circuit recently affirmed, prisoners "have no general expectation of privacy during their incarceration."[319] And courts have consistently held that prisoners making non-privileged telephone calls from prison telephones generally have no reasonable expectation of privacy in those calls.[320] Moreover, when the prison's policies and phone systems notify inmates that their calls on prison

---

[317] *Id*. at 4–5.

[318] *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurrence); *see also Free Speech Coalition, Inc. v. Attorney General*, 677 F.3d 519, 543 (3d Cir. 2012) ("Determining whether one's expectation of privacy is justifiable involves two separate inquiries: (1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances.").

[319] *United States v. Jarmon*, 14 F.4th 268, 272 (3d Cir. 2021), *cert. denied*, 142 S. Ct. 930 (2022)).

[320] *See id*. (affirming denial of defendants' motion to suppress because the defendants, inmates discussing drug trafficking and other criminal acts on prison phone calls, "had no reasonable expectation of privacy in their phone calls"); *United States v. Morin*, 437 F.3d 777, 780 (8th Cir. 2006) (agreeing with the district court that the recorded jailhouse calls would have been admissible at trial because the defendant "impliedly consented to the taping of his jailhouse calls" because he received "a prisoners' handbook which informed him that [the] calls would be monitored"); *United States v. Van Poyck*, 77 F.3d 285, 291 (9th Cir. 1996) ("[A]ny expectation of privacy in outbound calls from prison is not objectively reasonable and . . . the Fourth Amendment is therefore not triggered by the routine taping of such calls."); *United States v. Clark*, 651 F. Supp. 76, 81 (M.D. Pa. 1986) (Rambo, J.) (holding that "the monitoring and recording" of an inmate's telephone calls did not "constitute[] an unreasonable search and seizure" because "[t]he expectation of privacy . . . attributed to the user of a public telephone booth does not carry over to the user of a penitentiary telephone").

telephones are being monitored, an inmate cannot reasonably expect his call to be private.[321]

Here, the Lycoming County Prison's policies and phone systems notify inmates that their calls on prison telephones are subject to monitoring and recording. The inmate handbook, which all inmates at the Lycoming County Prison receive upon entering the facility, provides that "[a]ll calls are recorded, may be listened to and divulged."[322] Henderson certified that he received the inmate handbook on July 12, 2019, and completed the Lycoming County Prison Orientation, which included a presentation on "Mail, Visiting and Telephone Procedures," on July 23, 2019.[323] Further, all calls placed by an inmate on the Lycoming County Prison telephones begin with an express warning that the calls are "subject to monitoring and recording."[324]

Given the nature of incarceration and the notices the Lycoming County Prison provides inmates regarding call monitoring and recording, Henderson cannot claim that he subjectively believed that he had a legitimate expectation of

---

[321] *United States v. Shavers*, 693 F.3d 363, 390 (3d Cir. 2012) (because a former inmate "would have received a handbook alerting him that all telephone calls were recorded and been exposed to a document hanging in the common areas that notified prisoners that their calls might be monitored and recorded," he "should have known that all outgoing prison telephone calls were monitored and recorded"), *vacated on other grounds*, 570 U.S. 913 (2013).

[322] GX 4.0 (Lycoming County Prison Inmate Handbook) at 23.

[323] GX 4.1 (D. Henderson Lycoming County Prison Orientation Sign-Off).

[324] GX 4.2 (Lycoming County Prison Telephone Call Warning).

privacy over his prison calls.[325] And even if he could, he would be unable to establish that this belief was objectively reasonable.[326]

Henderson's argument that the Lycoming County Prison did not inform inmates that the calls will be divulged to law enforcement and prosecuting attorneys is of no moment. As a legal matter, Henderson presents no legal authority establishing that such a warning (or the absence of such a warning) has any bearing on the admissibility of prison call recordings, and the Court has found none. Indeed, the Court sees no reason why it would. Absent a reasonable expectation of privacy, a defendant cannot suppress evidence on privacy grounds.[327] Because inmates warned that prison calls are being monitored and recorded have no reasonable expectation of privacy as to those calls, transcripts and recordings of prison calls survive Fourth Amendment challenge regardless of whether the prison notifies inmates that these calls may be disclosed to law enforcement.[328]

Moreover, as a factual matter, the Lycoming County Prison inmate handbook explicitly states that all calls on prison telephones "may be listened to *and divulged.*"[329] Thus, even if prisons were required to inform inmates that prison

---

[325] *See Jarmon*, 14 F.4th at 272; *Shavers*, 693 F.3d at 390.

[326] *Id.*

[327] *Katz*, 389 U.S. at 361.

[328] *See*, *e.g.*, *Jarmon*, 14 F.4th at 272 (affirming district court's denial of motion to suppress where inmates "knew the calls were monitored and recorded"; no mention of further notice about possible disclosure to law enforcement); *Shavers*, 693 F.3d at 390 (same).

[329] GX 4.0 (Lycoming County Prison Inmate Handbook) at 23 (emphasis added).

calls may be divulged to law enforcement, the Prison here provided inmates with a satisfactory warning to that effect.

Henderson's motion to suppress any recordings of the telephone conversations he had on the Lycoming County Prison telephones is denied.

### b.    Physical Evidence

Henderson's second motion to suppress concerns the search warrant application supporting the FBI's June 15, 2019, search of his home in Elyria, Ohio.[330] Specifically, Henderson argues that the evidence seized from his home should be suppressed because (i) "the warrant was issued without probable cause to believe that the items sought would be found in Mr. Henderson's home at the time the warrant was issued"; (ii) the affidavit and its attached list of items to be seized "suffer from a fatal lack of particularity"; and (iii) the searching officers exceeded the scope of the warrant.[331] The Court addresses each argument individually.

### i.      "Nexus" Between Henderson's Home and the Alleged Drug Conspiracy

When considering whether to authorize a search, a magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence

---

[330]  Doc. 168 (Henderson Mot. to Suppress Physical Evid.).
[331]  Doc. 169 (Mot. to Suppress Physical Evid. – Henderson Br.) at 2–12.

of a crime will be found in a particular place."[332] The Third Circuit has consistently held that a magistrate judge may infer probable cause to search the residence of a defendant suspected of drug trafficking based on evidence that (1) the defendant "is actually a drug dealer"; (2) "the place to be searched is possessed by, or the domicile of, the dealer"; and (3) "the home contains contraband linking it to the dealer's activities."[333] For the third prong, the Third Circuit recognizes the following "factors that help establish the required nexus between a defendant's drug dealing activities and his home":

> [L]arge-scale operations, a defendant's attempt to evade officers' questions about his address, the conclusions of experienced officers regarding where evidence of a crime is likely to be found, the proximity of the defendant's residence to the location of criminal activity, probable cause to arrest the defendant on drug-related charges, and the tip of a concerned citizen that a specific stolen item would be found in the defendant's residence.[334]

According to Henderson, the probable cause affidavit at issue is "completely devoid of any information that [he and Bressi] met, ever, at [Henderson's home] for a social visit, let alone drug transactions or business," and likewise lacks "evidence from any source that Mr. Henderson was seen in possession of illegal narcotics at his residence, stored narcotics in his home, or that he trafficked

---

[332] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

[333] *United States v. Stearn*, 597 F.3d 540, 559 (3d Cir. 2010) (citing *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002)).

[334] *Id.* at 559–60 (internal quotation marks and citations omitted).

narcotics out of the residence."[335] The Court finds this argument wholly
unconvincing.

The affidavit details the multi-year investigation into Henderson, Harris, and
Bressi's alleged drug conspiracy, which included an analysis of the Defendants'
financial activities, physical and cell phone surveillance, the seizure of relevant
physical evidence, and Bressi's confession inculpating both Henderson and
Harris.[336] Relevant here, the affidavit provides that phone geolocation data placed
Henderson at his home in Elyria, Ohio throughout the conspiracy, and indicated
that Henderson's phone traveled to the locations where Henderson and Bressi met
in Clarion, Pennsylvania and Hermitage, Pennsylvania at the dates and times in
question.[337] The affidavit then substantiates this data with descriptions of the
physical surveillance of Henderson and Bressi's meetings, during which law
enforcement saw Henderson give Bressi tens of thousands of dollars in cash.[338]
Notably, immediately following at least two of these meetings, Henderson returned
to his home in Ohio.[339]

Based on this information, the issuing magistrate judge appropriately
concluded "there is a fair probability" that contraband or evidence of drug

---

[335] Doc. 169 (Mot. to Suppress Physical Evid. – Henderson Br.) at 5–6.
[336] *See* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application &
Authorization – SEALED) ¶¶ 15–32 (review of financial activity), 33–67 (surveillance
efforts), 68–84 (search of SHIVA and Bressi's confession).
[337] *See id*. ¶¶ 54–56.
[338] *See id*. ¶¶ 57–67.
[339] *See id*. ¶¶ 61, 65.

distribution activity would be found in Henderson's home.[340] First, the averments in the affidavit—particularly Bressi's confession that "he has delivered a total of between 600 and 800 Kilograms of lactose mixed with 3-methyl fentanyl to [Harris and Henderson] from 2015 through 2017"[341]—establish for purposes of the probable cause inquiry that Henderson "is actually a drug dealer."[342] Second, as provided in the affidavit, property records verify that the residence in Elyria, Ohio is "possessed by, or the domicile of," Henderson and his wife.[343] And third, based on the scale of the drug dealing operations described in the affidavit and the averments about Henderson's meetings with Bressi (with Henderson driving from and then later returning to his home), the magistrate judge reasonably concluded that Henderson's home "contains contraband linking it to" the drug conspiracy.[344] Henderson's protestations notwithstanding, these representations distinguish this case from those in which a magistrate authorized a search based solely on generalized, conclusory assertions that criminals keep the proceeds of their crimes in their homes.[345]

---

[340]  *See Gates*, 462 U.S. at 238.

[341]  Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization – SEALED) ¶ 72.

[342]  *Stearn*, 597 F.3d at 559.

[343]  *Id.*; *see* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization – SEALED) ¶ 5.

[344]  *Stearn*, 597 F.3d at 559; *see* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization – SEALED) ¶¶ 52–67, 71–72.

[345]  *See, e.g.*, *United States v. Loy*, 191 F.3d 360, 366–67 (3d Cir. 1999) (finding affiant's "conclusory statement that people who collect child pornography commonly keep it in their homes" was "insufficient" to establish probable cause to believe the defendant's home contained child pornography).

Accordingly, the Court finds this basis for suppressing the physical evidence seized from Henderson's home unavailing.

### ii.        "Particularized" List of Items to Seize

In addition to establishing probable cause, constitutionally valid search warrants must set out "the scope of the authorized search . . . with particularity."[346] The purpose of the particularity requirement is to prevent general exploratory searches.[347] A warrant offends the particularity requirement when it amounts to a "general warrant" or one that is constitutionally overbroad. A general warrant "vest[s] the executing officer with unbridled discretion to conduct an exploratory rummaging . . . in search of criminal evidence."[348] An overbroad warrant "describe[s] in both specific and inclusive generic terms what is to be seized, but . . . authorize[s] the seizure of items as to which there is no probable cause."[349] Importantly, the constitutional prohibition on general and overbroad warrants is subject to the good faith exception, which provides that an officer's execution of a search authorized by warrant is considered to be "in good faith"—and therefore admissible—so long as the warrant was not "so facially deficient" as to render the officer's belief in its legality "entirely unreasonable."[350]

---

[346] *Kentucky v. King*, 563 U.S. 452, 459 (2011).

[347] *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

[348] *United States v. Leveto*, 540 F.3d 200, 211 (3d Cir. 2008) (quotation marks and citation omitted).

[349] *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57)*, 307 F.3d 137, 149 (3d Cir. 2002) (citation omitted).

[350] *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001); *see also Leveto*, 540 F.3d at 211 (holding that "the good faith exception applies" to general warrants); *Ninety-Two Thousand*,

Here, Henderson asserts that the descriptions of items to be seized "either fail to limit the items . . . to those which are evidence of the alleged crimes or entirely fail to provide adequate guidance to the searching officers as how to distinguish those documents or other items which are related to the alleged crimes from those which are not."[351] Accordingly, Henderson contends that the warrant constitutes either a general warrant or an overbroad warrant, and that in either case, the search conducted thereto was constitutionally invalid.[352] The Court disagrees.

First, "[a]lthough the scope of the warrant was certainly extensive, the warrant was not general."[353] Specifically, the warrant authorized a search for and seizure of "evidence, fruits, and instrumentalities of violations of Title 21 United States Codes 841 and 846, Conspiracy to Manufacture and Possession of Controlled Substances."[354] The warrant specifies the following categories of evidence covered by the seizure authorization:

- "Business accounting records to include customer information, contracts, ledgers, invoices, purchase orders, and payment records";

- "Cellular telephone(s) and/or portable cellular telephone(s), SIM cards, pre-paid calling cards, pre-paid cellular telephones, voice over IP (VOIP) communication devices and the accompanying bills, detailed call records, internet service contracts, e-mail

---

307 F.3d at 149 ("Evidence seized pursuant to an overly broad warrant need not be suppressed if the good faith exception applies.").

[351] Doc. 169 (Mot. to Suppress Physical Evid. – Henderson Br.) at 10.

[352] *Id.*

[353] *Ninety-Two Thousand*, 307 F.3d at 149.

[354] Doc. 200-2, Ex. B (Attachment B to June 2019 Henderson Residence Search Warrant Application – SEALED) ¶ 1.

account information, residential telephone account information and bills, and any electronic communications data stored therein";

- "Electronic equipment, such as computers, personal organizers, personal digital assistant (PDA), telex machines, facsimile machines, currency counting machines, pagers, telephone answering machines and related manuals used to generate, transfer, count, record and/or store information," as well as "computer software, tapes and discs, audio tapes and the contents therein, containing the information generated by the aforementioned equipment";

- "Address and/or telephone books (written or typed by hand as opposed to printed commercially), including handwritten 'owe sheets,' rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, customers, financial institutions and other individuals of businesses with whom a financial relationship exists, and any financial records related to the alleged conspiracy"; and

- "Evidence related to the sale of suspected illegal drugs or narcotics, to include scales, money counting machines, or records of sales of illegal drugs or narcotics."[355]

The warrant thus "describe[s] in inclusive generic terms what is to be seized."[356] Because it does not "vest the executing officers with 'unbridled discretion' to search for and seize whatever they wish[]," the warrant is not an unconstitutional "general warrant."[357]

---

[355] *Id.* ¶¶ 2–6.

[356] *Ninety-Two Thousand*, 307 F.3d at 149 (internal brackets, ellipsis, and citation omitted).

[357] *Id.* (citation omitted).

Second, the Court does not consider the affidavit's description of the categories of items to be seized overly broad. And even if it was, suppression would nevertheless be inappropriate due to the good faith exception.

On this, the Court finds particularly relevant the Third Circuit's 2002 ruling in *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*. There, the defendant argued that the district court erred in refusing to suppress evidence because the warrant "did not particularly describe the items to be seized."[358] The warrant authorized a search for and seizure of a broad collection of business records as well as computers and software.[359] According to the Third Circuit, "reasonable officers could have easily believed that the warrant was not even overly broad with respect to the categories of items to be seized," emphasizing that "a principal purpose of the warrant to was to prove a negative"— that is, to show that the defendant "had *not* engaged in legitimate business transactions . . .  from which [he] had received large cash payments."[360] As such, the Third Circuit rejected the defendant's arguments relating to particularity.[361]

As in *Ninety-Two Thousand*, the warrant here authorized the search for and seizure of, among other things, business records as well as computers and other technology that could have been used as instrumentalities of the alleged criminal

---

[358] *Id*. at 145.
[359] *Id*. at 149.
[360] *Id*.
[361] *Id*. at 155.

conduct.[362] Although Henderson deems this authorizing language unduly broad,[363] the Court must consider the context and purpose of the warrant. The investigation into Henderson and his co-defendants, like that in *Ninety-Two Thousand*, sought to "prove a negative": the Government aimed to establish that the flow of cash into the Defendants' respective bank accounts was not, as they claim, the result of legitimate business efforts, but was instead the product of an illicit drug distribution conspiracy.[364] The breadth of the warrant thus corresponds with the breadth of the criminal inquiry and alleged criminal activity. Although the language is broad, it is not impermissibly "overbroad" because it covers only items for which there is probable cause.[365]

Moreover, even if the Court deemed the warrant overbroad, the description of items to be seized is not so overbroad as to render the warrant "facially deficient," obviating any reasonable belief in its legality.[366] Accordingly, regardless of this Court's ruling on the breadth of the warrant, the good faith

---

[362] *See* Doc. 200-2, Ex. B (Attachment B to June 2019 Henderson Residence Search Warrant Application – SEALED) ¶¶ 2–6.

[363] Doc. 169 (Mot. to Suppress Physical Evid. – Henderson Br.) at 10 (arguing that the warrant "authorize[s] the seizure of virtually every piece of paper, without limitation as to time or person," thus providing "absolutely no criteria to guide the searching officers in distinguishing between evidentiary documents and innocuous documents").

[364] 307 F.3d at 149.

[365] *See id.*

[366] *See Hodge*, 246 F.3d at 308; *see also Ninety-Two Thousand*, 307 F.3d at 151 (holding that a warrant's failure to limit the timeframe of documents subject to seizure "did not make the warrant so facially deficient as to render official belief in its legality entirely unreasonable") (internal quotation marks, brackets, and citation omitted).

exception to the exclusionary rule would preclude suppression of the physical evidence seized from Henderson's home on this ground.

### iii.      Scope of the Search

Finally, Henderson claims that the law enforcement officers who searched his home "seized a laundry list of items that were never mentioned in the search warrant, and were on their face innocuous and not contraband or fruits of a crime."[367] Specifically, Henderson highlights the seizure of "money, firearms, ammunition, jewelry, and watches" from his residence.[368] But as the Government asserts, the warrant "affidavits and attachments make it clear that the affiant is searching not only for evidence of criminal activity, but also for proceeds, fruits of crime, and records."[369] Firearms and ammunition indisputably constitute relevant evidence and instrumentalities of the offenses at issue. And the money and jewelry seized qualify as both "fruits of crime explicitly authorized by the search warrant itself and [its attachment]" as well as "evidence tending to prove the existence of narcotics distribution."[370]

---

[367] Doc. 169 (Mot. to Suppress Physical Evid. – Henderson Br.) at 11.

[368] *Id.*

[369] Doc. 197 (Mot. to Suppress Physical Evid. – Gov't Opp.) at 12; *see also* Doc. 200, Ex. A (June 14, 2019, Henderson Residence Search Warrant Application & Authorization – SEALED) at 2 ("Authority is sought to search [Henderson's] Residence . . . for the items specified in Attachment B, which constitute evidence, contraband, fruits, and instrumentalities of violations of Title 21 United States Codes 841 and 846.").

[370] Doc. 197 (Mot. to Suppress Physical Evid. – Gov't Opp.) at 12 (citing *United States v. Cooley*, 131 F. App'x 881, 883 (3d Cir. 2005); *United States v. Newton*, 891 F.2d 944, 948 (1st Cir. 1989)).

Accordingly, the Court finds that the officers did not exceed the scope of the authorized search by seizing from Henderson's home: money, firearms, ammunition, and jewelry. Henderson's second motion to suppress is denied.

### 3.    Harris's Motions to Suppress

The final two motions to suppress presently before the Court were filed by the third Defendant, Terry Harris.[371] Both motions concern a recorded conversation between Bressi and Harris that occurred on June 18, 2019, at Bressi's home in Danville, Pennsylvania.[372] That day, Bressi (who was then cooperating with the FBI) wore a recording device provided by the FBI agents investigating the case, who were on site, surveilling the home and recording the exterior of Bressi's house throughout Harris's time at the residence.[373] After the interaction ended, Bressi returned the recording device to the FBI agents, and an FBI employee listened to the 67-minute recording and prepared a transcript of the exchange between Bressi and Harris.[374]

In his motions to suppress, Harris asks the Court to prohibit the Government from introducing as evidence at trial either the recording or the transcript.[375] According to Harris, the recording contains inadmissible hearsay: Bressi's

---

[371]  Doc. 160 (Harris's Mot. to Preclude Co-Conspirator Statements); Doc. 162 (Harris Mot. to Preclude Tape Recordings and Transcripts).

[372]  *See* Doc. 161 (Mot. to Preclude Co-Conspirator Statements – Harris Br.); Doc. 163 (Mot. to Preclude Tape Recordings and Transcripts – Harris Br.).

[373]  *See* Doc. 193 (Harris Mot. to Preclude – Gov't Opp.) at 4.

[374]  *Id*. at 4–5.

[375]  Doc. 160 (Harris Mot. to Preclude Co-Conspirator Statements); Doc. 162 (Harris Mot. to Preclude Tape Recordings and Transcripts).

recorded statements are not subject to Federal Rule of Evidence 801(d)(2)(E)—

which permits out-of-court statements by a defendant's co-conspirator during and

in furtherance of the conspiracy—because when the interaction occurred, Bressi

was cooperating with the Government and therefore not acting in furtherance of

the conspiracy.[376] Additionally, Harris asserts that the recording cannot be properly

authenticated and the transcript contains inaccuracies.[377]

      Neither argument has merit. First, Harris misunderstands the Government's

proffered basis for admitting Bressi's recorded statements. According to the

Government, it is not offering the out-of-court statements Bressi made while

cooperating with the FBI as co-conspirator statements under the Rule 801(d)(2)(E)

exception to hearsay; rather, the Government asserts that such statements are

admissible because they are not hearsay.[378] The Government explains it does not

intend to present Bressi's statements to prove the truth of the matter asserted—

indeed, "because the audio recording was a controlled delivery of lactose, the vast

majority of Bressi's statements to Harris . . . were lies"—but instead "to provide

context to [Harris's] statements."[379] The Court finds this argument persuasive, as

---

[376] Doc. 161 (Mot. to Preclude Co-Conspirator Statements – Harris Br.) at 2–5; *see also* Doc. 264 (Harris Post-Trial Supplemental Br.) at 1–3.

[377] Doc. 163 (Mot. to Preclude Tape Recordings and Transcripts – Harris Br.) at 2–3.

[378] Doc. 193 (Harris Mot. to Preclude – Gov't Opp.) at 6–8.

[379] *Id*. at 7.

the Third Circuit has consistently deemed statements by cooperating co-conspirators admissible for this purpose.[380]

Second, Harris's objections to the audio recording and corresponding transcript on authentication and accuracy grounds, respectively, were repudiated by witness testimony at the November 2022 evidentiary hearing. On the question of authentication, Harris argues that absent Bressi's testimony, "[t]he Government cannot authenticate the recordings nor directly identify the speakers, or provide clear and convincing evidence that the statements are voluntarily made in good faith without any kind of inducement."[381] In response, the Government previewed that "[a]gents from the FBI can properly authenticate the audio recording based on their participation in the June 18 meeting between Bressi and Harris."[382]

Indeed, that's precisely what happened. During the evidentiary hearing, Special Agent O'Malley testified that he was on-site, stationed across the street

---

[380] *See, e.g.*, *United States v. Lee*, 339 F. App'x 153, 157 (3d Cir. 2009) (recording of conversation between the defendant and a confidential informant admissible non-hearsay: the defendant's statements "constitute admission of a party opponent," and the confidential informant's statements "were not offered for the truth of the matter asserted, but rather to provide context to [the defendant's] responses"); *United States v. Hendricks*, 395 F.3d 173, 184 (3d Cir. 2005) (holding that Government was permitted to introduce into evidence recordings of conversations involving a confidential informant because his statements "put the statements of the other parties to the conversations into perspective and make them intelligible to the jury and recognizable as admissions") (internal quotation marks and citation omitted); *see also United States v. Rodriguez-Mendez*, 2021 WL 6143581, at *5 (W.D. Pa. Dec. 29, 2021) (statements by confidential informant in recorded conversation with the defendant "are not hearsay, because they were not offered for the truth of the matter asserted, but to provide context to [the defendant's] statements").

[381] Doc. 163 (Mot. to Preclude Tape Recordings and Transcripts – Harris Br.) at 3.

[382] Doc. 193 (Harris Mot. to Preclude – Gov't Opp.) at 8.

outside Bressi's Danville home when the recorded interaction took place.[383] He

stated that he observed the initial interaction that occurred outside Bressi's garage,

and when asked to identify the individuals observed, he responded that he saw

Bressi and Harris.[384] Further, he explained that although he could not see the men

when they entered Bressi's home, he and his fellow agents performed a sweep of

the residence prior to Harris's arrival and confirmed that no one else was inside the

house.[385] In short, he certified that the recording was authentic and correct, and he

positively identified the individuals on the recording as Bressi and Harris.

At the evidentiary hearing, Harris's counsel disputed Special Agent

O'Malley's ability to identify Harris, arguing that Special Agent O'Malley had

never seen Harris prior to this encounter.[386] The Court struggles to comprehend the

---

[383] Doc. 258 (Nov. 15, 2022, Hearing Tr. – Special Agent O'Malley Testimony) at 190:21–191:7 ("Q. Okay. All right. I want to move forward to the events that happened on June 18th, 2019, at 63 Cricket Lane. Just to set the stage, am I correct that that is the day that Harris was coming up to Danville to Bressi's house at 63 Cricket Lane to meet with Bressi? A. Yes. Q. And this was done after Bressi's arrest, correct? A. Correct. Q. With the FBI's knowledge and supervision? A. Yes. Q. So you were there? A. I was there.").

[384] *Id.* at 193:2–7 ("Q. And whose truck was that that just pulled up? A. That's the truck that Mr. Harris drove up. Q. And who is this at 31.23 in blue? A. That's Mr. Bressi exiting the garage. Q. And who just got out of the truck? A. Mr. Harris.").

[385] *Id.* at 199:16–200:3 ("Q. All right. Was there any physical real-time surveillance of—of Harris—was there any physical real-time surveillance of Bressi on June 18th with whoever arrived in that truck? A. Did you say Bressi? Q. Yes. A. Yes. We took him there from Clinton County Prison. We were with him. We did check the entire residence, walked through the entire residence as part of setting up the operation. And there was five of us who were in the detached garage, monitoring the live feed of the audio as kind of a quick reaction of course for Mr. Bressi's safety, if there was something threatening Mr. Bressi's safety.").

[386] Doc. 259 (Nov. 16, 2022, Hearing Tr. – Special Agent O'Malley Testimony) at 28:3–20 ("Q. Okay. Oh, well, you believe it was Mr. Harris. You have no idea that it was, him, correct? A. No. It was Mr. Harris. I was there in the garage and could see through the glass and could see Mr. Harris get out of his truck at 63 Cricket Lane. Q. Well, let's talk about that. You had never seen him in person prior to that? A. No. I had not seen him in person. Q. And so were you able

relevance of this point. To properly identify a speaker on a recording, the proponent need only establish the speaker's identity by a preponderance of the evidence—that is, the proponent must show that the speaker is more likely than not the individual they claim him to be.[387] The question is whether, at the time of admission, the authenticating witness can verify the identity of a speaker; whether the witness knew the person at the time the recording was made is of no consequence.[388] As such, courts consistently accept identifications made by law enforcement officers based on the context of the recorded conversations and familiarity with the participant's voices.[389] Here, that is precisely the basis Special Agent O'Malley provided for his in-court identification of Bressi and Harris as the participants on the recording.

---

to identify his voice based upon your observation of Mr. Harris? A. No. But we were—we were listening to a live feed of the conversation that was going on. Q. I understand that. My question is, if you didn't see him—or see anybody else that day, would you have been ablet to identify the voice communicating with Mr. Bressi? A. I don't know. No. Q. You don't know or the answer is no? A. No.").

[387] *See United States v. Fratus*, 559 F. Supp. 3d 420, 422 (E.D. Pa. 2021) ("Since Rule 901, courts within the Third Circuit generally apply the *Starks* factors to determine the authenticity of a tape recording and use a preponderance of the evidence standard to identify a speaker on the recording.") (internal quotation marks and citation omitted). This burden is "relatively minimal": "[a]ny person may identify a speaker's voice if he has heard the voice at any time." *United States v. Madera*, 2019 WL 2509896, at *4 n.1 (M.D. Pa. June 14, 2019) (Mariani, J.) (internal quotation marks and citations omitted).

[388] *Id.*

[389] *See, e.g.*, *United States v. Dubose*, _____ F. Supp. 3d _____, 2022 WL 16781511, at *6 (E.D. Pa. Nov. 8, 2022) (finding that a law enforcement officer's "testimony that he identified Defendants as speakers because of the context of the calls and familiarity with their voices, acquired by listening to the recordings and hearing [one defendant's] voice during his arrest, meets [the preponderance of the evidence] standard").

Separately, Harris argues that the audio recording is "unintelligible" and "the transcript prepared by the FBI is not accurate."[390] Although the quality of the audio recording is poor and thus the recorded conversation difficult to follow, the Court, in its review of the recording and the corresponding transcript, did not identify any clear discrepancies. Moreover, even if Harris is correct that the transcript contains inaccuracies, that would not require wholesale preclusion. As the Government asserts, an admonition by the Court that the jurors should be "guided by what they heard rather than what they read" will obviate any possible prejudice, as the jurors will be able to listen to the recording and determine whether the Government's proffered transcript comports with what they heard.[391]

For these reasons, Harris's motions to suppress are denied.

## B.    Severance and Discovery Motions

In addition to their suppression motions, Henderson and Harris filed separate motions for severance, and Henderson filed a motion to compel.[392] As Henderson's attorney acknowledged during the November 2022 evidentiary hearing, the Government "has complied with" the discovery requests at issue in Henderson's

---

[390] Doc. 163 (Mot. to Preclude Tape Recordings and Transcripts – Harris Br.) at 2.

[391] Doc. 193 (Harris Mot. to Preclude – Gov't Opp.) at 13 (citing *United States v. Adams*, 759 F.2d 1099, 1115 (3d Cir. 1985); *United States v. Seibert*, 779 F. Supp. 366 (E.D. Pa. 1991)).

[392] *See* Doc. 158 (Harris Mot. to Sever); Doc. 170 (Henderson Mot. to Compel); Doc. 172 (Henderson Mot. to Sever).

motion to compel, and, as such, that motion is "moot."[393] Accordingly, the only remaining motions before the Court are the motions to sever.

Federal Rule of Criminal Procedure 8(b) states that "[t]wo or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transaction constituting an offense or offenses." The Supreme Court has long recognized the "preference in the federal system for joint trials of defendants who are indicted together," explaining that they "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."[394] That said, consistent with Rule 14 of the Federal Rules of Criminal Procedure, the Supreme Court acknowledges that joinder, even when proper under Rule 8(b), "may prejudice either a defendant or the Government," and as such, district courts "may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires."[395]

Henderson and Harris argue that for purposes of trial, their cases should be severed from Bressi's for two reasons. First, they contend that the admission of various statements Bressi made to law enforcement, which "expressly name and implicate" Henderson and Harris, present "a classic *Bruton* problem," as

---

[393] Doc. 258 (Nov. 15, 2022, Hearing Tr.) at 9:17–19.

[394] *Zafiro v. United States*, 506 U.S. 534, 537 (1993) (internal quotation marks and citations omitted).

[395] *Id.* at 538 (citing Fed. R. Crim. P. 14).

Henderson and Harris will be "precluded from cross-examining [Bressi], due to Bressi's privilege against self-incrimination."[396] Second, Henderson asserts that the Court should sever the case as the Defendants will assert irreconcilable defenses: he intends to argue that Bressi "was the progenitor behind the alleged conspiracy"—a position he presumes Bressi will dispute.[397] The Court addresses each argument in turn.

### 1.    The *Bruton* Rule

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." This right, which includes the right to cross-examine witnesses,[398] presents a particular problem in cases involving more than one defendant tried jointly, as the Government in such cases often seeks to offer into evidence the confession of one nontestifying defendant that incriminates the other defendants on trial. Through three cases in the latter half of the 20th century, the Supreme Court propounded the parameters of a criminal defendant's Sixth Amendment right of confrontation as applied in this context.

---

[396] Doc. 173 (Mot. to Sever – Henderson Br.) at 4–5 (cleaned up); *see also* Doc. 159 (Mot. to Sever – Harris Br.) at 3 (noting that a defendant's "Sixth Amendment right is violated in a joint trial when a co-defendant's confession is being admitted during the trial and that co-defendant does not take the stand").

[397] Doc. 173 (Mot. to Sever – Henderson Br.) at 5.

[398] *See Pointer v. Texas*, 380 U.S. 400, 406–07 (1965).

In *Bruton v. United States*, the Supreme Court considered the constitutionality of admitting into evidence testimony about one co-defendant's confession, which included inculpatory statements about the other defendant.[399] The principal question at issue concerned the nonconfessing defendant's right to confront his accuser, as the co-defendant did not testify at trial.[400] Although the trial court instructed the jury to disregard the confession for purposes of determining the nonconfessing defendant's guilt, the Supreme Court explained that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."[401] Recognizing the admission of "powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant . . . in a joint trial," as one such context, the Supreme Court set aside the defendant's conviction.[402]

A decade later, the Supreme Court in *Richardson v. Marsh* considered whether *Bruton* renders invalid a conviction in a joint trial "when the codefendant's confession is redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted

---

[399] 391 U.S. 123 (1968).
[400] *Id*. at 136–37.
[401] *Id*. at 135.
[402] *Id*. at 135–37.

against him at trial."[403] Noting that "evidence requiring linkage differs from evidence incriminating on its face," the Supreme Court declined to extend *Bruton* to the facts at issue, ruling that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."[404] That said, the Supreme Court in *Richardson* "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun."[405]

A decade after that, the Supreme Court addressed that latter issue squarely. In *Gray v. Maryland*, the Supreme Court held that simply redacting a nontestifying co-defendant's confession by "replac[ing] the nonconfessing defendant's name with a kind of symbol" (there, "the word 'deleted' or a blank space set off by commas") does not elide the *Bruton* rule.[406] Instead, the Court concluded that "redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results."[407]

---

[403]  481 U.S. 200, 202 (1987).
[404]  *Id*. at 208, 211.
[405]  *Id*. at 211 n.5.
[406]  523 U.S. 185, 192 (1998).
[407]  *Id*. at 195.

In reaching this conclusion, the Supreme Court acknowledged that *"Richardson* placed outside the scope of *Bruton*'s rule those statements that incriminate inferentially," and "concede[d] that the jury must use an inference to connect the statement in [a] redacted confession with the [nonconfessing] defendant."[408] However, the Supreme Court opined that "inference pure and simple cannot make the critical difference"; instead, the *Richardson* principle "depend[s] in significant part upon the *kind* of, not the simple *fact* of, inference."[409] The question, according to the majority in *Gray*, is whether the "inferences involved statements that did not refer directly to the defendant himself and which became incriminating only when linked with evidence introduced later at trial," or "statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."[410] The former falls outside the *Bruton* rule and thus can be admitted without running afoul of the Sixth Amendment's Confrontation Clause; the latter does not.

Analyzing these cases, the Third Circuit has held that "the current state of the law is that there is a Confrontation Clause violation when a non-testifying codefendant's confession is introduced that names another codefendant or that refers directly to the existence of the codefendant in a manner that is directly

---

[408] *Id.*
[409] *Id.* at 195–96.
[410] *Id.* at 196 (internal quotation marks omitted).

accusatory," but "there is no violation if the confession is properly redacted to omit any reference at all to the codefendant, making it more likely that the jury will be able to follow the court's instruction to disregard this evidence in rendering its verdict."[411] Although the Third Circuit recognizes that "using a neutral pronoun may satisfy *Bruton* in some circumstances," it directs district courts "to take a holistic approach when considering redacted confessions, by viewing the redaction in the context of the entire record."[412] Relevant here, in cases involving limited participants, the use of neutral pronouns typically fails to survive *Bruton* scrutiny when the redacted confession implicates the precise number of individuals tried alongside the confessing co-defendant.[413]

Here, the Government has signaled that it intends to offer into evidence transcripts from two prior interviews with Bressi: (1) a custodial interview that Special Agents O'Malley and Ambers P. Wilson conducted at the Milton Barracks on June 8, 2019;[414] and (2) a proffer session held with Bressi and his prior attorney

---

[411] *Washington v. Secretary Pa. Dept. of Corrections*, 801 F.3d 160, 166 (3d Cir. 2015) (internal citations omitted).

[412] *Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 796 (3d Cir. 2020) (citations omitted).

[413] *See Eley v. Erickson*, 712 F.3d 837, 860–61 (3d Cir. 2013) (finding a *Bruton* violation when the nontestifying co-defendant's confession "implicated exactly three people in the crimes and exactly three defendants appears at the joint trial"); *Johnson*, 949 F.3d at 797 (holding that "[t]he limited participants in this case made it obvious to a juror who need only lift his eyes to see Johnson, sitting at counsel table, to determine that he was 'the other guy'" referenced in the redacted confession, as Johnson was "the only other accused sitting at the table with" the confessing co-defendant) (internal quotation marks and citation omitted); *cf. Priester v. Vaughn*, 382 F.3d 394, 401 (3d Cir. 2004) (substituting "the other guy" did not implicate the defendant because at least fifteen people were involved in the crime).

[414] Doc. 201-1, Ex. A (June 8, 2019, Bressi Interview Tr. – SEALED).

on September 27, 2019.[415] During these interviews, Bressi confessed to

manufacturing fentanyl and fentanyl analogues (in particular, carfentanil) and

provided detailed accounts of his production process and distribution efforts.[416]

Relevant here, Bressi specifically named his co-defendants, Henderson and Harris,

as the two principle individuals he was "dealing with."[417] Accordingly, the

Government concedes that the transcripts, "in unredacted form," contain

statements that "plainly violate[] the *Bruton* rule."[418] But the Government contends

that the objectionable portions of the transcripts can be stricken, and, to that end, it

has provided copies of the transcripts in redacted form that it believes accord with

*Bruton*.[419]

The Court agrees with the Government—but only in part. As the

Government asserts, "the statements made by Bressi are lengthy and detailed

enough that references to Henderson and Harris can be excised in their entirety

while still allowing the [Government] to use Bressi's statements against Bressi

himself."[420] For example, during the custodial interview on June 8, 2019, Bressi

had the following exchange with Special Agents O'Malley and Wilson:

---

[415]  Doc. 201-2, Ex. B (Sept. 27, 2019, Bressi Proffer Tr. – SEALED).

[416]  *See* Doc. 201-1, Ex. A (June 8, 2019, Bressi Interview Tr. – SEALED); Doc. 201-2, Ex. B (Sept. 27, 2019, Bressi Proffer Tr. – SEALED).

[417]  Doc. 201-1, Ex. A (June 8, 2019, Bressi Interview Tr. – SEALED) at 29.

[418]  Doc. 198 (Mot. to Sever – Gov't Opp.) at 24.

[419]  *Id*. at 22–25 (citing Doc. 201-1, Ex. A (June 8, 2019, Bressi Interview Tr. – SEALED); Doc. 201-2, Ex. B (Sept. 27, 2019, Bressi Proffer Tr. – SEALED)).

[420]  *Id*. at 22–23.

**O'Malley**:   You admitted to us that you were making fentanyl and carfentanil at the laboratory.

**Bressi**:      Yeah. That's right.

. . .

**O'Malley**:   . . . And the distillation you were doing today with the solvents that you said were stage one or step one—

**Bressi**:      Yeah. That's basically part of stage one of—

**O'Malley**:   But you said that this distillation was a first time go for this method?

**Bressi**:      Uhm hmm.

**O'Malley**:   That you were doing today?

**Bressi**:      Yeah.

**O'Malley**:   And you didn't know what the yield would be but this distillation process today was to produce one of the precursors—

**Bressi**:      Uhm hmm.

**O'Malley**:   —to make fentanyl. Is that correct?

**Bressi**:      The, this precursor can be used for fentanyl or carfentanil.

**O'Malley**:   Fentanyl or Carfentanil?

**Bressi**:      Yeah.

**O'Malley**:   But what were you going to do?

**Bressi**:      Oh, I told them. It was going to be Car.

**Wilson**:     It was going to be Car?

| | | |
|---|---|---|
| **Bressi**: | Uhm hmm. | |
| **Wilson**: | Why did you choose, why Car? Out of curiosity. Is it more, worth, is it more valuable? Is it more potent? | |
| **Bressi**: | Oh, well, yeah. It's more potent which means less, the qualities that these people are asking for.[421] | |

As the Court sees it, nothing in that exchange implicates the *Bruton* rule. Bressi admitted he was making fentanyl and carfentanil out of the SHIVA laboratory, and that on the day of the interview (i.e., the day the FBI executed the search warrant on Bressi and SHIVA), he was producing a precursor for carfentanil.[422] These statements indisputably inculpate Bressi; they do not, however, refer to either Henderson or Harris in a manner that is "directly accusatory."[423] Given Bressi's later admissions regarding Henderson and Harris, one could infer that Bressi's statement about "these people" who "are asking for" the illicit narcotics refers to Henderson and Harris.[424] But the statement excerpted here does not, on its face, incriminate them.[425] Accordingly, this portion of Bressi's statement can be admitted into evidence in the Defendant's joint trial (with the requisite limiting instruction, of course) without running afoul of *Bruton*.

---

[421] Doc. 201-1, Ex. A (June 8, 2019, Bressi Interview Tr. – SEALED) at 21–23.
[422] *Id*.
[423] *Washington*, 801 F.3d at 166.
[424] Doc. 201-1, Ex. A (June 8, 2019, Bressi Interview Tr. – SEALED) at 23.
[425] *See Richardson*, 481 U.S. at 208.

That said, other portions of the interview transcripts won't pass constitutional muster, even with the Government's proposed redactions. Consider this exchange from the June 8, 2019, custodial interview, which the Government excerpted in its opposition brief:

**Bressi**: But I'm not, I mean, the one guy I mean, his his, he's telling me his people are like, they want like hundreds and hundreds and hundreds.

**O'Malley**: Of?

**O'Malley**: Kilograms. Right. ~~Names. I'm not going to wait, cause we didn't get into that yet. This guy. Who is this guy you're talking about right here?~~

~~**Bressi**: This is Terry Harris.~~

~~**O'Malley**: Terry Harris.~~

~~**Bressi**: You know him as South. Or whatever you were, whatever you were down south.~~

~~**O'Malley**: Down south.~~

~~**Bressi**: These are the down South guys.~~

~~**O'Malley**: Down south. Down south. Terry Harris is a Philly guy?~~

~~**Bressi**: Uhm hmm.~~

~~**O'Malley**: Right. Okay. Who else were you dealing with?~~

~~**Bressi**: Ah, on the west side, it's ah Monty Henderson.~~

~~**O'Malley**: Monty Henderson?~~

~~**Bressi**:        Uhm hmm.~~

~~**O'Malley**:   And he's in Ohio?~~

~~**Bressi**:        Uhm hmm.~~

**O'Malley**:   Okay. Who else are you dealing with?

**Bressi**:        That's it.

**O'Malley**:   They're two guys?

**Bressi**:        They're the two guys.

**O'Malley**:   Have they always been your two guys? Anyone else? Anyone down in Harrisburg?

**Bressi**:        I never did any business with anybody down in Harrisburg.

**O'Malley**:   Nothing. Nothing in Harrisburg. Okay. ~~So from the outset of Shiva and fentanyl and whatnot it's been Terry Harris in Philly?~~

~~**Bressi**:        Uhm hmm.~~

~~**O'Malley**:   And Monty Henderson—~~

~~**Bressi**:        Uhm hmm.~~

~~**O'Malley**:   in Ohio?~~

~~**Bressi**:        Right.~~

**O'Malley**:   And no one else?

**Bressi**:        Yup.[426]

As proposed, the Government has appropriately excised all direct references to Henderson and Harris. But the Government would like to keep Bressi's

---

[426] Doc. 201-1, Ex. A (June 8, 2019, Bressi Interview Tr. – SEALED) at 28–29.

statement about the "two guys" he is "dealing with."[427] To the Government, this portion of the statement "does *not* prejudice Harris and Henderson because their identities are not apparent from the face of the statement."[428] The Court disagrees. Given that there are only three people on trial, it would be obvious to a juror presented with this statement that Bressi's discussion of the "two guys" he dealt with—"[a]nd no one else"—refers to the two men seated beside him at counsel's table: Henderson and Harris. As the Third Circuit has made plain, redacted confessions of this sort, which implicate the precise number of individuals tried alongside the confessing co-defendant, violate the *Bruton* rule.[429]

Accordingly, the Court finds that the statements made by Bressi can be redacted to comply with the *Bruton* rule. But the redacted transcripts proposed by the Government do not. Before the Court accepts these statements into evidence, the Government will need to perform further redactions, excising all references to Henderson and Harris that, consistent with Third Circuit precedent, qualify as "directly accusatory."[430]

### 2.    Antagonistic Defenses

Separate from the *Bruton* objection, Henderson argues that severance is appropriate because he and his co-defendants will "assert clearly irreconcilable

---

[427] *Id.*
[428] Doc. 198 (Mot. to Sever – Gov't Opp.) at 24 (cleaned up).
[429] *See Eley*, 712 F.3d at 860–61; *Johnson*, 949 F.3d at 797.
[430] *Washington*, 801 F.3d at 166.

defenses."[431] Specifically, Henderson notes that he will argue at trial that Bressi was "the progenitor behind the alleged conspiracy," which Bressi will presumably dispute.[432] But as with the Defendants' *Bruton* arguments, the Court finds this stated basis for severance unavailing.

Although the Supreme Court recognizes that "'mutually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance," it specifically declined to adopt a "bright-line rule, mandating severance whenever codefendants have conflicting defenses," explaining that "[m]utual antagonistic defenses are not prejudicial *per se*."[433] Instead, co-defendants seeking to sever their scheduled joint trial must articulate "specific instances of prejudice."[434] To the end, the Third Circuit instructs that to warrant severance, "the defenses must be so antagonistic that the jury, in order to believe the defense of one defendant, must necessarily disbelieve the other defendant's defense"—the so-called "either or" situation.[435] This test "is not lightly met," as "'the mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another' does not require severance."[436]

---

[431] Doc. 173 (Mot. to Sever – Henderson Br.) at 5.

[432] *Id.*

[433] *Zafiro*, 506 U.S. at 538.

[434] *Id.* at 539.

[435] *United States v. Sandini*, 888 F.2d 300, 310 (3d Cir. 1989) (quotation marks and citation omitted).

[436] *Id.* (quoting *United States v. Barber*, 442 F.2d 517, 530 (3d Cir.), *cert. denied* 404 U.S. 846 (1971)); *see also United States v. Blankenship*, 382 F.3d 1110, 1126 (11th Cir. 2004) ("The fact that a defendant or his attorney is a de facto prosecutor who will shift blame from himself

Here, Henderson argues that his and Bressi's defenses are antagonistic because he intends to shift blame from himself to Bressi, claiming that Bressi coordinated the drug conspiracy at issue, but he (i.e., Henderson) wasn't a part of it.[437] As this Court sees it, Henderson is simply seeking "to exculpate himself by inculpating another"—a strategy that although antagonistic, does not, per Third Circuit precedent, warrant severance.[438] Accordingly, the motions for severance are denied.

## III.   CONCLUSION

As the length of this opinion demonstrates, the Defendants have done their level best to attack the Government's case against them. As they should have. Because the Defendants pleaded not guilty, they owe it to themselves to mount a vigorous defense. But for all the Sturm and Drang, they have not identified any constitutional infirmities warranting the suppression of any evidence. And they likewise have not established that the standard, preferred practice of trying accused co-conspirators jointly is, in this case, unduly prejudicial or otherwise improper. Accordingly, the Defendants' pretrial motions are denied.

---

to co-defendants does not justify severance.") (internal quotation marks, brackets, ellipses, and citation omitted).

[437] Doc. 173 (Mot. to Sever – Henderson Br.) at 5.

[438] *See Sandini*, 888 F.2d at 310.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge