# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:19-CR-00207-01 |
| v. | (Chief Judge Brann) |
| ANTHONY D. BRESSI, | |
| Defendant. | |

## MEMORANDUM OPINION

### MARCH 11, 2025

On November 4, 2024, a jury convicted Anthony Bressi of conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1). Bressi now moves for a judgment of acquittal or, in the alternative, a new trial.[1] Bressi is guilty, and his motion is largely without merit. For the following reasons, the Court denies it with minor exception.

## I.      BACKGROUND

In early 2018, the Federal Bureau of Investigation ("FBI") opened an investigation into Anthony Bressi.[2] Bressi caught the FBI's attention after several banks reported that he had been making suspicious cash deposits to accounts

---

[1]    Doc. 436 (Mot.); *see* Fed. R. Crim. P. 29, 33.
[2]    Doc. 459 (Trial Tr. Vol. IV) at 67:8-11.

associated with his business, SHIVA Science and Technology Group, LLC ("SHIVA"), at branch locations in Central Pennsylvania.[3] Over the next year and a half, FBI investigators gathered evidence which strongly suggested that Bressi was involved in a large scale drug trafficking conspiracy. Some of the evidence included: bank records and surveillance video detailing past and continued suspicious cash deposits, many of which involved Bressi depositing piles of cash pulled from black duffel bags;[4] photos of Bressi meeting with his suspected co-conspirators, Damonico Henderson and Terry Harris (the three men had previously been cellmates at FCI Fort Dix serving prior sentences for federal convictions),[5] in various locations along the Pennsylvania/Ohio border and outside of Philadelphia, Pennsylvania, and at times exchanging suspicious items;[6] and a traffic stop following one of these meetings in which Bressi admitted to Pennsylvania State Trooper Luke Straniere that he had a shopping bag with $10,000 cash in his car.[7]

On June 8, 2019, a joint FBI and Pennsylvania State Police ("PSP") task force executed federal search warrants on Bressi's home and SHIVA.[8] Bressi was at SHIVA that day, and was leaving for lunch with his fiancée when law enforcement arrived.[9] While the PSP Clandestine Lab Response Team ("CLRT") staged to enter

---

3    Doc. 271 (Feb. 28, 2023, Mem. Op.) at 2-3.
4    *See, e.g.*, Government Exhibit ("GX") 2.1-2.19.
5    *See* Doc. 460 (Trial Tr. Vol. V) at 170:7-12.
6    *See, e.g.*, GX 14.2-14.7; 15.2; 16.1-16.2; 17.2-17.3; 19.1-19.5; 20.2-20.4.
7    GX 4.1.
8    GX 5.1; 5.3.
9    Doc. 461 (Trial Tr. Vol. VI) at 20:19-24.

the building, FBI Special Agent Timothy K. O'Malley and PSP State Trooper Ryan Kelley questioned Bressi about his work at SHIVA.[10] After Bressi detailed a laundry list of society-altering inventions that he claimed to be on the brink of perfecting, the conversation turned to the reason for the warrants.[11] O'Malley and Kelley explained that the FBI had been investigating Bressi for some time and that they suspected he was in the business of producing fentanyl.[12] Bressi, who was presumably watching CLRT scientists don personal protective equipment ("PPE") to enter the building, admitted that he had been caught red-handed: he was in the midst of preparing an enormous batch of carfentanil.[13]

O'Malley and FBI Special Agent Ambrose Wilson then took Bressi to the Milton, Pennsylvania PSP barracks—stopping for Burger King on the way—*Mirandized* him, and resumed the conversation in a videotaped interview.[14] Bressi detailed his fentanyl operation in a more-than-four-hour confession.[15] In the confession, he named Damonico Henderson and Terry Harris as his associates and told investigators that each coconspirator had a 100-kilogram delivery of carfentanil

---

[10]  Doc. 456 (Trial Tr. Vol. I) at 57:1-58:1.

[11]  GX 1.4 (Milton PSP Barracks Confession) at 10 (noting that the participants had already discussed "the Automated Beverage Synthesizer, ah, the ZPUs . . . nanocur[,] . . . Dazzle[,] . . . Vaness, Vaness Plus[,] . . . Rocanna[,] . . . [and] Liness[.]"); Doc. 456 (Trial Tr. Vol. I) at 59:7-60:6.

[12]  Doc. 456 (Trial Tr. Vol. I) at 59:7-60:6.

[13]  *Id.* at 60:5-61:8.

[14]  Doc. 457 (Trial Tr. Vol. II) at 90:1-92:10.

[15]  *See* GX 1.4.

scheduled for the upcoming week.[16] Bressi eventually made those deliveries with a fake substance while under FBI surveillance and wearing a wire.[17] A few months later, Bressi, accompanied by his defense attorney, sat down for a proffer interview with several Federal Drug Enforcement Agency ("DEA") Chemists.[18] Bressi confessed for a third time and explained his production process in detail, from setting up his lab and gathering materials, to developing product, to testing potency on mice.[19]

Bressi's statements in these interviews are incredibly damning. He admitted to operating a drug trafficking conspiracy delivering vast quantities of an extremely potent and dangerous opiate to the streets of Cleveland, Ohio and Philadelphia, Pennsylvania. He bragged about his skill and savvy in pulling the operation off. And he absolved himself of any responsibility for the devasting harm his actions undoubtedly wrought.

At trial, the Government played a majority of the barracks confession and some of the DEA confession. The prosecution also presented the evidence that it had gathered before the searches along with the footage and recorded audio of the controlled buys in which Bressi participated. Bressi took the stand in his own defense

---

[16]  *Id.* at 98-99.
[17]  GX 7.2 (Henderson Controlled Delivery Footage); GX 8.1 (Harris Controlled Delivery Footage).
[18]  GX 1.8 (DEA Interview).
[19]  *Id.*

to explain how he had brilliantly smuggled seemingly minor errors into his confessions which a discerning listener (and expert chemist) would recognize as a secret code pointing to Bressi's innocence.[20] The jury, without the help of a Sherlock Holmes,[21] Robert Langdon,[22] or Benjamin Gates,[23] were apparently unable to crack Bressi's cryptic message. Instead, they seem to have believed his confessions were straightforwardly true: the jury returned guilty verdicts on the charges of conspiracy to manufacture with intent to distribute controlled substances and possession with intent to distribute a controlled substance.

Bressi must not have been very confident in his absolution cipher because, before trial, he repeatedly attempted to suppress his confessions. Now, following his conviction, he again asks that the Court ignore his interviews and grant him a new, confession-less trial. The fifth time is not the charm. Bressi's confessions were properly admitted, and it was perfectly reasonable for the jury to believe that they were truthful and voluntary. A jury believing as much had ample evidence to convict Bressi on both charges, and his conviction will stand in large part.

---

[20] Doc. 461 (Trial Tr. Vol. VI) at 34:12-35:2; *id.* at 40:4-41:22, 68:19-69:2 (Bressi claiming that he was actually discussing "Despropionyl Carfentanyl" in the controlled deliveries but left off the "Despropionyl" because that is what the Government wanted); *id.* at 42:15-44:15 (Bressi explaining that he gave the DEA Scientists a made up story about substance production); *id.* at 105:16-106:10 (Bressi claiming that delays in his responses during the interviews indicated that he was "probably fabricating it").

[21] *See, e.g.*, Sir Arthur Conan Doyle, *A Study in Scarlet* (London, Ward Lock & Co. 1888).

[22] *See, e.g.*, Dan Brown, *The Da Vinci Code* (2003).

[23] *See, e.g.*, National Treasure (Walt Disney Pictures 2004).

## II.    DISCUSSION

Bressi requests two types of relief. First, he moves for a judgment of acquittal on both charges pursuant to Federal Rule of Criminal Procedure 29(a) and (c), arguing that the Government's evidence at trial was insufficient to establish his guilt beyond a reasonable doubt. Second, he argues that a number of errors occurred before and during trial which independently or collectively rendered his trial unfair and entitle him to a new trial pursuant to Federal Rule of Criminal Procedure 33.

### A.    Acquittal

After a criminal defendant is convicted by a jury, he may move the court to enter a judgment of acquittal notwithstanding the jury's verdict, arguing that the evidence was insufficient to establish his guilt.[24] In considering such a motion, the Court must "view the evidence 'in the light most favorable to the prosecution' to determine whether a 'rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt.'"[25] The Court should be "'highly deferential' to the factual findings of the jury" and should not "weigh[] credibility and assign[] weight to the evidence, or [] substitut[e] [its] judgment for that of the jury."[26] "Unless the jury's conclusion is irrational, it must be upheld."[27]

---

[24]    Fed. R. Crim. P. 29(a), (c)(1).
[25]    *United States v. Tyler*, 956 F.3d 116, 122 (3d Cir. 2020) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).
[26]    *Id.* (quoting *United States v. Caraballo-Rodriguez*, 762 F.3d 418, 430 (3d Cir. 2013) (en banc)).
[27]    *Id.* at 123 (quoting *Caraballo-Rodriguez*, 762 F.3d at 433).

First, however, the Court must determine what evidence to consider in determining whether the trial evidence was sufficient to support a conviction. Bressi argues that the Court should ignore his confession because it was improperly admitted. That is not the standard for a Rule 29 motion for acquittal. Instead, the Court reviews "all of the evidence admitted . . . regardless of whether that evidence was admitted erroneously."[28] That is because a judgment of acquittal is a determination that the "[G]overnment has failed to prove its case," and acts as a bar to reprosecution pursuant to the Double Jeopardy clause.[29] In contrast, a finding of "incorrect receipt or rejection of evidence" "implies nothing with respect to the guilt or innocence of the defendant," and thus does not bar a retrial without the offending evidence.[30] Accordingly, the Court will consider *all* of the evidence admitted at trial in determining whether the jury's verdict was rational.

On the merits, Bressi argues that he should be acquitted because the Government's evidence was insufficient to establish his guilt. Specifically, as to the conspiracy charge, Bressi complains that the Government did not provide evidence that he physically possessed any controlled substances and contends that the jury's

---

[28] *United States v. Aldridge*, 98 F.4th 787, 793-94 (6th Cir. 2024) (quoting *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (per curiam)); *United States v. Acevedo*, 882 F.3d 251, 258 (1st Cir. 2018) (quoting *United States v. Diaz*, 300 F.3d 66, 77 (1st Cir. 2002)); *see Lockhart v. Nelson*, 488 U.S. 33, 40-42 (1988) (explaining that a trial court must consider "all of the evidence it has admitted" in deciding whether a retrial is permissible pursuant to the Double Jeopardy clause); *McMullen v. Tennis*, 562 F.3d 231, 242 (3d Cir. 2009) (describing *Lockhart*);

[29] *Lockhart*, 488 U.S. at 40 (quoting *Burks v. United States*, 437 U.S. 1, 15 (1978)).

[30] *Id.* (quoting *Burks*, 437 U.S. at 15).

7

findings as to mass are undermined for the same reason.[31] In response, the Government points to Bressi's confession in which he admitted to participating in a conspiracy to manufacture and traffic enormous quantities of the substances for which he was convicted, evidence obtained at the SHIVA search, and the controlled deliveries to Harris and Henderson in which Bressi participated. Bressi contends that his confession was not sufficiently "corroborate[d]," and was too "vague and varied" to support a conviction without supporting evidence, and, in reply, aggressively asserts that his confession should not be considered in deciding whether to acquit because it should have been suppressed.[32]

As to the charge for possession with intent to distribute acetyl fentanyl, Bressi complains that the Government did not establish that he knew he possessed acetyl fentanyl specifically because he stated in interviews that he had not produced acetyl fentanyl, and that the total mass of the substance containing acetyl fentanyl was improperly considered because it was waste material and therefore not readily marketable.[33] The Government responds that Bressi's knowledge of the presence of acetyl fentanyl could be inferred from his penchant for making fentanyl analogues, and that the mass of the entire mixture containing acetyl fentanyl should be considered for the quantity enhancement.

---

[31]  Doc. 436 at 3-5.
[32]  Doc. 455 (Opp'n to Mot.) at 1-4.
[33]  Doc. 436 at 7-8.

### 1.    Count 1: Conspiracy

To prevail on the charge of conspiracy to distribute controlled substances, "the Government must show (1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [Bressi] knowingly joined."[34] Specifically, the defendant must know that the illegal objective contemplated was distribution of a controlled substance.[35] "The elements of a conspiracy may be proven entirely by circumstantial evidence."[36]

Bressi argues that the Government did not prove an agreement to violate the law because there was no evidence to establish "a physical connection between Mr. Bressi and possession of any of [the charged] substances."[37] He contends that his confession was not corroborated because testimony about the chemical testing that was conducted was flawed, and that, without a scientifically backed connection between him and actual controlled substances that were trafficked, his conviction cannot stand. That assertion is legally and factually wrong.

Legally, a conviction for conspiracy under 21 U.S.C. § 846 does not require proof "of any overt acts in furtherance of the conspiracy."[38] So whether the Government proved that Bressi ever possessed the charged substances is irrelevant

---

[34]    *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010) (citing *United States v. Mastrangelo*, 172 F.3d 288, 291 (3d Cir. 1999)).

[35]    *Id.* (citing *United States v. Cartwright*, 359 F.3d 281, 287 (3d Cir. 2004)).

[36]    *United States v. Perez*, 280 F.3d 318, 342-43 (3d Cir. 2002) (quoting *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988)).

[37]    Doc. 436 at 4.

[38]    *United States v. Shabani*, 513 U.S. 10, 15 (1994).

to this charge. The conviction is valid if the Government has established that Bressi *agreed* to work with coconspirators to achieve a common illegal goal. Furthermore, "[i]n order to provide corroboration for a confession, the government need only 'introduce substantial independent evidence which would tend to establish the trustworthiness of the statement.'"[39] It is not necessary to corroborate every assertion in the confession, nor does the corroborating evidence have to prove the offense or its elements; as long as some relevant admissions are confirmed, the entire confession may be taken as true and relied upon as affirmative evidence of the offense.[40] Moreover, there is no independent requirement that substances be scientifically traceable to a specific source when that source has openly admitted his role. The evidence clearly reflects that Bressi agreed to and actually did possess and deliver the charged substances on multiple occasions, and his confession is sufficiently corroborated to sustain his conviction.

Bressi confessed that he delivered controlled substances to "Terry Harris . . . down south" (i.e. "Philly") and "on the west side . . . Monty Henderson."[41] Harris

---

[39]  *United States v. Thomas*, 127 F. App'x 582, 584 (3d Cir. 2005) (quoting *Opper v. United States*, 348 U.S. 84, 93 (1954)); *see United States v. Brown*, 617 F.3d 857, 860-61 (6th Cir. 2010) (describing the "corroboration rule" as "a dusty doctrine of criminal law" and explaining that its utility has been questioned in recent years).

[40]  *Brown*, 617 F.3d at 862-63; *see Thomas*, 127 F. App'x at 585 (reasoning that corroboration of communication code used by coconspirators, locations of "drug 'cooking' materials," and knowledge of drug sources and cooking methods were sufficient to support reliance on the entire confession); *United States v. Sterling*, 555 F.3d 452, 456 (5th Cir. 2009); *United States v. Rodriguez-Soriano*, 931 F.3d 281, 287-88 (4th Cir. 2019).

[41]  GX 1.4 at 27-28.

and Henderson were "top . . . [drug] suppl[iers]" in their areas.[42] The trio met while

serving prior federal sentences at FCI Fort Dix, where they shared a room and

"talked and talked."[43] Harris asked for "hundreds and hundreds and hundreds . . . of

kilograms" of fentanyl, and Bressi delivered "multiple kilogram quantities" of "the

product" to Clarion, Pennsylvania, where he would meet Henderson "at either like a

Pizza Hut or Perkins . . . or McDonalds."[44] Bressi delivered the drugs himself,

usually in batches of "around fifty" kilograms.[45] The Government corroborated

Bressi's statements about the handoff locations with surveillance footage of Bressi

meeting Henderson at a Perkins and an Applebees,[46] and Harris at the parking lot of

the King of Prussia Mall outside of Philadelphia.[47]

Bressi also stated that Henderson "paid for what he got" and was good about

paying "as he sold things."[48] Harris was less forthcoming with payment, and did not

pay "for everything that he had gotten."[49] Bressi would pick up payments in

---

[42]  *Id.* at 81.

[43]  *Id.* at 54.

[44]  *Id.* at 27, 31.

[45]  *Id.* at 37-38.

[46]  *See* GX 16.2; 19.9.

[47]  *See* GX 15.2. Bressi stated that these meetings did not involve direct payments for drug deliveries but were instead loans. *See* GX 1.4 at 32; Doc. 460 (Trial Tr. Vol. V) at 183:16-23. Whether or not these specific meetings involved criminal activity does not alter the fact that the matching locations serve to corroborate part of Bressi's confession. Moreover, Bressi also stated that he was expected to repay the loans by making batches of narcotics in the future. GX 1.4 at 33 (Bressi: "Well of course they want their stuff (laughs). You know the loans aren't indefinite.").

[48]  GX 1.4 at 31.

[49]  *Id.* at 32.

additional trips following delivery of a batch of product.[50] Bressi told investigators that he was paid $25,000 per kilo of product, and that in total he made approximately "two and a half" million dollars.[51] By the end of Bressi's primary producing period, he estimated that he had delivered "over 200, but less than 250" kilograms of product.[52] He later revised his estimate down to "150 to 175 kilos" based on his earnings.[53] The Government corroborated Bressi's claims about the payment process with bank surveillance footage of Bressi depositing piles of cash from a black duffel bag on multiple occasions,[54] bank statements showing multiple cash deposits in the $10,000+ range during the period when Bressi stated he was delivering batches of 3-methylfentanyl,[55] and SHIVA "profit distribution" checks paid to Bressi at times when SHIVA was doing no legitimate business.[56]

Bressi stated that when he began producing controlled substances for the conspiracy, he started with "fentanyl [and] [t]hen [] went over to 3-Methyl right after that."[57] At that time he was working with small (relatively speaking) quantities of

---

[50]  *Id.* at 38.
[51]  *Id.* at 32, 42.
[52]  *Id.* at 39.
[53]  *Id.* at 41.
[54]  *E.g.*, GX 2.1; 2.2; 2.13.
[55]  *E.g.*, GX 2.11; 2.12; 2.13.
[56]  *E.g.*, GX 2.14; 2.15.
[57]  GX 1.4 at 37, 51; *see* GX 1.8 (DEA Interview) at 23 (Bressi "made 3-Methylfentanyl, Ohmefentanyl, fentanyl just by itself, regular fentanyl . . . and carfentanil").

Notably, Bressi did not mention acetyl fentanyl in his Barracks Confession and expressly denied making acetyl fentanyl in his DEA Interview. *See* GX 1.8 at 23 (AUSA MacArthur: "And Acetyl right? You made acetyl fentanyl?" Bressi: "No."). Count 2 of the indictment charged Bressi with possession with intent to distribute acetyl fentanyl, and the Court will

less than a kilogram of diluted product.[58] He admitted that he eventually made "fentanyl, and carfentanil, and 3-Methyl."[59] When the SHIVA warrant was executed, Bressi was in the process of preparing an enormous batch of "carfentanil" that would produce "two hundred" kilograms of "diluted product."[60] Upon entering SHIVA, investigators located an ongoing reaction containing chemicals that are known precursors for fentanyl.[61] In the simultaneous search of Bressi's home, investigators located twelve boxes of lactose,[62] which Bressi stated he used as a cutting agent for controlled substances.[63] The lactose boxes had Harris's fingerprints on them.[64] Bressi admitted that he was set to make a delivery of "a hundred keys" to Henderson the upcoming Saturday in Hermitage, Pennsylvania, and that Harris would be visiting his home "on Tuesday . . . to pick up his hundred."[65]

Bressi, then in Government custody, went ahead with those deliveries using a fake substance (lactose power) while under surveillance and wearing a wire. Bressi set up his delivery with Henderson via text message using coded language that

---

analyze the evidence to support the conspiracy charge with regard to a specific quantity of acetyl fentanyl in the context of Count 2, as the evidentiary issues turn on whether Bressi made acetyl fentanyl and in what quantities, rather than the core elements of conspiracy.

[58]  GX 1.4 at 41.

[59]  *Id.* at 42.

[60]  *Id.* at 33, 110.

[61]  *See* GX 6.1 at 2-3 (identifying N-phenethyl-4-piperidone ("NPP") in multiple samples recovered from SHIVA); Doc. 457 (Trial Tr. Vol. II) at 30:5-25 (stating that NPP is a precursor to fentanyl); *id.* at 44:11-23 (confirming that NPP is used in the manufacture of "Fentanyl, Acetylfentanyl, Carfentanyl").

[62]  *See* GX 5.13; Doc. 459 (Trial Tr. Vol. IV) at 73:18-75:16.

[63]  GX 1.4 at 22.

[64]  Doc. 459 (Trial Tr. Vol. IV) at 74:4-74:10.

[65]  GX 1.4 at 98-99.

matched a code he had described in his confession.[66] The Government introduced

the recordings of both controlled deliveries into evidence.[67] Bressi explicitly told

both Henderson and Harris that he was giving them "carfentanil," which had been

packaged in ten five-gallon white plastic buckets.[68] Neither seemed surprised to be

receiving an enormous delivery of powder. Instead, both confirmed that they had

expected to pick up carfentanil.[69]

This is a limited selection of the evidence against Bressi.[70]

---

[66]  *Compare* GX 7.1 (text messages setting up controlled delivery in which Bressi referred to Henderson as "my friend" and discussed an upcoming "wedding") *with* GX 1.4 at 82 (Agent O'Malley: "What, tell me what a normal conversation would be, a normal text exchange, let's talk about a text exchange?" Bressi: "Ah, with like Monty, you know he would contact me, you know saying, hey my friend or whatever. That's to establish it's a code letting us know that there's no issue. . . . That he's not being coerced to making this text.").

[67]  *See* GX 7.3 (Henderson Controlled Delivery Transcript); GX 8.2 (Harris Controlled Delivery Transcript).

[68]  GX 7.3 at 3, 4 (Bressi: "It looks like straight lactose itself because of the spray dryer and of how little of that, you know, when you use carfentanil you don't need much." Henderson: "Yeah." Bressi: "You know." Henderson: "Yeah."); GX 8.2 at 4, 5 (Bressi: "Cause this what I used was the carfentanil . . . This stuff is three times the strength of the stuff the Mexicans are putting out there. That's the nice thing about carfentanil. That you only need a little tiny drop.").

[69]  GX 7.3 at 4-5 (Bressi noting that he had delivered carfentanil and describing its strength in response to Henderson's inquiries about dilution); GX 8.2 at 4 (Bressi: "Alright. Ten each. So you got a hundred. This stuff can be strong." Harris: "Carfentanil?" Bressi: "Safe but strong.").

[70]  Other corroborated statements include: Bressi's statement that he gave a "sample" of 3-methylfentanyl in a pill bottle to an individual in Williamsport, PA, which he agreed may have been shared with Amy Morgret, GX 1.4 at 28-30, corroborated by a pill bottle containing 3-methylfentanyl recovered from Amy Morgret's apartment, GX 9.2; 9.3; 9.4; Bressi's statement that he used 4-piperidone monohydrate hydrochloride as a precursor for fentanyl, GX 1.4 at 43, corroborated by a bucket of 4-piperidone monohydrate hydrochloride hidden in the shed of Robert Scheuren, GX 12.3; 12.4; 12.5, which Mr. Scheuren testified that Bressi had asked him to hold because he was worried about the authorities finding it, Doc. 458 (Trial Tr. Vol. III) at 109:4-13, 110:17-113:9; Bressi's statement that he purchased precursor chemicals from Tokyo Chemical Industries ("TCI"), J&K Scientific, and Angene, GX 1.4 at 42-43, 119, corroborated by invoices from TCI, J&K, and Angene recovered at SHIVA, GX 13.5; 13.7; 13.8.

A jury which believed the above confession and corroborating evidence could reasonably conclude that the Government proved all the elements of conspiracy to distribute controlled substances beyond a reasonable doubt. Bressi said that he had coordinated with Henderson and Harris to manufacture and deliver multiple fentanyl variants to ultimately be distributed at the street-level. Direct evidence confirmed that all three men knew what they were doing and illustrated that they fully intended to coordinate to produce large batches of carfentanil to sell to consumers. Circumstantial evidence and Bressi's confession showed that they had done it before. The jury clearly assigned this evidence substantial weight, and the Court cannot second guess that decision.[71] The guilty verdict as to conspiracy stands.

The jury also returned verdicts on several special interrogatories finding that Bressi had conspired to distribute specific quantities of several fentanyl variants. Specifically, the jury found that the Government had proved beyond a reasonable doubt that Bressi "agreed to manufacture, distribute, and possess with intent to distribute . . . 400 grams or more" of "a mixture or substance containing fentanyl," "100 grams or more" of "a mixture or substance containing 3-methylfentanyl," "100 grams or more" of "a mixture or substance containing carfentanil," and "100 grams or more" of "a mixture or substance containing acetyl fentanyl."[72] Bressi contends that these findings unsupported by evidence because his "statements [on quantity]

---

[71]  *Caraballo-Rodriguez*, 726 F.3d at 430.
[72]  Doc. 426 (Verdict Form) at 2-4.

were somewhat vague and varied depending on the day of the interrogation," thereby forcing the jury to "speculate regarding the amounts of substances involved."[73]

"The jury, when determining drug quantity for purposes of the mandatory minimum, may attribute to a defendant only those quantities involved in violations of § 841(a) that were within the scope of, or in furtherance of, the conspiracy and were reasonably foreseeable to the defendant as a consequence of the unlawful agreement."[74] "Multiple transactions committed as part of a conspiracy" should be aggregated "in determining whether the amount of drugs involved reached [a Section 841] threshold."[75] Moreover, "[t]he quantity of drugs for which conspirators can be held accountable . . . includes amounts that conspirators agreed to distribute or possess with intent to distribute, even if those amounts were not actually distributed or possessed."[76] Drug quantities need not be established with exact precision; it is sufficient for the Government to introduce evidence from which a reasonable quantity can logically be approximated or extrapolated.[77]

---

[73]  Doc. 436 at 5.

[74]  *United States v. Williams*, 974 F.3d 320, 366 (3d Cir. 2020).

[75]  *United States v. Gori*, 324 F.3d 234, 237 (3d Cir. 2003); *Williams*, 974 F.3d at 366 (extending *Gori*'s aggregation holding to the "violations of multiple conspirators . . . for determining the mandatory minimum of any one conspirator").

[76]  *Williams*, 974 F.3d at 366 n.34; *see United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (quoting *United States v. Jackson*, 335 F.3d 170, 181 (2d Cir. 2003)).

[77]  *United States v. Titus*, 78 F.4th 595, 600-01 (3d Cir. 2023); *see Pauling*, 924 F.3d at 657.

There is ample evidence to establish the quantities of controlled substances for which Bressi was convicted.[78] Bressi stated that he had delivered batches of up to 50 *kilo*grams of 3-methylfentanyl to both Henderson and Harris.[79] Although his estimate of the aggregate quantity of substances varied during his conversation with authorities, Bressi explained his revision and never dipped below a total of 150 *kilo*grams.[80] He stated that he was in the process of making a 200 *kilo*gram batch of carfentanil, and his coconspirators clearly expected to received 100 kilograms of carfentanil each at the controlled deliveries which had been arranged prior to Bressi's arrest.[81] These amounts are several *orders of magnitude* greater than the quantities with which Bressi was charged. A jury that believed only the most conservative estimates in Bressi's confessions would conclude that he delivered 1,000 times the amount of 3-methylfentanyl and planned to deliver 2,000 times the amount of carfentanil at issue. That supports finding the 100-gram quantities were proved beyond a reasonable doubt.

As to plain old fentanyl, Bressi stated that he made a batch at the start of the conspiracy which was relatively small. In his Barracks Confession, he said that it

---

[78] As noted, the Court will address the issue of acetyl fentanyl with its analysis of Count 2, *see* n.57, *supra*.

[79] GX 1.4 at 27, 37, 40.

[80] *Id.* at 39, 41 (Bressi explaining that he did not track quantity and revised his estimate after considering his total earnings).

[81] *Id.* at 33, 110; *see* GX 7.2; 7.7; 8.1; 8.6 (depicting ten five-gallon buckets of false product for each controlled delivery); Doc. 459 (Trial Tr. Vol. IV) at 111:18-20.

"wasn't even a kilogram—of diluted product."[82] In his DEA Interview, he explained that the batch "when it was diluted . . . made a kilogram's worth."[83] These statements are enough to support the jury's finding that Bressi produced at least 400 grams of a mixture containing fentanyl. Though they are not entirely consistent, the logical conclusion following from Bressi's use of a kilogram benchmark in both estimates is that, even taking his more conservative measure of less than a kilogram as true, the final diluted quantity was *near* a kilogram. That is more than twice the amount the jury found (400 grams), and that finding is a rational conclusion based on inferences drawn from Bressi's testimony. Moreover, the jury was free to believe Bressi's statement that the batch produced "a kilogram's worth," which would indisputably support its verdict.[84]

There is sufficient evidence to support the jury's guilty verdict on the conspiracy charge, and its quantity findings as to fentanyl, 3-methylfentanyl, and carfentanil. Bressi's motion for acquittal on those charges is denied.

### 2. Count 2: Possession with Intent to Distribute Acetyl Fentanyl

For a conviction under 21 U.S.C. § 841(a)(1), the Government must prove beyond a reasonable doubt that the defendant "(1) knowingly possessed a controlled

---

[82]  GX 1.4 at 37.
[83]  GX 1.8 at 20.
[84]  Additionally, as Bressi's confession made clear, picking which fentanyl variant to make was his call. The jury could have reasonably concluded that the conspirators agreed to manufacture and distribute hundreds of kilograms of fentanyl *or* its variants, and convicted Bressi of the fentanyl quantity enhancement based on a general agreement to deal in fentanyl.

substance with (2) the intent to distribute it."[85] Because the Government alleged possession of a specific type and quantity of a controlled substance, proof of those facts also become elements of the offense.[86] Nevertheless, the Government need not prove that the defendant was aware of the specific type of controlled substance at issue; it is sufficient to prove that he knew "that he was trafficking in what he believed was a controlled substance."[87] Possession can be actual or constructive.[88] And a defendant's knowledge and intent to distribute a controlled substance can be inferred from circumstances, including possession of large drug quantities[89] or use of a specific method of packaging,[90] or from other conduct, such as distributing other drugs.[91]

The Government's evidence of acetyl fentanyl consisted primarily of a sample of a substance recovered during the SHIVA search.[92] The sample was taken from a

---

[85] *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008) (quoting *United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006)). The elements have also been stated as: "(1) knowing or intentional (2) possession (3) with intent to distribute (4) a controlled substance." *United States v. Lacy*, 446 F.3d 448, 454 (3d Cir. 2006).

[86] *Lacy*, 446 F.3d at 454.

[87] *United States v. Barbosa*, 271 F.3d 438, 458-59 (3d Cir. 2001); *see McFadden v. United States*, 576 U.S. 186, 192 (2015).

[88] *United States v. Rowe*, 919 F.3d 752, 760 (3d Cir. 2019) (citing *United States v. Crippen*, 459 F.2d 1387, 1388 (3d Cir. 1972) (per curiam)).

[89] *United States v. Rodriguez*, 961 F.2d 1089, 1092 (3d Cir. 1992).

[90] *United States v. Johnson*, 302 F.3d 139, 149-50 (3d Cir. 2002).

[91] *United States v. Davis*, 726 F.3d 434, 442-43 (3d Cir. 2013) ("[E]vidence of past distribution is relevant to prove intent to distribute in a later distribution trial." (citing *United States v. Lee*, 573 F.3d 155, 166 (3d Cir. 2009))).

[92] Bressi's testimony did not establish possession of any acetyl fentanyl. Instead, he expressly denied making acetyl fentanyl after admitting to producing several fentanyl analogues. GX 1.8 at 23.

large round-bottom flask containing a brown substance.[93] According to Pennsylvania State Police testing, the substance tested positive for the presence of acetyl fentanyl.[94] The SHIVA search also turned up some used paper towels which tested positive for acetyl fentanyl.[95]

Bressi argues that this evidence does not establish the knowledge element of the offense. He points to his own testimony that he did not produce acetyl fentanyl as evidence that the acetyl fentanyl found a SHIVA was not possessed knowingly.[96] He is wrong.

Bressi stated that he was experimenting with different fentanyl variants and methods for producing them.[97] Just a few weeks before the search, Bressi had begun a batch of "regular fentanyl" to deliver to Henderson and Harris.[98] But the cook didn't turn out well, and Bressi "wasn't sure if [he] was going to be able to clean it up properly. [He] wasn't happy with how, appearance wise and everything so [he] . . . just bleached the hell out of it which should have destroyed it."[99] In addition, the

---

[93]  *See* GX 6.1 at 1-2; GX 6.2.
[94]  GX 6.1 at 2.
[95]  *Id.* at 4 (concluding that paper towels in item 2.7 contained acetyl fentanyl).
[96]  Bressi also argued that possession was not established because "there was opportunity for the substance to be planted by a third party in the flask." Doc. 436 at 7. The jury clearly did not accept this outlandish theory when it convicted Bressi, and the Court may not reweigh the evidence suggesting a government frame-job on a motion for acquittal. *Tyler*, 956 F.3d at 122. In any event, taken in the light most favorable to the prosecution, *id.*, the assertion that evidence was planted is unsupported and must be discarded as a bunch of hooey.
[97]  GX 1.4 at 24-25 (discussing pros and cons of fentanyl, 3-methylfentanyl, and carfentanil); *id.* at 51-53 (discussing fentanyl synthesis and noting that he may have been "the only one who pieced these together for this particular synthesis that I was starting today").
[98]  *Id.* at 35-36.
[99]  *Id.* at 36.

jury was free to extend its finding of intent based on evidence supporting the conspiracy charge to drugs that Bressi possessed while it was ongoing.[100]

From this evidence, there are two perfectly plausible explanations for the presence of acetyl fentanyl and Bressi's knowledge thereof. First, it is possible that Bressi's experimenting inadvertently produced an unexpected fentanyl variant. In that case, Bressi was still well aware (and had fully intended) that he had produced a controlled substance which he meant to market. Second, Bressi's waste batch of fentanyl may have somehow resulted in acetyl fentanyl either (1) by the synthesis errors which rendered it undesirable or (2) by the interaction of the compound Bressi produced and the bleach that he used to try to destroy it. If this occurred, Bressi still produced the initial material intending it to be a controlled substance which he planned to distribute.[101] These explanations (or one this Court has not hypothesized) are perfectly reasonable conclusions to reach based on the evidence at trial. Moreover, the fact that Bressi may have attempted to destroy the compound does not preclude a finding that he originally manufactured and possessed it with the intent to distribute; a possession with intent to distribute charge only requires proof

---

[100] *See Davis*, 726 F.3d at 442-43.

[101] This conclusion is supported by testimony at trial, in which the Government's expert stated that item 1.3 in her lab report was "a batch [Bressi said] that he had messed up." Doc. 457 (Trial Tr. Vol. II) at 3:22-5:5, 80:12-16.

that the defendant's "intent to distribute coincided with his possession of the narcotics" at some point.[102]

With regard to the quantity enhancement, the Government must prove that Bressi possessed at least 100 grams of a mixture or substance containing acetyl fentanyl with intent to distribute it at a single point in time.[103] Unlike the conspiracy charge, discrete quantities cannot be aggregated to reach this amount unless the Government shows that the defendant possessed all of them at once.[104] Moreover, when calculating the mass of a "mixture or substance" containing a controlled substance, the final value should only include mixtures that are "usable," and should exclude parts of the mixture that are not "consumable."[105]

Testimony at trial established that the acetyl fentanyl found in item 1.3 was not readily consumable. Rebecca Patrick, an expert witness for the Government who performed the lab testing of items recovered at the SHIVA search, testified that the contents of the flask from which item 1.3 was taken were not marketable in their current form, and that the substance would need to be purified and then combined with an acid to create a powder that could then be consumed.[106] Furthermore, the lab

---

[102] *United States v. Campbell*, 534 F.3d 599, 604 n.3 (7th Cir. 2008)

[103] *Rowe*, 919 F.3d at 759-60.

[104] *Id.* at 760 ("[P]ossession of 1000 grams of heroin begins when a defendant has the power and intention to exercise dominion and control over all 1000 grams, and ends when his possession is interrupted by a complete dispossession or by a reduction of that quantity to less than 1000 grams.").

[105] *United States v. Rodriguez*, 975 F.2d 999, 1006-08 (3d Cir. 1992).

[106] Doc. 457 (Trial Tr. Vol. II) at 58:4-12.

analysis of item 1.3 took the mass of the entire sample, including all nonconsumable material.[107] Ms. Patrick did not take any steps to quantify the acetyl fentanyl in the sample because the "lab in Pennsylvania . . . does not do any quantitative analysis."[108] She agreed that the sample could have contained as little as a drop of the controlled substance because she did not test for concentration.[109]

This evidence was insufficient to support a finding that the 100-gram quantity enhancement for acetyl fentanyl was met. The jury only had evidence sufficient to conclude that the 848.7 gram substance in item 1.3, which consisted of a substantial amount of nonconsumable material, contained some amount of acetyl fentanyl. And there was no guiding principle from which the consumable and nonconsumable contents could be separately estimated—the only testimony on that issue agreed that the concentration of acetyl fentanyl could have been practically anything. Determining the quantity of acetyl fentanyl in item 1.3 could therefore have only been the result of "mere speculation," which is not permitted.[110] Accordingly, the jury's verdict finding a 100-gram quantity enhancement for the possession of acetyl fentanyl charge is vacated.[111]

---

[107] *See* GX 6.1 at 2 (noting the mixture's "net weight of 848.7g ± 0.7g").

[108] Doc. 457 (Trial Tr. Vol. II) at 59:22-60:12; *see id.* at 65:5-14 (Counsel: "[I]s there a way to estimate the quantity of Acetyl in that flask based on the concentration in your—that you found when you prepared your standards or prepared the sample?" Ms. Patrick: "No. You would— you would have to have an instrument set up to do that quantification, which I didn't have.").

[109] *Id.* at 60:13-24.

[110] *United States v. Collado*, 975 F.2d 985, 998 (3d Cir. 1992).

[111] This conclusion is extended to also vacate the jury's 100-gram quantity enhancement for acetyl fentanyl under the conspiracy charge. Although it would be reasonable for the jury to estimate

To summarize, the Government presented ample evidence to support conviction on both counts, and Bressi is not entitled to a judgment of acquittal. The jury's quantity enhancements for fentanyl, 3-methylfentanyl, and carfentanil on the conspiracy charge are also supported by sufficient evidence. The quantity enhancements for acetyl fentanyl on both charges are not supported by the evidence and are vacated.[112]

## B.    New Trial

A defendant may move for a new trial "if the interest of justice so requires."[113] "The interest of justice requires a new trial 'if errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision.'"[114] The Court begins by "determin[ing] whether the defendant has correctly identified any errors during the trial, and, if so, undertake[s]

---

the fentanyl quantity enhancement given that the conspiracy revolved around trafficking large quantities of fentanyl and its variants, *see* n.84, *supra*, it would not be reasonable to inversely infer that a conspiracy to traffic large quantities of fentanyl automatically includes any and all variants. Permitting such an inference would allow the Government to add endless quantity enhancements to any conspiracy focused on a central controlled substance which has many consumable chemical analogues.

[112] Fed. R. Crim. P. 29(d) requires that the Court "conditionally determine whether any motion for a new trial should be granted if a judgment of acquittal is later vacated or reversed." Bressi did not raise issues with the quantity of acetyl fentanyl as a basis for a new trial, so technically he has waived that option and no new trial is due. *United States v. Wasserson*, 418 F.3d 225, 240 n.10 (3d Cir. 2005). Nevertheless, the Court concludes that, if the acquittal is reversed, a new trial should be granted on the limited issue of the quantity of acetyl fentanyl because the jury was not instructed that it could not consider non-marketable material in reaching its conclusion about quantity.

[113] Fed. R. Crim. P. 33(a).

[114] *United States v. Anthony*, 354 F. Supp. 3d 607, 619 (E.D. Pa. 2018) (quoting *United States v. Rich*, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004)); *United States v. Delgado*, 367 F. Supp. 3d 286, 291 (M.D. Pa. 2019) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).

a harmless error analysis to determine whether those errors merit a new trial."[115] Motions for a new trial are "disfavored and should be 'granted sparingly and only in exceptional cases.'"[116] Ultimately, "the decision to grant or deny a motion for a new trial lies within the discretion of the district court."[117]

Bressi argues that he should be granted a new trial because of several purported errors including: (1) contradictory testimony from two of the Government's expert witnesses, which apparently indicates that one of them gave unreliable testimony as an expert; (2) admission of testimony that one of Bressi's witnesses was afraid of him; (3) admission of and instructions regarding his confession; (4) statements the Government made in its closing argument; and (5) the cumulative effect of these errors.[118] The Government opposes each point in turn.[119] In reply, Bressi primarily argues that the admission of his confession infects every aspect of his trial and requires a do-over.[120] Because Bressi focuses so intensely on his confession, the Court begins there before turning to his other alleged errors.

---

[115] *Anthony*, 354 F. Supp. 3d at 619.
[116] *Delgado*, 367 F. Supp. 3d at 291 (quoting *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008)).
[117] *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006).
[118] Doc. 436 at 9-17.
[119] Doc. 450 at 6-15.
[120] Doc. 455 at 4-7.

## 1.    Confession

To be admissible as evidence against him, a criminal defendant's confession must be voluntary.[121] Recognizing that a confession is "the most compelling possible evidence of guilt"[122] and that "[t]he overall determination of the voluntariness of a confession [is] an exceedingly sensitive task,"[123] the Supreme Court has established a number of per se rules barring confessions obtained under coercive circumstances. If a suspect is in custody and has not been advised of his rights to remain silent and to have an attorney present, and the consequences of forgoing these rights, his confession is inadmissible.[124] And if a suspect has been arrested and confesses during a period of unreasonable delay before being presented to a magistrate, his confession likewise must be suppressed.[125]

If none of the per se exclusions applies, a defendant may still argue that his confession was involuntary and should be suppressed. Before his confession is presented to the jury, the defendant is entitled to a factual hearing and a "reliable resolution of [all] evidentiary conflicts" bearing on voluntariness.[126] The trial judge

---

[121]  *Dickerson v. United States*, 530 U.S. 428, 432-34 (2000) (discussing the history of the voluntariness rule); *Jackson v. Denno*, 378 U.S. 368, 376 (1964).

[122]  *Mapp v. Ohio*, 367 U.S. 643, 685 (1961) (Harlan, J., dissenting).

[123]  *Jackson*, 378 U.S. at 390.

[124]  *Miranda v. Arizona*, 384 U.S. 436, 467-75 (1966); *see Dickerson*, 530 U.S. at 444 (holding that *Miranda* announced a constitutional rule).

[125]  *Corley v. United States*, 556 U.S. 303, 322-23 (2009) (affirming continued application of *McNabb v. United States*, 318 U.S. 332 (1943) and *Mallory v. United States*, 354 U.S. 449 (1957) in light of 18 U.S.C. § 3501).

[126]  *Jackson*, 378 U.S. at 391-92.

then determines, based on the factual findings adduced from evidence at the hearing, whether the Government has proven by a preponderance of the evidence that the confession was voluntary.[127] This inquiry requires a consideration of the totality of the circumstances surrounding the confession, including "(1) the time elapsing between arrest and arraignment . . ., (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected . . ., (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession."[128] The Court should also consider "[a] suspect's background and experience, including prior dealings with the criminal justice system."[129] If the Court determines that the confession was made voluntarily, it is admissible; if not, it is suppressed.

Although the Court alone must pass on voluntariness,[130] the circumstances surrounding the confession also bear on whether it is credible.[131] Accordingly, even after the trial judge has determined that a confession is admissible, the defendant

---

[127] *Lego v. Twomey*, 404 U.S. 477, 489 (1972).

[128] 18 U.S.C. § 3501(b).

[129] *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (plurality)).

[130] *See Lego*, 404 U.S. at 489-90.

[131] *Crane v. Kentucky*, 476 U.S. 683, 687-88 (1986).

may argue that the jury should not believe his confession based on the situation that led him to confess.[132] The jury is free to consider the facts and make its own determination as to whether the circumstances induced the defendant to falsely accuse himself.[133]

Bressi has employed just about every possible argument to suppress his confession at various points in this litigation. In the first round of pretrial motions, Bressi contended that his confessions should be suppressed based on a *Miranda* violation.[134] In the second round of motions, Bressi argued that his confessions were coerced by Agent O'Malley and Trooper Kelley and thus should be suppressed.[135] Bressi also took the position that he had been promised complete immunity from prosecution in return for his cooperation, and that the entire indictment should therefore be dismissed.[136] At trial, Bressi argued that the jury should not credit his confession because it was coerced.[137] Now, he argues that the Court erred at every turn, that his confession should have been excluded from evidence, and that he should get a new, confession-free trial.[138]

---

[132] *Id.* at 690-91; 18 U.S.C. § 3501(a).
[133] *Crane*, 476 U.S. at 690-91.
[134] Doc. 150 (First Mot. to Suppress).
[135] Doc. 362 (Omnibus Mot.) at 11-17.
[136] *Id.* at 14-15.
[137] *See, e.g.*, Doc. 461 (Trial Tr. Vol. VI) at 174:16-177:3 (arguing in closing that Bressi "was coerced and pressured into saying something that wasn't true").
[138] Doc. 436 at 13-16; Doc. 455.

Before giving Bressi yet another bite at the apple (if there is any left to eat), the Court notes that Bressi's real argument that his confession should have been suppressed was only substantially raised in his reply brief in support of his post-trial motion.[139] "Courts need not address arguments raised for the first time in a reply brief."[140] Bressi has been warned time and again that the Court does not appreciate his freewheeling approach to legal argument.[141] Indeed, many of the procedural circumstances about which Bressi complains are attributable to his constant inability to present arguments in an organized manner in compliance with the Court's scheduling Orders. For example, Bressi complains repeatedly about not receiving a hearing on issues raised in his July 19, 2024, omnibus motion, but the Court resolved those issues on the papers in part because they were raised in a surprise filing on the morning of a trial-scheduling status conference.[142] Nevertheless, everyone, including the Court, agrees that Bressi's confessions were devastating evidence of his guilt. It is therefore appropriate to review the record to ensure that Bressi's confession was properly admitted, and to clearly explain why.

---

[139] *Compare* Doc. 436 at 13-14 (arguing that the Court should have held a pre-trial hearing on the issue of coercion), *and id.* at 14-16 (arguing that the jury instructions regarding the confessions were inadequate), *with* Doc. 455 (arguing only and extensively that the confessions should have been suppressed because they were involuntary).

[140] *Williams v. City of Pittsburgh Pub. Sch. Dist.*, 742 F. Supp. 3d 464, 468 n.4 (W.D. Pa. 2024) (quoting *Marcum v. Columbia Gas Transmission, LLC*, 549 F. Supp. 3d 408, 420 n.4 (E.D. Pa. 2021)).

[141] Doc. 387 at 2-3; *see* Doc. 368 at 2 (noting Bressi's unexpected filing of a suppression motion on the date scheduled for the pretrial conference).

[142] Doc. 368 at 2.

### a.    *Miranda*

Although his opening post-trial brief takes no issue with the Court's pre-trial resolution of his *Miranda* arguments (and instead notes that "the [C]ourt carefully reviewed the issue of *Miranda*"),[143] in his reply Bressi asserts that he was in custody during the SHIVA questioning and was not read his *Miranda* rights.[144] In previously considering the same issue, the Court concluded that Bressi was not in custody and that he had in fact been advised of his *Miranda* rights.[145] In making that decision, the Court painstakingly reviewed the relevant law and facts, and a full-scale do-over is not required here. Since the Court first decided the issue, one new piece of evidence has come to light: at trial, Trooper Kelley stated that he did not believe that Bressi was free to leave during the conversation at SHIVA.[146] This additional fact does not change the Court's prior conclusion for two reasons.

First, Trooper Kelley's comment does not on its own establish that Bressi was in custody during the SHIVA questioning, nor does it alter the custody analysis in any way. "As the Supreme Court has emphasized repeatedly, the inquiry in *Miranda* cases is not into the officer's subjective intent, suspicion, or views."[147] "A policeman's unarticulated plan has no bearing on the question whether a suspect was

---

[143]  Doc. 436 at 14.

[144]  Doc. 455 at 3-4.

[145]  Doc. 271 at 51-65.

[146]  Doc. 456 (Trial Tr. Vol. I) at 70:15-23.

[147]  *United States v. Kiam*, 432 F.3d 524, 528 (3d Cir. 2006) (citing *Stansbury v. California*, 511 U.S. 318, 324 (1994) (per curiam)).

'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."[148] It is undisputed that Kelley never told Bressi he was not free to leave. So his subjective belief has no impact on the Court's prior analysis of the circumstances bearing on custody.[149] That is true even if Kelley's belief was based on his understanding that Bressi would likely be arrested after the SHIVA search was completed.[150] Focusing on the objective circumstances of the SHIVA conversation, which the Court developed in detail in its pretrial decision, Bressi was not in custody.

Second, in its pretrial decision, the Court held that Kelley's testimony at the suppression hearing was truthful and established that he had *Mirandized* Bressi.[151] Bressi offers no new evidence that would change this conclusion. Indeed, the only evidence he cites to challenge this point, an FBI FD-302 report on the conversation at SHIVA,[152] was considered in the pretrial motions and held to *support* the conclusion that Bressi had been *Mirandized*.[153] The words in that report are the same

---

[148] *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

[149] *See United States v. Parker*, No. 17-CR-1034, 2018 WL 340048, at *4 (N.D. Iowa Jan. 9, 2018) ("One officer's belief that Defendant would not have been free to leave, which was not communicated to Defendant, does not render the encounter custodial.").

[150] *See United States v. Aguilar*, 742 F. Supp. 3d 322, 339-40 (E.D.N.Y. 2024) (holding that officers' belief in the defendant's guilt does not bear on the custody analysis).

[151] Doc. 271 at 61-65.

[152] *See* Doc. 455-1 (FBI FD-302 Report Bates Stamped G000013).

[153] *See* Doc. 271 at 63-64 (citing Doc. 216-1 (FBI FD-302 Report Bates Stamped G000013)).

today as they were when the Court first decided this issue two years ago. So too is the Court's conclusion as to their meaning. Bressi was read *Miranda*.[154]

### b. Immunity

Bressi briefly complains that the Court erred by denying his motion to dismiss the indictment based on an immunity agreement, and by doing so without a hearing.[155] To the extent the Court's initial ruling on this issue was incomplete,[156] that was remedied when the Court held a hearing on the immunity issue in response to a motion in limine by the Government seeking to preclude Bressi from submitting the question of his immunity to the jury.[157] At the hearing, the Court stated that it would consider "whether the existence of an immunity agreement is a question for the jury or for the Court, and if for the Court, . . . resolve any underlying factual disputes and credibility issues related to this motion."[158] The Government presented two witnesses: Trooper Kelley and Agent O'Malley, who stated that they had not promised Bressi immunity from prosecution at any point.[159] Bressi testified on his own behalf and told a conflicting story.[160] After the hearing, the Court issued a

---

[154] *See* Doc. 456 (Trial Tr. Vol. I) at 55:15-56:5.
[155] *See* Doc. 455 at 2, 4 (complaining that the court "denied the motion to dismiss the Indictment on the basis that the defendant had been promised immunity without holding a hearing thereon").
[156] *See* Doc. 368 at 3-4.
[157] Doc. 404.
[158] Doc. 413 (Immunity Hrg. Tr.) at 4:19-23.
[159] *Id.* at 9:4-9, 10:17-19, 12:9-11, 14:5-8 (Trooper Kelley); *id.* at 29:2-6, 31:14-17, 32:1-8, 42:12-43:3 (Agent O'Malley).
[160] *Id.* at 53:21, 55:3-6.

written opinion making findings of fact and concluding that, "[b]ased on the evidence, . . . Bressi has not carried his burden of proving the existence of an immunity agreement on the facts and the law."[161] So, ultimately, Bressi received a hearing and fully-reasoned decision concluding that he was not entitled to immunity. His complaint that the hearing was provided in the context of the Government's motion is without merit given the extensive scope of the Court's ruling.

### c. Voluntariness

Next, Bressi contends that the Court should have suppressed his confession as involuntary based on the presence of coercive pressures he claims overbore his will.[162] More specifically, Bressi complains that he asserted a voluntariness argument in his surprise suppression motion of July 19, 2024, but that the Court denied it without due consideration or a hearing.[163] It is true that the Court's ruling on this issue was cursory.[164] But any issue as to voluntariness was comprehensively resolved in subsequent proceedings: the Court clearly determined that Bressi's confession was voluntary based on a fulsome record that Bressi had multiple opportunities to develop.

---

[161] Doc. 407; *id.* at 8.
[162] Doc. 455 at 4-7.
[163] Doc. 436 at 13-14
[164] *See* Doc. 368 at 19.

Bressi did not object when the Government entered his confession into evidence at trial.[165] Nevertheless, recalling that Bressi had impugned his confession throughout pretrial briefing and in his opening statement,[166] and foreseeing a posttrial argument exactly like this one, the Court determined that it would be prudent to make a formal finding of voluntariness *sua sponte*. So the Court held a *Jackson/Denno* hearing outside the presence of the jury.[167] The Court opened by asking Bressi's counsel whether she "plan[ned] to argue that Mr. Bressi's confession was not voluntary . . . [which] include[s] any argument that his confession was induced or coerced by promises of some benefit made by Government officers."[168] When she answered in the affirmative, the Court explained that it would "make formal findings of voluntariness required to admit a defendant's confession under Title 18 of the United States Code, at Section 3501(a)."[169] The Court then proceeded to describe the voluntariness inquiry with citations to authority.[170]

The Court also noted that "in [its] view, the issues relevant to this question have already been decided by [its] prior rulings on Mr. Bressi's motions to suppress . . . as well as the Government's Motion in Limine to preclude the Defendant from

---

[165] Doc. 457 (Trial Tr. Vol. II) at 96:11-22.
[166] Doc. 456 (Trial Tr. Vol. I) at 38:5-39:22.
[167] *See Jackson v. Denno*, 378 U.S. 368, 376 (1964).
[168] Doc. 458 (Trial Tr. Vol. III) at 160:1-11 (citing *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 347-48 (1963)).
[169] *Id.* at 160:13-20.
[170] *Id.* at 162:3-164:11.

submitting to the jury a question regarding his immunity."[171] The Court further explained that "the evidentiary record regarding Mr. Bressi's statements has been amply developed in two prior hearings [related to those motions], the suppression hearing held November 15 and 16, 2022, and the immunity hearing held October 24, 2024."[172] Nevertheless, the Court gave both sides a third opportunity to present "any issues that you believe were not previously addressed."[173] Although both sides argued, neither presented any evidence.[174] Accordingly, the Court made specific findings of fact based on the existing record and concluded that "the Government has proven that Mr. Bressi's confession was voluntary by a preponderance of the evidence."[175]

Bressi does not identify any new evidence that was not considered by the Court in finding that his confession was voluntary. There is accordingly no basis to revisit this ruling. Bressi's request for a fourth[176] (or fifth, if one counts the presentation of the same evidence at trial) "evidentiary hearing on this matter" is groundless for the same reason. Furthermore, as he admitted at trial, Bressi is an

---

[171] *Id.* at 161:20-162:2 (citing Docs. 271, 407). Bressi does not challenge the Court's immunity ruling in his posttrial motion.

[172] Doc. 458 (Trial Tr. Vol. III) at 164:2-11.

[173] *Id.*

[174] *Id.* at 164:13-168:24.

[175] *Id.* at 169:2-19.

[176] For absolute clarity, the prior three hearings were: (1) Suppression Hearing of November 15th & 16th, 2022, *see* Docs. 248 & 251; (2) Immunity Hearing of October 24th, 2024, *see* Doc. 404; (3) *Jackson/Denno* Hearing of October 30th, 2024, *see* Doc. 458 (Trial Tr. Vol. III) at 160:1-160:19.

incessant liar.[177] The Court would not be inclined to believe any new testimony he might offer that was not disclosed in the prior proceedings.[178]

### d.    Jury Instruction

Finally, Bressi contends that the Court erred in instructing the jury to consider the voluntariness of his confessions.[179] Although he concedes (as he must) that "the Court in the instant case did provide a charge to the jury regarding the voluntariness of a confession and the weight to be placed upon the confession," he argues that the Court should have "specifically instruct[ed] the jury to apply that standard to each inculpatory statement by the Defendant."[180] The Court's instruction stated:

> The Government introduced evidence that the Defendant, Anthony D. Bressi, made several statements to Special Agent Timothy O'Malley, Pennsylvania State Trooper Ryan Kelley, Special Agent Porter Wilson, and several Drug Enforcement Administration Chemists. You must decide whether Anthony D. Bressi did in fact make the statements. If you find that Anthony D. Bressi did make the statements, then you must decide what weight, if any, you feel the statements deserve. In making this decision, you should consider all matters in evidence having to do with the statements, including those concerning Anthony D. Bressi himself and the circumstances under which the statements were made.
>
> If, after considering the evidence, you determine that a statement was made voluntarily, you may give it such weight as you feel it deserves under the circumstances. On the other hand, if you determine that the statement was not made voluntarily, you must disregard it. In determining whether any alleged statement was made voluntarily, you should consider Anthony D. Bressi's age, training, education, occupation, and physical and mental condition, and his treatment while

---

[177] Doc. 461 (Trial Tr. Vol. VI) at 60:14-62:8.

[178] *See* Doc. 407 at 9-10 (finding that Bressi's failure to assert arguments in more than five years of pending litigation undercut their credibility).

[179] Doc. 436 at 14-15.

[180] *Id.* at 15.

in custody or under interrogation as shown by the evidence in the case. Also consider all other circumstances in evidence surrounding the making of the alleged statement.[181]

Bressi did not object to this instruction at the charge conference nor when the Court read the charge to the jury.

As the actual instructions make clear, the Court *did* instruct the jury to consider the voluntariness of each of Bressi's statements. The Court noted that Bressi made "several statements," identified specific participants involved in different conversations, and then, in instructing the jury on how to determine voluntariness, the Court framed the inquiry as relating to "a statement," suggesting that the jury should apply the general principles listed in the first paragraph to each individual statement using the specific factors listed in the second paragraph.[182] The instruction exactly mirrors Third Circuit Model Criminal Jury Instruction § 4.32, which "should be given when the prosecution introduces a defendant's confession or similar statement and the defendant raises questions about the weight that the jury should accord that evidence."[183] A similar instruction which did not repeat itself for each confession to be considered was approved by the Third Circuit in *Government of Virgin Islands v. Gereau*.[184] Accordingly, the Court concludes that its instruction was not erroneous or insufficient.

---

[181]  Doc. 428 (Jury Instructions) at 18-19.

[182]  *Id.*

[183]  Third Circuit Model Criminal Jury Instruction § 4.32 cmt.

[184]  502 F.2d 914, 934-35 (3d Cir. 1974).

Bressi's confession was properly admitted and considered by the jury. There was no error requiring a new trial.

### 2.    Expert Testimony

At trial, Rebecca Patrick testified as an expert witness regarding the results of chemical tests she performed on substances recovered in the SHIVA search,[185] and about methods of synthesizing fentanyl and its analogues.[186] Dr. Joseph Bozenko testified as an expert witness regarding methods of synthesizing fentanyl and its analogues.[187] Both also gave some factual testimony. On cross-examination, Dr. Bozenko reviewed an acetyl fentanyl synthesis recipe prepared by Ms. Patrick and stated that the recipe was incorrect because it used acetic acid instead of acetyl chloride.[188] On re-direct, Dr. Bozenko clarified that he was not testifying that using acetic acid would certainly produce *no* acetyl fentanyl, but rather that to his knowledge it would not do so.[189] Bressi argues that the disagreement between the Government's experts renders Ms. Patrick's testimony unreliable, and that, by extension, admission of her unreliable testimony rendered the trial unfair. Bressi is wrong.

---

[185] *See* Doc. 457 (Trial Tr. Vol. II) at 6:21-30:1.
[186] *Id.* at 31:2-47:13.
[187] *See* Doc. 459 (Trial Tr. Vol. IV) at 9:18-21:13, 26:7-31:10.
[188] Doc. 459 (Trial Tr. Vol. IV) at 42:20-44:19.
[189] *Id.* at 56:23-59:24.

To begin, Ms. Patrick primarily testified to the results of her laboratory testing of substances recovered from the SHIVA search. That testimony is entirely separate from testimony about methods of chemical synthesis, and Dr. Bozenko's testimony does nothing to call Ms. Patrick's testing into question. Indeed, Bressi himself testified that he had no issue with Ms. Patrick's testing.[190] So Ms. Patrick's "analytical chemistry" testimony is undisputedly acceptable.

Second, an expert need not be "the best qualified . . . [nor] have the specialization that the court considers most appropriate" in order to testify.[191] Furthermore, there is no requirement that the expert be "correct" before her opinion can be admitted.[192] Instead, "the proponent of the evidence [need only] show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion."[193] The Count determined that Ms. Patrick's testimony was reliable following pretrial briefing and a hearing,[194] and one discrepancy drawn out at trial does not undermine that finding. Indeed, the proper

---

[190] Doc. 461 (Trial Tr. Vol. VI) at 65:21-66:6 (Government: "So if it was planted, then you agree that [Ms. Patrick's] analysis was correct?" Bressi: "On item 1.3, yes." Government: "Oh, so her analysis was correct, right?" Bressi: "I didn't say it wasn't." Government: "Okay." Bressi: "Analytical chemistry and synthetic chemistry are two different branches." Government: "All right. So she wasn't—in your opinion, she wasn't an expert qualified to testify on that, right?" Bressi: "On synthetic chemistry, no."); *see* Doc. 457 (Trial Tr. Vol. II) at 53:1-54:3.

[191] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

[192] *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)).

[193] *Id.* (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

[194] Doc. 350.

means of addressing "shaky but admissible evidence" is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."[195] Bressi conducted his cross-examination on this issue; that is sufficient.

Finally, Dr. Bozenko did not definitively contradict Ms. Patrick's testimony. He clearly stated that he could not offer an absolute opinion on whether or not Ms. Patrick's recipe would produce acetyl fentanyl. Dr. Bozenko noted that he "d[id]n't represent all of organic chemistry."[196] Although it was his understanding that the recipe would not work,[197] he "could not eliminate" the possibility that the reaction would produce some amount of acetyl fentanyl.[198]

Accordingly, the Court finds that there was no error or prejudice in admitting Ms. Patrick's testimony. She was duly qualified as an expert witness, and her testimony was reliable. To the extent it was erroneous, Bressi was fully permitted to cross-examine. Moreover, even excluding all of her testimony about chemical synthesis, Ms. Patrick's testimony about chemical testing is undisputedly reliable and provides strong evidence of Bressi's guilt. Thus, Bressi is not entitled to a new trial on this issue.

---

[195] *Mitchell*, 365 F.3d at 245 (quoting *Daubert*, 509 U.S. at 596).
[196] Doc. 459 (Trial Tr. Vol. IV) at 43:1-3.
[197] *Id.* at 44:17-19.
[198] *Id.* at 58:23-59:1.

### 3.    Witness Testimony

Bressi complains that testimony elicited from one of his witnesses on cross-examination was improperly admitted because it was not relevant and unfairly prejudicial.[199] On Government questioning, Jennifer Schuman testified that she was "intimidated" by Bressi, that she believed him to be the embodiment of Shiva, "the destroyer of God," and that Bressi had made statements to his employees that he could "dissolve you in Hydrochloric acid" or blow "pixie dust" "in your face and make you forget everything."[200] Ms. Schuman also affirmed that she was reluctant to be a witness "because [she was] afraid of Mr. Bressi."[201] Bressi's counsel objected to this testimony several times at trial.[202] The Government at trial and in opposition argued that this testimony was proper because Bressi "opened the door" to it by eliciting testimony about his good character on direct examination, including that Bressi had developed a "fatherly" relationship with Ms. Schuman's daughter and that he had paid her college tuition and bought her a car, along with testimony that impugned the Government, including that Ms. Schuman felt threatened by law

---

[199]  Doc. 436 at 11-12 (citing Fed. R. Evid. 401, 403).

[200]  Doc. 460 (Trial Tr. Vol. V) at 97:13-14, 98:8-17, 99:11-24. Shiva is a god of the Hindu "Trimurti," a triad of deities responsible for the creation, preservation, and destruction of universe. Trimurti, Brittanica (Jan. 7, 2025), https://www.britannica.com/topic/trimurti-Hinduism. Brahma is the creator, Vishnu is the preserver, and Shiva is the destroyer. *Id.* This belief appears to be the focus of Ms. Schuman's comment; Bressi is a Tantrist (a sect of Hinduism). *See* Doc. 368 at 8.

[201]  *Id.* at 103:5-12.

[202]  *Id.* at 97:15-18, 98:22-25, 102:20-23.

enforcement during an interview.[203] In its opposition, the Government further argues that its questioning was generally permissible to demonstrate Ms. Schuman's incentive to testify on Bressi's behalf for fear of retribution.[204]

On cross examination, the Government was permitted to inquire into "the subject matter of the direct examination and matters affecting the witness's credibility."[205] "[T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit the witness."[206] Credibility attacks may be "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."[207] Such questioning is always subject to Federal Rule of Evidence 403's balancing test between probative value and prejudice, but the Supreme Court has advised that "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."[208]

The Court concludes that inquiring as to whether Ms. Schuman feared Bressi and asking about specific bases for that fear was relevant and a perfectly acceptable

---

[203] *Id.* at 87:19-22, 88:7-12 (asking "[D]id Mr. Bressi do some good things for Brittany?"), 95:14-24.
[204] Doc. 450 at 10.
[205] Fed. R. Evid. 611(b).
[206] *Davis v. Alaska*, 415 U.S. 308, 316 (1974).
[207] *Id.*
[208] *United States v. Abel*, 469 U.S. 45, 52 (1984).

line of questioning for the Government to pursue on cross-examination, whether or not Bressi opened the door to it. "Questioning a witness' motives for testifying is precisely the type of inquiry permissible on cross-examination."[209] Moreover, the Court finds that the risk of prejudice from Ms. Schuman's testimony did not outweigh its probative value.[210] Ms. Schuman testified about the work being done at SHIVA and her participation in several trips in which Bressi obtained "loan" money from Henderson to the effect that she believed the work was legitimate and the loans were on the up-and-up.[211] The Government sought to paint a different picture: that Ms. Schuman turned a blind eye to evidence that Bressi was involved in illegal activity because he paid his employees well and threatened them with retribution if they were disloyal. Whether Ms. Schuman was afraid of Bressi is therefore extremely probative of whether she would be willing to testify fully and openly about the goings-on at SHIVA. On the other hand, the risk of prejudice was not particularly high. Ms. Schuman specifically stated that some of the "threats" Bressi made were jokes,[212] and evidence that a witness was generally afraid of the defendant

---

[209] *United States v. Thompson*, 359 F.3d 470, 479 (7th Cir. 2004) (holding that cross-examination about the defendant's past violence and continued threats of violence toward a witness was permissible).

[210] Fed. R. Evid. 403.

[211] *See* Doc. 460 (Trial Tr. Vol. V) at 84-96.

[212] *Id.* at 99:16-20 (stating that the hydrochloric acid comment was a joke).

is not especially prejudicial—indeed, that is exactly why the evidence is relevant and probative.[213]

Accordingly, the Court finds that there was no error in permitting the Government to elicit testimony about Ms. Schuman's fear of Bressi.

### 4.    Closing Argument

Next, Bressi argues that the Government's closing argument included "several prejudicial and inflammatory statements" which undermined the validity of the jury's verdict.[214] Specifically, Bressi takes issue with two statements allegedly designed to "alienate" him from the jury (that he is a "very small man" who thinks that he is "the smartest man in the room" while "just about everybody else [including the jury] is impossibly stupid"), and the Government's invocation of the harm fentanyl has done to society at large.

In closing, the Government "may 'argue reasonable inferences from the evidence,' but may not 'misstate evidence.'"[215] Arguments should not be "calculated to inflame the jury's prejudices,"[216] nor should a prosecutor "ask jurors to find a defendant guilty as a means of promoting community values, maintaining order, or

---

[213] *See Thompson*, 359 F.3d at 479-80 (affirming district court's balancing permitting testimony that witness was afraid of defendant).

[214] Doc. 436 at 16-17.

[215] *United States v. Fulton*, 837 F.3d 281, 306 (3d Cir. 2016) (quoting *United States v. Carter*, 236 F.3d 777, 784 (6th Cir. 2001)).

[216] *United States v. Ford*, 618 F. Supp. 2d 368, 395 (E.D. Pa. 2009) (citing *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 284-85 (3d Cir. 1999)).

discouraging future crime."[217] Ultimately, the Supreme Court has advised that "a criminal conviction is not to be lightly overturned on the basis of the prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial."[218] "Reversal is only warranted when the 'prosecutor's behavior amounted to prejudicial error.'"[219] Whether comments were prejudicial depends on "the scope of the comments within the context of the entire trial, the effect of any curative instructions given, and the strength of the evidence against the defendant."[220]

The prosecutors' comments were: (1) Small Man: "[A]s jurors, your whole thing should be to apply the law to the facts and to hold that very small man over there, and I don't mean small by virtue of his physical stature, but to hold that very small man over there responsible for his heinous actions"[221]; and (2) Smart/Stupid: "If the evidence in this case has proved anything, it showed that Anthony Bressi thinks he's exceptionally intelligent. But what truly distinguishes Bressi is not only

---

[217] *United States v. Rodriguez*, 597 F. App'x 713, 715 (3d Cir. 2015) (quoting *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000)).

[218] *United States v. Bonner*, 177 F. App'x 253, 255 (3d Cir. 2006) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)).

[219] *Id.* (quoting *Young*, 470 U.S. at 12).

[220] *United States v. Gambone*, 314 F.3d 163, 179 (3d Cir. 2003) (citing *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999) and *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc); *see United States v. Keleta*, 949 F.3d 1082, 1091 (8th Cir. 2020) (listing similar considerations).

[221] Doc. 461 (Trial Tr. Vol. VI) at 186:21-25.

does he think he is exceptionally intelligent, he also simultaneously believes that just about everybody else is impossibly stupid. And I hate to break it to you folks, but that includes all of you."[222]

These comments were unnecessary and did not encourage the most calm and measured consideration of the evidence. However, considering the relevant factors, they were not unfairly prejudicial. First, the comments were relatively fleeting. The "small man" point boils down to essentially a phrase, and the smart/stupid comment is two sentences (Bressi agrees that the evidence supported the Government's argument that he believes that he is intelligent). Two brief insults do not taint a trial lasting six days and closing arguments covering over thirty-four pages of transcript.[223] Second, the Court advised the jury to "[p]erform [its] duties fairly and impartially" without influence from "sympathy, prejudice, fear, or public opinion."[224] It also instructed that "statements and arguments of the lawyers for the parties in this case" are not evidence.[225] Although these are general instructions, they have some curative effect because any misconduct was not particularly severe,[226] and the Court did not specifically correct the statements at issue because Bressi did

---

[222]  *Id.* at 182:13-19.

[223]  *United States v. Savage*, 85 F.4th 102, 124 (3d Cir. 2023) (citing *Zehrbach*, 47 F.3d at 1260, 1267 and *United States v. Homer*, 545 F.2d 864, 868 (3d Cir. 1976)).

[224]  Doc. 461 (Trial Tr. Vol. VI) at 188:18-20.

[225]  *Id.* at 189:6-8.

[226]  *See Government of the Virgin Islands v. Mills*, 821 F.3d 448, 462-63 (3d Cir. 2016); *Rodriguez*, 597 F. App'x at 716 (finding that general instructions that attorney arguments were not evidence had a curative effect).

not object to them. Third, the evidence of Bressi's guilt was overwhelming, as detailed above.[227]

As to comments about the general damage done by fentanyl, the Court located two possibly objectionable statements.[228] In redirect examination of Agent O'Malley, the prosecution asked about fentanyl's "impact . . . on society," to which Agent O'Malley responded that it "has devastated this country" and caused "70,000 overdose deaths a year."[229] And in closing, a prosecutor noted that: "make no mistake, ladies and gentlemen, what he was doing here, spreading poison east and west to finance his mostly fantasy life was monstrous. It was ruin[ous] to untold numbers of peoples' health and lives."[230]

The first comment, while unnecessary, did not ask the jury to punish Bressi to promote social order. The point was not made in the context of advocacy to the jurors and arose from a responsive line of questioning about the modern forms of fentanyl.[231] Moreover, as soon as Bressi's counsel objected, the prosecution ceased its questioning.[232] The second comment was based in the evidence. The record clearly established that Bressi was distributing huge quantities of fentanyl "east" to

---

[227] *See Savage*, 85 F.4th at 125; *Mills*, 821 F.3d at 465 (holding that misconduct which "stepped far over the line of what is acceptable at trial . . . was more than counterbalanced by the strength of the evidence and thus did not affect Mills's substantial rights").

[228] The trial transcripts were not available to either party during briefing, so the Court is the first to fully review this record.

[229] Doc. 459 (Trial Tr. Vol. IV) at 172:16-24.

[230] Doc. 461 (Trial Tr. Vol. VI) at 185:21-24.

[231] Doc. 459 (Trial Tr. Vol. IV) at 172:9-15.

[232] *Id.* at 172:25-173:10.

Philadelphia and "west" to Cleveland. It is a perfectly fair inference to conclude that those drugs became many doses which were sold on the street and had a negative impact on consumers' lives. Making that point did not suggest that the jurors should hold Bressi responsible for anything but his own conduct. In any event, both of these statements were exceedingly brief and did not result in any prejudice when considering the overwhelming evidence of Bressi's guilt.[233]

Accordingly, Bressi was not prejudiced by the Government's statements, even if they were improper.

### 5. Cumulative Effect

A defendant may argue that several errors which do not individually compel a new trial combine to render his trial constitutionally unfair.[234] To raise a cumulative error argument, the defendant must have identified more than one error, and will only be entitled to relief "when the combined errors 'so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'"[235] Here, Bressi has identified, at most, one error: the Government's statements in closing argument. But one error is not enough, and the Court has held that those statements did not prejudice the trial. Bressi's cumulative error argument fails.

---

[233]  *Gambone*, 314 F.3d at 179; *see Rodriguez*, 597 F. App'x at 716.

[234]  *United States v. Bailey-Snyder*, 923 F.3d 289, 296 (3d Cir. 2019) (quoting *United States v. Hill*, 976 F.2d 132, 145 (3d Cir. 1992)).

[235]  *Id.* (quoting *Hill*, 976 F.2d at 145).

## III.    CONCLUSION

Anthony Bressi confessed that he committed the crimes with which he was charged. His confession was extensive, detailed, and corroborated. It was also voluntary and admissible. Combined with the rest of the Government's case, there was essentially no doubt of Bressi's guilt. The jury considered the evidence with the proper guidance and returned a conviction. There was no error in reaching that result.

Since law enforcement executed the SHIVA search warrant, Bressi has unleashed an avalanche of words in various attempts to wriggle out of criminal accountability. The record in this case contains over 100 pages of his confessions and over 200 pages of his testimony at various hearings and at trial, not to mention conversations not entered into evidence and many pages of legal briefing.

Bressi's acute logorrhea has begotten increasingly fantastical tales to explain away the mountains of evidence demonstrating his guilt. His confession was all a ruse to save himself, his fiancée, and his employees; it was induced by threats and false promises from law enforcement; he was unfairly targeted for investigation because of his prior criminal record, or maybe because he was involved in high-level international corporate espionage,[236] or maybe because he was on the brink of perfecting an invention that would revolutionize global energy consumption and

---

[236] *See* Doc. 461 (Trial Tr. Vol. VI) at 78:8-81:3 (Bressi discussing his consulting work and explaining that "[a] lot of these things are very secretive, so I handle it just—I have a—a bit of a background when it comes to, shall we say intelligence-type stuff, so I handle it like that").

undermine the entrenched energy interests,[237] or maybe all of these at once; and he is, in fact, one of the most brilliant and capable scientists of the modern era, poised to deliver society-altering innovations on unimaginably short timelines if not for Government interference.

The jury was not convinced.

For the above-stated reasons, Bressi's motion for a judgment of acquittal or a new trial is denied in large part.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[237]  *See id.* at 84:7-18 (Bressi claiming that the ZPU "was a multi-trillion dollar project" which "would have cost OPEC around $20 trillion dollars during the course of the Patent life, so."); Doc. 460 (Trial Tr. Vol. V) at 158:11-20 (stating that the ZPU "would have completely changed society, basically.").